**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CHRISTOPHER HARMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> STELLANTIS N.V., JOHN JACOB PHILIP ELKANN, DOUGLAS R. OSTERMANN, ANTONIO FILOSA, and JOAO LARANJO, <br><br> Defendants. | Case No. 1:26-cv-02839 <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **CLASS ACTION** <br><br> <u>Demand for Jury Trial</u> |

Plaintiff Christopher Harman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Stellantis N.V. ("Stellantis" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Stellantis' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all persons who purchased Stellantis common stock on the New York Stock Exchange ("NYSE") between February 26, 2025, and February 5, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Stellantis' earnings projections for 2025. Defendants' statements included, among other things, confidence in Stellantis' ability to achieve guided earnings benchmarks, the belief in a growing electrification market and Stellantis' ability to capitalize upon it to achieve guided earnings benchmarks while improving on all key performance indicators ("KPIs") each quarter.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Stellantis' earnings growth potential, notably, that it was not truly equipped or positioned to grow its adjusted operating income ("AOI") as forecasted; that electrification was either not truly growing as Defendants claimed or that Stellantis was not well positioned to capitalize upon it and convert the opportunity to growth. Instead, Stellantis would ultimately be required to take on considerable charges to adjust its priority, focus, and overall execution in a shift away from battery-powered electric vehicles ("BEV"). Such statements absent these material facts caused Plaintiff and other shareholders to purchase Stellantis' securities at artificially inflated prices.

4.      On February 6, 2026, Stellantis announced €22 billion in charges alongside a "reset" of the Company's business and a shortfall, even discounting the charges, against Defendants' previously guided AOI benchmarks. Pertinently, Defendants disclosed the charges and reset were

due in significant part to the need to shift organizational priorities, stakeholder relationships, supply chains, execution, and quality control due to "an initial overestimation of pace of adoption of electrification in the regions." Defendants further pointed specifically to "substantially reduced volume and profitability expectations for BEV products."

5. Investors and analysts reacted immediately to Stellantis' revelation. The price of Stellantis' common stock declined dramatically. From a closing market price of $9.54 per share on February 5, 2026, Stellantis' stock price fell to $7.28 per share on February 6, 2026, a decline of about 23.69% in the span of just a single day.

## JURISDICTION AND VENUE

6. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant Stellantis' business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**THE PARTIES**

11.     Plaintiff purchased Stellantis common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Stellantis is attached hereto.

12.     Stellantis N.V. is a Netherlands corporation with its principal executive offices located at Taurusavenue 1, 2132 LS Hoofddorp, The Netherlands. During the Class Period, the Company's common stock traded on the NSYE under the symbol "STLA."

13.     Defendant John Jacob Philip Elkann ("Elkann") was, at all relevant times, the Executive Chairman of the Board of Stellantis.

14.     Defendant Douglas R. Ostermann ("Ostermann") was the Chief Financial Officer of Stellantis until he departed the Company on September 29, 2025.

15.     Defendant Antonio Filosa ("Filosa") was, at all relevant times, the Chief Operating Officer of North American Brands of Stellantis. Defendant Filosa also served as the Company's Chief Quality Officer until his appointment to the roles of Chief Executive Officer and Executive Director of Stellantis on June 23, 2025, roles he maintained at all relevant times through the remainder of the class period.

16.     Defendant Joao Laranjo ("Laranjo") was, at all relevant times following his appointment on September 29, 2025, the Chief Financial Officer of Stellantis following Defendant Ostermann's departure from the Company and role.

17.     Defendants Elkann, Ostermann, Filosa, and Laranjo are sometimes referred to herein as the "Individual Defendants." Stellantis together with the Individual Defendants are referred to herein as the "Defendants."

4

18.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Stellantis' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.     Stellantis is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

20.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Stellantis under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

21.     Stellantis is a global automobile designer, engineer, manufacturer, and distributor.

22.     The Company also provides contracting, financing, leasing services, and rental services, and also engages in after-market parts businesses.

23. Stellantis operates under various notable brands both inside and outside the US, including Abarth, Alfa Romeo, Chrysler, Citroën, DS Automobiles, Dodge, Fiat, Jeep, Maserati, Ram Trucks, Opel, Lancia, Vauxhall, Peugeot, Free2move, Share Now, Leasys, and Comau.

***The Defendants Materially Misled Investors Concerning Stellantis' Current Opportunity in Electrification and the Depth of Restructuring Required to Capitalize Upon It***

<u>*February 26, 2025*</u>

24. On February 26, 2025, Defendants issued their fourth quarter and full year results for fiscal 2024. Defendants pertinently highlighted a strong, growing market for the EV segment. In pertinent part, Defendant Elkann provided the following highlights:

> And lastly, we have been very focused in empowering our regions ***making sure that decisions are made where our customers are*** and making sure that problems are solved where they happen. Now if we look forward, what we really want to focus on is growth, profitable growth. We need our company to go back to profitable growth. Execution. We need to be rigorous in making sure as we develop, as we build, as we sell our cars we are rigorous and we execute.

> And lastly, profitability. Top line doesn't necessarily equate with profits. And we want to make sure that at Stellantis, it does and we also want to make sure that those profits convert into cash. ***One of the things that we've been prioritizing to that end is really making sure that we spend capital where our customers are and in order to do this, we have been very deliberate in making sure that our customers are free to choose.***

> Our offering, both in products and powertrains has been extending in order for us to have a much bigger reach in terms of coverage of the market going from what we do in hybrids in Europe, going to combustion engines in the U.S. or doubling down where we're very strong in South America, in Brazil with biohybrids.

> . . .

> ***Electrification is growing***. China is the largest market in the world, and we see progress in terms of market share overall. And we believe that we have made significant inroads both in terms of our offering of electric vehicles, hybrid vehicles. We believe that software is becoming a major feature, and we see this with AI and autonomous features. Last year, Tesla launched its robotaxis, more recently, BYD launched its Eye of God features. This is the reason why we have decided that

software and engineering should be tighter together in order for us to make sure that we are fast in terms of the applications we work on software.

(Emphasis added).

25.    During the question-and-answer segment, Defendant Elkann confidently continued touting Stellantis' opportunity in electrification, in pertinent part:

<Q: George Anthony Galliers-Pratt – Goldman Sachs Group, Inc. – Head of European Automotive Research & Equity Analyst> John, you did allude to this in your closing comments, but I really wanted to just ask a question about the group. Obviously, Stellantis was formed during a different period when we seemed to be heading towards global convergence and powertrains with high levels of electrification and the risk presented by Chinese OEMs to global carmakers was also substantially lower.

Obviously, the industry dynamics have changed. And therefore, the question I really had was operationally, does it still make sense to have a global auto company in a world which is seemingly increasingly geopolitically decoupled and where perhaps it doesn't make sense to be one of the largest car players. But in fact, that may work against you in what is an increasingly dynamic industry. And perhaps related to this, if there was a clear case to create shareholder value through breaking up the organization, is that something you would consider or explore?

<A: John Jacob Philip Elkann> George, that's a great question. And *I do believe that what is actually happening is playing to our strengths*. And the reason why we have been empowering the regions is exactly to make sure that we're able to create regional scale. And we believe that our regional scale in the largest markets in which we operate is actually a big strength. And *a big strength in allowing us to be differentiated in terms of what our customers want*, but also in terms of what the different regulations are.

Equally, if we look at different aspects of having global reach and without touching upon electrification, which has different velocities among the regions, but just on software, or on some of the features that we've been working on our products, those actually benefit from us being global. And if we look at the incumbent world or the insurgent world, a Toyota or a Tesla, they're actually gaining market share, and they are of global size and global reach. But I believe that in our case, where we have regional scale and global scale, we're actually very well equipped for the world to come.

. . .

<Q: Thomas Besson – Kepler Cheuvreux – Head of Automobile Sector>I have a question to start, please, on the dynamic of the year. Clearly, growth has become

7

again the key priority for the group. But it seems that for the time being, it's more an H2 story. Could you confirm that? And could you confirm that absolute inventory levels may be going up, which I think is well understood by year-end, while maintaining days of sales. I had the impression that eventually inventories were at an appropriate level. And I have a follow-up question, which is linked to a timely topic with tariffs in the USMCA region that you've mentioned in your comments. Could you try to help us understanding what the impact would be on your financial outlook for you as much as for the industry if these tariffs were to be implemented?

<A: John Jacob Philip Elkann> Those are 2 great questions. And -- on the tariffs, the discussions are ongoing. It's really premature to be able to express any view. We strongly believe that the real opportunity is really to try and close the loophole for 4 million cars that are sold in America that don't have any U.S. content. And as conversations progress, and we're very aligned with the [indiscernible] in those conversations and making sure that what was negotiation -- what was negotiated by the first Trump administration to create USMCA is actually respected and valued and eventually improved.

***We are, of course, working in a very deliberate way in trying to understand what consequences this would have for us***. So what I can reassure you is we're doing the work, ***we are prepared and have different scenarios in place***. Which of these scenarios will play out is premature for us to discuss today without having the knowledge. I also think that ***'25 is a year where we need to get to our potential***. We have had the first chapter of our history, which was very much linked to creating the synergies and to making our company efficient. But we have not grown. And so '25 is a year on the back of product launches, 20 in '24, 10 in '25 as Doug was expressing that we are in the trajectory of ***making sure that we get back to growth and profitable growth***. In terms of the dynamic H1, H2, why don't you take that, Doug?

<A: Douglas R. Ostermann> Yes. So I think your question on inventory is a good one. When we think about the inventory dynamic, of course, ***we're always thinking about inventory relative to sales pace, right, because it's all kind of about managing to days supply***. Now as we're launching a number of products this year that are going to fill in these kind of blank spaces in our product portfolio, if we look at first half, of course, we know in Europe, the Smart Cars are just -- a number of the sister cars are just entering production right now, and we'll be in the market in March. We talked a little bit about a few of those in terms of C3 Aircross, the Frontera, the Fiat Grande Panda. But we also have some STLA Medium vehicles off the new STLA Medium platform.

As you know, we've launched the E-3008, E-5008, and the Grandland, just very recently Opel launched that vehicle. But we also have the C5 Aircross coming later in the year. So I would expect to see absolute inventories ramp a little bit towards the end of the year as these vehicles come into the European market and the sales

pace picks up, but I don't think we'll see significant increase even on an absolute level, but really, we'll be managing to a days supply perspective.

North America, kind of a similar story in many respects. We're going to be getting the new HD pickups here in the first quarter, which is very exciting because pretty much now all of our light-duty and heavy-duty lineup will be renewed after we get the new HDs out. When we look at second half, of course, we're very excited about having the Cherokee replacement come into the market with our first HEV powertrain. And again, I would expect that we would see a little bit of pickup in absolute numbers of inventory, but again, keeping days supply on a very reasonable level.

(Emphasis added).

26.     Defendant Ostermann also spoke directly to the company's AOI expectations for the year, with a particular focus on a ramp during the back half, during the following pertinent exchange:

> <Q: Patrick Hummel – UBS Investment Bank – Executive Director & Head of European Autos Research> My first question goes to Doug, please. We talked about your volume expectations for 2025 and the impact of the new model launches. Can you just elaborate a little bit on the other key building blocks in the AOI bridge? What about pricing? What about costs? Can you share your expectations, please?
>
> And my second question goes to John, please. You said this year has to be the year of growth, but how long can you give the company, how long do you give the company to get fully back on track, show the full potential again? And what is that full potential in terms of AOI margin and free cash flow? Is that still double-digit AOI margin? Is it still EUR 10 billion free cash flow? What is it that you think this company should be capable of delivering? And in that context, do you think the company has to invest more? Has the company underinvested under Tara's leadership? Or do you think that's not an issue.
>
> <A: Douglas R. Ostermann> I will start. Okay. So a couple of comments on the AOI and AOI development. Look, I think when we look at North America, for example, I think we'll be looking to run at kind of low single digit during the first half. ***It's very much will be more back half where we can, I think, achieve margins in kind of the mid- to high single-digit range.*** In large Europe, of course, I think we have significant opportunities to improve over the kind of 4.1% we ran for the full year of 2024.
>
> Now I know you specifically asked about pricing and costs. So let me try and just kind of address those 2 topics a little bit. I think it seems to be that the ***market expectations for North America are generally in the kind of 1% to 2% headwind***

*on pricing*. When I think about Stellantis specifically, ***we have done a significant recalibration in North America during the second half of 2024. We're in a much more competitive place right now***.

And so while I don't think we're going to see significant adjustments during the first half from that point, of course, the year-over-year comparison when we look at the really, really strong pricing we had in the market in early 2024 is going to make for a year-over-year comparison that probably will reflect that change, right? ***But I see really the second half maybe where we can abate some of those pricing headwinds as we bring in some very exciting new products***. And really kind of I think when we look at Europe, Europe, of course, stacks up as a very, very competitive environment, as you know. But again, because we have so much new product in our core segments, so in the B segment and in the C segment, I think a lot of that new product will be a mitigating factor against some of those competitive headwinds. So hopefully, that gives you a little bit of color.

Now let me just try to address costs again quickly. I think we have a significant opportunities on cost in a couple of different areas. When we look at direct material costs, of course, we do see some increases in steel and aluminum prices. We have, I think, very good contracts in terms of how those prices step up. I don't think we have a huge amount of exposure there. On the components and raw materials for BEV, as you know, this year, we've seen prices come down and help us quite a bit on the raw material side there. When I think about the big opportunities for us on the cost side, frankly, it's in looking at the TPC of our vehicles. We really have the opportunity for some good technical improvements on TPC, but I think can really help us on the cost side, and we are hard at work at that. So I think that's the big opportunity for us in this coming year.

(Emphasis added).

27.     In the accompanying press release, Stellantis provided its Fiscal 2025 guidance as follows, in pertinent part:

> Net Revenue Growth: Positive
> Adjusted operating income margin: Mid-Single Digits
> Industrial free cash flows: Positive

<u>*April 30, 2025*</u>

28.     On April 30, 2025, Stellantis issued a press release reporting its first quarter results, in pertinent part, as follows:

- Net revenues of €35.8 billion, down 14% compared to Q1 2024 primarily due to lower shipment volumes, as well as unfavorable mix and pricing

10

- Consolidated shipments(1) of 1,217 thousand units, down 9%, reflect lower North American production, a consequence of extended holiday downtime in January, product transition impacts and lower industry LCV volumes in Enlarged Europe
- Total new vehicle inventory of 1,210 thousand units (Company inventory of 333 thousand units) on March 31, 2025, broadly in line with December 31, 2024
- Commercial recovery actions included the launch of 3 all-new products and several updated nameplates in Q1 2025, contributing to increased EU30 market share compared to Q4 2024, and improvement in U.S. retail order volumes
- The Company is suspending its 2025 financial guidance due to tariff-related uncertainties

29.     Defendant Ostermann was quoted in the release, highlighting that despite "Q1 2025 top-line results were below prior year levels" the Company's "other KPIs reflect early, initial progress on our commercial recovery."  Continuing, Defendant Ostermann clarified: "North America is at a very early stage, with improvement in retail order intake, while we are seeing sequential improvement in EU30 market share. At the same time, the Company is benefitting from its diverse geographic footprint"

30.     The release further informed investors Stellantis was temporarily suspending its full-year guidance in light of "evolving tariff policies, as well as the difficulty predicting possible impacts on market volumes and the competitive landscape."

31.     During the contemporaneous earnings call, Defendants Ostermann highlighted Stellantis' focus on "execution … amidst what is a very turbulent backdrop."  In pertinent part, he outlined the Company's execution highlights as follows:

> First is the top line performance in Q1 in terms of revenue and shipments, which was difficult and not where we want to be. ***At the same time, we are seeing important progress resulting from our commercial recovery actions. Second, we're executing well on the start of our 2025 new product wave, filling in product gaps and expanding our opportunities***. And third, I'll discuss how the company is positioned vis-a-vis the tariff dynamic and the management team's focus on reducing these impacts.
>
> Now let's look at a summary of today's presentation. First, in terms of the top line results, ***we had challenging year-over-year comparisons in the period***. Shipments

11

of 1.22 million units were down 9%, while revenues of EUR 36 billion were down 14%. ***At the same time, we were encouraged by initial progress on our commercial recovery efforts***. For example, our EU30 market share is edging higher, and the U.S. is seeing improvement in retail order intake. A big contributor is our new product wave. Q1 saw strong launch execution with 3 all-new products kicking off in Europe, along with 3 refreshed products, including the Ram heavy duty.

Turning to the -- of course, to the issue of the day with tariffs. We are taking actions to protect the company in the short term, including temporary shutdowns and layoffs. While engaging with relevant governments on the policies themselves. Stellantis, of course, appreciates the tariff relief measures decided by President Trump this week, and we're assessing the impact of the updated policy on our North American operations. I'll talk a little bit more about that later in the presentation.

Nonetheless, we remain subject to extreme uncertainties. The policy framework on tariffs has shifted since we initially set our 2025 expectations and is continuing to involve -- to evolve. ***And so we're taking what we believe is the appropriate step of temporarily suspending our financial guidance***. I'll come back to the tariffs and guidance later in my prepared remarks, but now let's go into more detail on what occurred in Q1 of 2025.

(Emphasis added).

32.     Defendant Ostermann went on to tout Stellantis' progress toward its commercial recovery, highlighting their previous efforts to reduce inventories and recalibrate pricing leading into 2025, in pertinent part:

Next, ***let's look at how our new products and other go-to-market improvements are driving our recovery. In Europe, where we've now launched 7 major all-new products in the last 6 months, we've begun to see sequential market share improvement.*** Q1 2025 share of 17.3% was 190 basis points higher than Q4 of 2024 and, in fact, was the highest quarterly level since Q1 of 2024. European shares improved particularly in electrified products, as ***Stellantis climbed to the #1 position in hybrids in Q1 and climbed to the #2 in BEVs with Q2 to benefit more fully from the new B segment products. We have the opportunity to continue our market share momentum in Europe.***

Turning to the United States. The commercial recovery is at an earlier stage. After successfully reducing inventories and recalibrating pricing in the second half of 2024, the company is seeing improvement in the retail channel in key nameplates like the Jeep Grand Cherokee and the Compass and in Ram light- and medium-duty trucks. We're also seeing strong retail order intake from our dealers. Overall, I'd say we're seeing encouraging progress on the commercial recovery.

Now let's turn to the shipment and revenue comparisons. ***Consolidated shipments fell 118,000 units or 9% year-over-year to 1.22 million***. And let's break that down a bit geographically. ***A little over 80,000 units of the decline was in North America, where shipments fell 20% year-over-year***, much more steeply than the sales ***due primarily to a later start of production in certain factories in January after extended downtime. And secondarily, due to the transition to refreshed and upgraded Ram 2500 and 3500 models***.

***The remainder of the shipment decline, almost 40,000 units, was driven by Europe*** where shipment -- ***shipments declined primarily due to product transition gaps***, in particular, from the ICE Fiat 500, which remains on hiatus until very late in this year. And to a lesser degree, products like the Citroën C3 Aircross and Opel/Vauxhall Frontera, which were reintroduced in mid-Q1, but, of course, will have a bigger impact on our volumes in Q2.

. . .

Now the next page, let's review our regional segments. ***In North America, shipments and revenues were lower*** primarily due to extended January shutdown that I mentioned previously. ***This was due to how production ramped following very deliberate inventory reduction in the second half of 2024***. It also was negatively impacted by the switchover of the medium- and heavy-duty Ram trucks.

In Enlarged Europe, I mentioned previously the sequential improvement in our market share, which I think was even more notable given the soft industry volume that we had in LCVs, where, of course, we have a very strong share. ***We're particularly encouraged by the increase in BEV sales mix as we start the year on the back of a significant expansion of our electrified offerings across the B and C segments.***

South America delivered 6% year-over-year revenue growth on 19% higher shipments as the company maintained its #1 market position, giving it the biggest benefit from a dramatic recovery in the Argentinian market and a more moderate increase in Brazil.

Middle East and Africa continued to see negative year-over-year comparisons due to import restrictions in the region, especially in Algeria, but the company has been increasing its local production to mitigate this impact.

(Emphasis added).

13

*May 29, 2025*

33.      On May 29, 2025, Stellantis issued a press release announcing the promotion of Defendant Antonio Filosa from his role of Chief Operating Officer for the Americas and Chief Quality Officer "to assume CEO powers on June 23."

34.      According to the release, Stellantis' "Board selected Antonio Filosa to be CEO based on his proven track record of hands-on success during his more than 25 years in the automotive industry, the depth and span of his experience around the world, his unrivalled knowledge of the Company and his recognized leadership qualities."

35.      Defendant Elkann was quoted on the release, promoting Defendant Filosa, in pertinent part as follows:

> Antonio's deep understanding of our Company, including its people who he views as our core strength, and of our industry equip him perfectly for the role of Chief Executive Officer in this next and crucial phase of Stellantis' development . . . I have worked closely with Antonio over the past six months during which time his responsibilities have increased, and his strong and effective leadership spanning both North and South America at a moment of unprecedented challenge have confirmed the excellent qualities he brings to the role. Together with the entire Board, I look forward to working with him.

(Emphasis added).

*June 24, 2025*

36.      On June 24, 2025, Stellantis issued another release, announcing the appointment of a new management team under Defendant's Filosa's new leadership.

37.      In pertinent part, Defendant Ostermann retained his role as "CFO, tak[ing] responsibility for mergers and acquisitions and joint ventures," while Defendant Filosa would retain his role as head of North America and American Brands while holding the CEO position.

14

*July 21, 2025*

38.     On July 21, 2025, Defendants conducted an earnings call, discussing the preliminary results for the first half of 2025 ahead of the full result release 8 days later.

39.     During the earnings call, Defendant Ostermann turned the discussion to Stellantis' AOI performance, highlighting the difficulties of the first half and shortfall against the Company's guidance, in pertinent part:

> So for the first half of 2025, the preliminary figures we've disclosed today are net revenues of approximately EUR 74.3 billion. ***Adjusted operating income of approximately EUR 540 million. AOI consistent with the company's definition excludes the impact of approximately EUR 3.3 billion of net charges from our IFRS figures.***
>
> . . .
>
> ***First, if we turn to AOI, there were really kind of 4 things that shifted the AOI level below the kind of low single-digit H1 expectations*** I discussed back in February when we set our initial full year 2025 financial guidance. And of course, before that guidance was suspended in April due to the tariff-related uncertainties. So the first was ***lower-than-expected volumes, where we've noted in prior updates the sluggish European LCV market. And on the passenger car side, where we suffered from a lower production ramp-up of certain newly launched products.***
>
> ***In North America, our fleet sales remained low relative to the market***, dragging on our share even as the retail side showed some encouraging improvement. Shipments were also impacted in the first half due to some downtime that we took in the initial period of the tariff announcements, particularly in our products that are produced in Europe, in Canada, in Mexico until we had some clarity on the policy itself.
>
> The ***second impact was really higher industrial costs***, including the impact of higher fixed asset absorption due to lower volumes, of course, and higher warranty costs.
>
> The third was foreign exchange with an impact of just under EUR 1 billion year-over-year. That was primarily related to the Turkish lira, strengthening the euro against the U.S. dollar and Brazilian real.
>
> And last was tariffs of approximately EUR 330 million net impact that was felt in the first half, and that's really consistent with the disclosed estimate that I made of EUR 1.15 billion in net tariff impact as we'll see more impact in the second half.

(Emphasis added).

40.    Stellantis also announced a significant €3.3 billion restructuring charge for the first half of 2025, as detailed by Defendant Ostermann during the earnings call, in pertinent part, as follows:

> Next, let's move to the net total of ***approximately EUR 3.3 billion of adjustments to AOI***, and I'll provide you some detail on that figure. First, ***approximately EUR 2 billion is related to management taking some decisive and tough decisions on product programs where we really couldn't see sufficient returns***. This included our hydrogen fuel cell EV efforts, as we announced to the market last week, which resulted in approximately EUR 700 million charge of that EUR 2 billion I mentioned, certain product cancellations and related supplier payments as well as restructuring charges mostly related to the European headcount reductions.
>
> Second, ***about EUR 700 million across 2 noncash items. The majority of this was related to impairments of certain Maserati vehicle platforms that really reflects the reality of the current sales pace that we see on those vehicles***.
>
> Third, there was a net expense of roughly EUR 300 million associated with several items related to the change in U.S. CAFE penalty rates going to 0 with the passage of major U.S. congressional legislation, the one big beautiful bill, including a write-down of the CAFE credits and a provision for purchase commitments netted against the release of the majority of our CAFE compliance cost provision.
>
> Last, approximately EUR 300 million relates to about 2/3 of an expansion of the Takata airbag recall campaign in Europe with the rest split between miscellaneous items. ***In total, about half of the approximately EUR 3.3 billion of net charges relates to future period expected cash flows and the other half are all noncash in nature***.

(Emphasis added).

41.    During the question-and-answer segment, Defendant Ostermann briefly discussed the company's BEV position in Europe, as well as the current state of competition in that market, during the following pertinent exchange:

> <Q: Horst Schneider – BofA Securities – Research Analyst> . . . we just had last week kind of warning from Renault, which was saying basically that there's increased competitive pressure in Europe. That just happened in June. So maybe

16

you can comment on that specifically in Europe, if you see something like that, too? And if you can share any further detail on that.

<A: Douglas Ostermann> Yes. I mean Europe is a very competitive environment. I won't disagree with our counterparts at Renault. I think we're very fortunate in that we have some fantastic new products, right, that are coming out. But for us, there's a number of headwinds that we are combating in Europe. I talked a little bit about the sluggish LCV market. Of course, ***the race to be compliant on the CO2 side with increased BEV penetration, we increased our BEV penetration in Europe in the first half to 13% and our BEVs have been very well received***. Our new B segment BEVs are based on very affordable LP technology. They have really nice ranges. I think the pricing is very attractive, and we make money on them. But it is a profitability headwind, of course, because we don't make as much money on a BEV in most cases as we do on the ICE counterparts.

***But it's a tough market as everybody tries to get up that scale to the levels that are going to be required for compliance***. Now luckily, because of the change in regulations, we all have 3 years to be compliant, right? So there shouldn't be a panic at the end of the year, which we had all kind of feared. But yes, Europe is a tough environment. I give our credit -- our team and the new products a lot of credit for being able to increase our market share sequentially second half '24 to '25 by 130 basis points despite a 13% decline in the area where we have basically one of our strongest market shares at 30% in LCV. So I think it's -- given the environment, as you said, which is pretty tough, I think it's quite a good accomplishment for the team. And certainly not where we want to be. We want to continue to strive for more. But yes, there are a lot of headwinds in Europe. You are correct on that.

(Emphasis added).

*July 29, 2025*

42.    On July 29, 2025, eight days after the preliminary earnings results were unveiled, Defendants issued a press release detailing the Company's second quarter, and more broadly first half 2025, results. In pertinent part, Stellantis outlined its results as follows:

- Net revenues of €74.3 billion, down 13% compared to H1 2024 primarily driven by Y-o-Y declines in North America and Enlarged Europe, partially offset by growth in South America
- Net loss of (€2.3) billion, including €3.3 billion of net charges excluded from Adjusted operating income(1), down compared to H1 2024 Net Profit of €5.6 billion. AOI(1) of €0.5 billion, with AOI margin(2) of 0.7%, below prior year levels of €8.5 billion and 10.0%, respectively
- Industrial free cash flows(3) of (€3.0) billion, as the subdued level of AOI generation was more than offset by CapEx and R&D expenditures in H1 2025

17

- Total industrial available liquidity at June 30, 2025 was €47.2 billion, above targeted ratio to Net Revenues
- Total inventories of 1.2 million units (Company inventory of 298 thousand units) at June 30, 2025, +1% compared with year-end 2024, even as new products launched and consolidated shipments rose +5% sequentially
- H1 2025 saw sequential improvement in Shipments, Net revenues, AOI(1) and Industrial free cash flows(3) compared to H2 2024, realizing benefits from an expanded product lineup, revitalized marketing and strong inventory discipline; Net loss deteriorated sequentially

43.    Defendant Filosa was quoted in the release, focusing on the purported positives from the first half results, in pertinent part:

"My first weeks as CEO have reconfirmed my strong conviction that *we will fix what's wrong in Stellantis by capitalizing on everything that's right in Stellantis* – starting from the strength, energy and ideas of our people, combined with the great new products we are now bringing to market.

2025 is turning out to be a tough year, but also one of gradual improvement. *Signs of progress are evident when comparing H1 2025 to H2 2024, in the form of improved volumes, Net revenues, and AOI, despite intensifying external headwinds*. Our *new leadership team*, while realistic about the challenges, will *continue making the tough decisions* needed to re-establish profitable growth and significantly improved results."

(Emphasis added).

44.    Stellantis further returned to issuing guidance, announcing that it "expects to see increased Net revenues, low-single digit AOI profitability, and improved Industrial FCF results in H2 2025."

45.    Another earnings call was conducted following the release of the final H1 results, during which Defendant Filosa acknowledged the difficulties thus far, but remained optimistic about the Company's progress, stating, in pertinent part:

2025 has been and will be a tough year, and these H1 results make that very clear. At the same time, we are making progress on our product wave and beginning to see early but encouraging improvement. Our new leadership team is in place and is committed to taking decisive actions

18

46.    Defendant Ostermann also presented on the earnings call, during which he highlighted the "tough period," while detailing Stellantis' reestablished guidance for the second half of the year, in pertinent part:

Consolidated shipments of 2.7 million units fell 7% with declines in North America and in large Europe, slightly mitigated by growth in South America and Middle East and Africa. Net revenue of EUR 74 billion saw a larger 13% decline as adverse regional mix and lower pricing added to the change in volumes. ***AOI margins were compressed as the early stage of our recovery actions was negatively impacted by external factors, like tariffs and foreign exchange headwinds. Our adjusted diluted earnings per share generally track our AOI development***, and our industrial free cash flow was an outflow of EUR 3 billion in the first half. ***While nowhere near our potential, each of these 5 figures did, in fact, improve in H1 2025 compared to the second half of 2024 as we benefited from new products, improved inventory discipline and more stable production schedules compared to the prior 6 months***.

. . .

Let's look at the AOI bridge now from prior year. This is a particularly challenging walk considering the H1 2024 comparison period wherein the company ran at a 10% margin. AOI came in this year in the first half at EUR 540 million with a 70 basis point margin, reflecting the aforementioned volume, mix, pricing and FX headwinds.

. . .

***we're now going to take a look at the sequential improvement in AOI comparing the first half of 2025 to the second half of 2024***. In particular, volumes improved sequentially as new product launches helped the European business and North America move past successful inventory reduction initiatives. Pricing improved 1% sequentially with North America being the big driver. And it's encouraging to see industrial cross moving in the right direction as our production schedules became more steady in both North America and in large Europe in the first half of this year.

Now let's turn to industrial free cash flow. Obviously, a very difficult result for the first half of 2025 with EUR 3 billion in cash outflows. ***The main reason for this was AOI generation that was simply too low***. Even adding back the D&A, this figure was too low to cover our CapEx and R&D spending in the period, but we did manage to lower investment expenditures versus the prior year. There was also a headwind of EUR 1.3 billion of working capital increase due in part to production disruptions related to our initial tariff response.

*Looking at inventories now. We can see that our corrective actions in 2024 have gotten us back to healthy levels*. And as you can see, we're now maintaining that discipline through 2025. Globally, the trend for the following months should be flattish to perhaps a slight increase, including impacts of ramping the recently introduced B and C7 segment vehicles in Europe, but also the planned North American launches such as the new Cherokee.

. . .

As Antonio mentioned in his opening remarks, we are reestablishing financial guidance. With H1 in the books, we want to provide a clear view of how we see the rest of the year developing. And *our second half 2025 guidance tells a story of continued improvement*. Net revenues are expected to increase half-over-half and *AOI margin is expected to be in the low single digits*. Lastly, we expect improvements in industrial free cash flow as compared to the first half of 2025. *We're not, of course, anywhere near or close to the full potential of this company, but we're making the tough decisions and executing on fundamental issues to build on our first half progress in the second half and beyond*.

(Emphasis added).

47.     Defendants elaborated somewhat on the second half guidance during the question-and-answer segment of the call that followed, in pertinent part:

<Q: Thomas Besson – Kepler Cheuvreux – Head of Automobile Sector> I'd like to come back to your guidance, please. Is it fair to say that you're trying to be conservative for the second half as you should be able to produce normally for the first time in a long time without downtime for tariffs or without having to substantially cut your inventories? Or is that a lot related to the USMCA uncertainty or the willingness not to have to one again?

And to follow up on Philippe's question on free cash flow, is it fair to assume that H2 CapEx has a little reason to rise sequentially?

<A: Antonio Filosa> Okay. thank you for your question. And as I mentioned a little bit before in my previous answer, yes, *we need to consider that H1 was basically breakeven for our business*. And *we are committed to drive the business into a gradual sequential improvement that needs to be evident quarter-by-quarter in all our business KPI, that means AOI, industrial free cash flow generation, volumes, shipments, et cetera.*

So this is our commitment. And considering that, as Doug said, around EUR 1.2 billion, EUR 1.3 billion of the overall EUR 1.5 billion of initially estimated tariffs, if things don't change, will be paid in the second half. This is a commitment that I

would not call conservative, but we are very committed to do that as we are committed to transition in acceleration into the next year, keep going.

Doug, if you want to take the technical part?

<A: Douglas R. Ostermann> Yes. No, I think that's exactly right, Antonio. When we think through the dynamics first half versus second half, we think about where we can guide the business and where we see the business performing, ***I think we can step up production. I think we can make progress on volumes. I think we can make progress on pricing, particularly in the United States***. I think a lot of the pre-tariff vehicles that were on dealer lots are running out. I think we'll see industry dynamic that should be supportive of pricing.

When we look at industrial, of course, our fixed costs will spread a bit better with the higher volumes. But there are significant headwinds as well, right? Because we only paid, as Antonio outlined, EUR 330 million of the expected EUR 1.5 billion was impact in the first half. Part of that is just because of the timing of when the tariffs came in, right? But yes, we're looking at a step-up in that expense from EUR 330 million to more like EUR 1 billion plus in the second half. So that's a significant headwind for us.

Now offsetting that, we also should be able to run a richer mix that probably more aligns much better with customer demand that we see in the United States with CAFE fines going to 0. That's going to be a positive. But there is certainly a lot of headwinds still to be handled in the second half. ***I think our guidance is reasonable and achievable***, but certainly, there are challenges in meeting it.

(Emphasis added).

48.     Defendants also responded to an inquiry regarding the €3.3 billion restructuring charge, as disclosed during Stellantis' preliminary H1 earnings call on July 21, 2025, and pertinently the potential for additional charges in H2. In pertinent part, while Defendants acknowledged the potential for additional charges in the second half, they fell well short of articulating how significant they could be:

<Q: Stuart Patrick Pearson – BNP Paribas Exane – Chief Financial Analyst & Head of Thematic Research> So I guess for Antonio, to start with, I mean, Stellantis has obviously gone from being the benchmark for profitability in both Europe and North America not so long ago to now pretty much loss-making in both, and peers are earning reasonable returns. So I mean, you've had a front row seat on all of this. I mean what's your diagnosis of what's gone wrong? And what kind of response should we expect from you? I know we've got to wait for the CMD. But I mean,

when we look at what you're saying today, it looks like more of the same. That might be unfair, but more incremental actions. But I wonder, are you considering anything more radical that you think might be required to get the company back to benchmark levels?

And maybe just linked to that, possibly for Doug, just on the restructuring charges and exceptional items. We've had EUR 3 billion on average now over the last 5 years, another EUR 3 billion in H1 this year. *I mean, what can you say about H2 as things stand today? Do we expect anything more there?* And then when will those continued charges perhaps finally moderate? And then maybe to finish the question, Doug, perhaps now that financial services is becoming such a bigger part of the business, we could get some separate disclosure between industrial and the Finco. And I'm sure there'll be lots to look at and analyze there.

<A: Antonio Filosa> Well, thank you for your question. I will take the first part, and then I will hand to Doug for the second part.

So the first part, the diagnosis, both in Europe and North America. Well, diagnosis itself is large and complex. But for sure, one important root cause of our market share deterioration, both in North America, especially, but also in Europe, is the fact that in the past, we decided to phase out many important, relevant and successful nameplates. For instance, in North America, U.S. specifically, we phased out 7 successful nameplates: Jeep Cherokee, Jeep Renegade, Chrysler 300, Ram DS Classic, Ram ProMaster CD, Dodge Charger, the muscle car of the past, Dodge Challenger, same family. Those 7 nameplates were granting to us 300,000 units per year sold and several billions of gross commercial result per year. So now we are restoring that lineup.

Jeep Cherokee is coming much improved than the previous one with 2 years of absent but coming strong. The powertrain that we have discontinued in the past, they are coming back, starting with the legendary Hemi V8 engine has been shared before. And this means volumes and this means margin per unit. *And also in Europe, we are correcting some initial all-in BEV powertrain decisions into multi-energy offers to our customer because we believe that both in North America and Europe, to be multi-energy means to be closer to the real customer demand.*

Then on the rest of the question, I will leave Doug answering.

<A: Douglas R. Ostermann> Okay. Thanks, Antonio. *So just to address the other pieces of the question, when you talked about onetime charges, when we look at the EUR 3.3 billion of onetime charges that we saw in the first half, as I've mentioned in my comments on the 21st, roughly EUR 2 billion of that, I think, represents some tough decisions and changes in strategy that have been made by this new management team*. Antonio certainly mentioned one significant one, which was our decision to stop our investment -- continued investment in fuel cell

22

programs in Europe. But there are other shifts in strategy that are all a part of that number, including some restructuring, as you mentioned in your question itself.

In terms of -- now there are other factors built in there, changes in our environment. For instance, there's some recognition of the changes of the One Big Beautiful Bill passed in the United States that impacted CAFE fines and the like. So there's some -- certainly, *I think the majority of it represents us getting after those tough decisions and changes in strategy, but there are also some pieces related to changes in our environment.*

In terms of -- *we don't typically forecast kind of onetime items for the future.* But looking forward, given that I think the new management team still has a fair amount of work to do in looking at our strategies and preparing for all the announcements that will come forward on the Capital Markets Day, *we could see other strategic shifts that could lead to onetime charges in the second half.*

(Emphasis added).

### *October 30, 2025*

49.    On October 30, 2025, Defendants conducted a trading statement call related to their third quarter results. Defendant Filosa presented on the call, highlighting Stellantis' progress with its commercial plan, providing, in pertinent part, the following:

First, *let's look at the performance, which improved as we progressed our commercial trends.* Consolidated shipments and net revenue both increased 13% compared to prior year, and we delivered a global sales performance that was 4% higher year-over-year.

Net sales performance included a sequential increase in market share in North America and even stronger trends in the United States. At the same time, we also saw some share contraction in Europe for reasons I will explain shortly. Second, we announced our $13 billion U.S. investment program, which directs significant capital into our U.S. products, plants and production.

. . .

*Last quarter highlighted 6 near-term opportunities we had to improve profitability*, spending new products, changes for the new model year vehicles and improved manufacturing and operational efficiencies. *And I'm happy to report we are making good progress*. The return of the HEMI V-8 to the RAM 1500 light-duty trucks in the third quarter has delighted many of our customers.

. . .

23

Since I took the CEO role, I made clear inside and outside the company that the U.S. is a key priority for our success. Because when we are strong in the U.S. we are stronger and better as a company everywhere. ***The $13 billion we will invest in U.S. in the next 4 years is an investment in growth. This is the largest single investment in our history and a proud commitment to our U.S. people, plants, products and communities.***

(Emphasis added).

50.     Defendant Laranjo largely reiterated the Company's expectations for the second half, including briefly touching on the possibility of charges in the second half, though, once again, Defendant Laranjo did not caution investors as to the overall scale or ratio of the cash component of such a charge could be. In pertinent part, Laranjo provided only the following:

We expect the second half 2025 to continue the third quarter's return to year-over-year growth and to be above first half 2025 levels, ***stronger volumes and their contribution to improved industrial efficiency will put us in position to deliver low single-digit adjusted operating income margin in the second half*** and we are working to deliver sequentially improved industrial free cash flow.

Please note also, we have refined our projection for net tariff expenses for 2025, now approximately EUR 1 billion compared to the prior EUR 1.5 billion. There are a few other things I'd like to touch on which, ***while they are currently expect to have limited impact on the aforementioned second half guidance metrics will likely affect other aspects of our second half financial results***. First, as we indicated in July, we are engaged in the ongoing process of reviewing all aspects of the business as part of updating our strategic plan. This will ***likely lead to further charges in the second half***.

***We expect that a large portion of the charges will be excluded from AOI to the extent that they are not indicative of our ongoing operations***. Second, we are in the process of updating how we estimate warranty costs. Our historical model was in line with industry practice and worked well. However, in recent periods, we've experienced cost inflation. While this change in estimate does not change the actual cash cost or their time, it is likely to result in a onetime charge, which would increase the level of balance sheet reserves. ***It is not expected to materially impact future period profitability compared to the 2025 run rate.***

(Emphasis added).

24

51.    A question-and-answer segment followed the Defendants' prepared remarks. During the segment, Defendants responded to requests to elaborate on the potential for charges in the second half of 2025. In pertinent part, Defendants downplayed the potential impact of any charges by only indicating to investors they could "possibly" have cancellations that "could have a cash impact."  In pertinent part, the following exchanges occurred on the call:

<Q: Thomas Besson – Kepler Cheuvreux – Head of Automobile Sector> . . . On warranty cost and provision, you talked about a change in methodology that will drive some one-off charges. Can you remind us broadly the recall costs for '25 you expect versus '24 and '23 and confirm that setting up this provision for using this new way of assessing future recall costs has no cash impact on H2? And can you eventually make as well some comments by region, whether you're using different methodologies or whether costs vary a lot between North America and Europe in particular?

<A: So -- on the warranty, the first thing is that the methodology that we are reviewing would primarily impact U.S. and Europe. And *the potential adjustments* would be a noncash provision in 2025. The warranty cost, the total warranty cost for the group in 2023 was EUR 8.9 billion. In 2024, sorry -- corrections here. It was actually mentioned the balance sheet for warranty in 2024 was EUR 9.3 billion. And then on the details specifically to the recalls, we can follow up on off-line if it's okay, Thomas, because I don't have the numbers on hand here.>

. . .

<Q: Emmanuel Rosner – Wolfe Research, LLC – Managing Director of Research & Senior Research Analyst> The first one is just a point of clarification. *These charges that you're taking in the second half, both for, I guess, turnaround actions but also for warranty. Can you just confirm again if there's any sort of cash impact that you should be thinking about associated with it and whether that would be included in the free cash flow reiterated guidance?* And then just maybe a little bit longer term, with these changes in U.S. regulations and in particular, a significant easing in the emissions regulations, what kind of opportunity does that provide for you? What kind of upside does that unlock 1 of your the 3 competitors on the record saying that this is a multibillion dollar opportunity. How would you plan to take advantage of it?

. . .

<A: Joao Laranjo> Thank you, Antonio, and hi Emmanuel. So the reviews -- the *strategic review and the product plan reviews that we are undertaking would lead possibly to project cancellations as we have already communicated the light-duty*

25

***BEV here in the U.S.*** And the type of adjustments that we should expect on the project cancellations would be a write-off of CapEx and R&D capitalized spend and also other program cancellations costs. And ***those other program cancellation costs, they could have a cash impact, which we would expect to have limited cash impact in '25 and more into the future.***

(Emphasis added).

52.     Defendants also elaborated further on their guidance for the second half, and more particularly fourth quarter of 2025, during the following pertinent exchanges:

<Q: Henning Cosman – Barclays Bank PLC – Research Analyst> Can I just ask you a little bit higher level, your predecessor management had given us a bit of a steer saying that you've abandoned all-weather above 10% margin company narrative. I think the indication then became more like 6% to 8%, perhaps in favor of growing volume, growing market share. I just wanted to ask again, if you're still endorsing this kind of narrative now as a new now complete management team and what the underlying prerequisites for this are? Does that still imply something like 10% U.S. market share, 20% European market share? Does it require incrementally positive pricing from current levels? How does the reshoring in the U.S. fit into that?

I would imagine it would come with higher depreciation, it will probably come with higher labor costs. If you could just give us like a sort of updated framework where you see the company going over the next few years in a sort of steady state.

. . .

<A: Antonio Filosa> . . . So I believe that we will deploy -- ***we are deploying already since January, a strategy of growth that will deliver to the company, a steady sequential improvement in all business KPIs quarter-by-quarter***. This is our major target, and this is what we will do.

Now what ***we understand is also that a 6% to 8% AOI business is a reasonable target for the mid-, long-term for this company***, and we will have Capital Market Day to discuss further on those objectives. The most important to us is now to deliver what we want to do, which is a steady sequential improvement quarter-by-quarter or all business KPIs.

. . .

<Q: Patrick Hummel – UBS Investment Bank – Executive Director & Head of European Autos Research> Also 2 questions from my end. The first one, Joao, ***your predecessor said that the second half AOI in North America should be positive.*** Now this is nowhere in the deck, you had a good volume balance over the first half

in North America. So I was just wondering if that statement is still valid that we should expect a positive AOI for North America in the second half?

And my second question relates to free cash generation of the business. I appreciate today is not guidance day. But if we qualitatively think about the puts and takes for the cash flow as we're heading into next year, is it fair to say they are going to be higher investments year-over-year because you've got that $13 billion plan for the U.S., I guess some of that CapEx is going to be incremental and I'm still wondering if there is a little trailing effect on free cash flow of any bigger further one-off announcements you might have in the second half of this year.

So would you say with confidence that next year's free cash flow should be in positive free territory? Or is that too early to say?

<A: Joao Laranjo> Yes. No, thank you for the question, Pat. So first on North America, we are not providing guidance by region. But *we are very focused on sequentially improving quarter-by-quarter*, as Antonio mentioned. And then on free cash flow, despite the investments that we have announced in the U.S., we continue to focus on [ monthly ] investments around 8% of our revenue going forward.

And the -- *in relation to the adjustments that we are working on our strategic plan, we are still going through them and assessing the amount*. So I don't have right now final figures to understand the impacts for next year. And we'll provide an update, obviously, on that when we have the financials for the full year financials.

(Emphasis added).

### *December 4, 2025*

53.     On December 4, 2025, Defendant Filosa presented on behalf of Stellantis at Goldman Sachs Industrials & Autos Week. During the exchange, Filosa highlighted the missteps toward the company's prior EV targets and the potential implications to shareholders. Again, however, Filosa fell short of disclosing the potential significant charge to the company as a result of the shift in direction, in pertinent part, as follows:

<Q: Christian Frenes – Goldman Sachs Group, Inc. – Vice President> Stellantis is taking corrective actions. What kind of business decisions and strategic shifts are driving these actions, sort of product planning and?

<A: Antonio Filosa> Yes. I believe that many, right, because we realize that we have obviously many opportunities. We need to be fast and rigorous the way we

explore them. So -- but we can talk a lot about product, if you want, and product planning and what we have learned, right? ***So what we have learned is that some assumption of the past strategy resulted to be wrong, right? So we were thinking of a battery electric vehicle penetration in U.S. up to 50% by 2030. Last month was less than 6%. It will say 6% or 7% a few years, right? We are planning to have a BEV penetration in Europe at 100% by 2030. It will be, for sure, higher than U.S., but not at that level, we believe***. So we understood that was needed to change strategy around those assumptions, number one. The other thing that we learned was on ourselves, right, by listening more to our customer, we discover what they really wanted from us, right? For instance, the return of the Hemi V-8 engine is exactly the results of listening to them and understanding that they badly wanted that engine back in our cars, right? ***And this is what we are doing. So by mixing what we keep discovering about ourselves and our customer base and the change of strategy that we are implementing, I believe that we have a good recipe to do what you said, which is incremental improvement quarter-by-quarter on all KPIs, including profitability.***

<Q: Christian Frenes> And the execution is also sort of seems to have improved and that's in addition...

<A: Antonio Filosa> Yes, so ***execution is improving***. You see that the product launches now are much more on time, right? So we promised by the end of the year, Jeep Cherokee is coming in this month. We promised in quarter 3, the V-8, it came in record time. We promised by quarter 4, the new Dodge Charger with ICE engine, we presented it -- we launched it in production last week. So ***we are getting sharper and more rigorous in execution on product launches, we have a lot to improve, and we will do that heads down, working rigorously day by day***. But I believe that we ***have a clear part on how to move forward***.

. . .

<Q: Jolyon Wellington – Centiva Capital LP – Analyst> It's Jolyon Wellington from Centiva. Question, as you execute on your turnaround strategy, you are still in the process of consuming cash. I'm just wondering if you can give any comments around how you see the balance sheet? And then as a follow-up to that, you are -- your earnings will be negative this year because of the restructuring charges and your low margins. Would you rule out shareholder returns as per your dividend policy at this point?

<A: Antonio Filosa> ***There are parts of this question that I cannot answer now***. Obviously, we -- ***not because I don't have the information, but because we will answer by when we close the year***. But obviously, ***we need to get back to cash generation for sure***. What we will do is ***we will improve all business KPI quarter-by-quarter gradually but progressively***. So ***you will see that***. And for the dividends,

28

well, we will have a Board of Director to be scheduled on that where as every year, we will decide what to do

(Emphasis added).

54.     The above statements in Paragraphs 24 to 53 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's opportunity to capitalize on a growing electrification market and its potential for earnings growth while also minimizing impact and risk from strategic restructuring charges and macroeconomic fluctuations. In truth, Stellantis' confidence in the electrification market or otherwise Defendants' faith in the Company's ability to capitalize on such growth was misplaced; Stellantis would ultimately see earnings slide through repeated guidance reductions despite efforts to minimize the potential of any impact until it manifested on Stellantis' doorstep, resulting in significant restructuring charges far above and beyond the realm of what Defendants caused the market to expect.

### The Truth Emerged When Stellantis' Revealed
### Preliminary Earnings and a Business Reset
### February 6, 2026

55.     On February 6, 2026, Stellantis issued a press release announcing a "Reset[ of] its Business to Meet Customer Preferences to Support Profitable Growth."  The release further disclosed that the "reset of Stellantis' business resulted in charges of approximately €22.2 billion … including cash payments of approximately €6.5 billion, which are expected to be paid over the next four years."

56.     Notably, the release contended that "[t]hese actions continue the decisive changes Stellantis began implementing in 2025," suggesting such charges were planned or at least previously contemplated by management.

29

57.     Defendant Filosa was further quoted in the release, reiterating that this was part of an existing process, but disclosing that the charges further reflect execution missteps by previous management:

> The reset we have announced today is ***part of the decisive process we started in 2025***, to once again make our customers and their preferences our guiding star. The charges announced today ***largely reflect the cost of over-estimating the pace of the energy transition that distanced us from many car buyers' real-world needs, means and desires***. They also ***reflect the impact of previous poor operational execution***, the effects of which are being progressively addressed by our new team

(Emphasis added).

58.     Regarding the charges themselves, the release detailed their breakdown across various operations, pertinently providing the following details:

1) €14.7 billion related to re-aligning product plans with customer preferences and new emission regulations in the U.S., ***largely reflecting significantly reduced expectations for BEV products***:
   - Includes write-offs related to cancelled products of €2.9 billion and impairment of platforms of €6.0 billion, primarily due to significantly reduced volume and profitability expectations.
   - Includes approximately €5.8 billion in projected cash payments over the next four years, relating to both cancelled products as well as other ongoing BEV products whose volumes are now expected to be considerably below prior projections.

2) €2.1 billion related to the resizing of the EV supply chain:
   - €2.1 billion of charges, including a total of approximately €0.7 billion in cash payments expected to be paid over the next four years, related to steps of rationalizing battery manufacturing capacity.

3) €5.4 billion related to other changes in the Company's operations:
   - €4.1 billion due to a change in estimate for contractual warranty provision, resulting from the reassessment of the estimation process, taking into account recent increases in cost inflation and a deterioration in quality, as a result of operational choices, which did not deliver the expected quality performance, now being reversed by the new management team.
   - €1.3 billion of other charges, including restructuring primarily related to already communicated workforce reductions in Enlarged Europe.

59. As a result of this business reset, Stellantis updated its second half 2025 guidance, notably announcing adjusted operating income margins would be "finishing below the guided low-single digit range."

60. Stellantis additionally announced it would "not pay a dividend in 2026" and that "the Board authorized the issuance of up to €5 billion non-convertible subordinated perpetual hybrid bonds."

61. Defendants conducted a corresponding shareholder call to discuss the business reset and the second-half guidance revisions. In pertinent part, Defendant Filosa opened his remarks by providing the following details regarding the reset:

> What we are presenting today is a ***decisive reset*** for our future profitable growth. We are today ***resetting our organization*** by empowering our regional teams so that they can accelerate the decision-making process and maximize the rigor of execution.
>
> We are ***dramatically resetting our stakeholder relationship***, improving all of them, including relationship with our employees, with our partners, the dealers, the suppliers, the governments and the unions. ***We are resetting our product plan and our EV supply chain*** to reflect much more real customer demand and shifting regulation following an ***initial overestimation of pace of adoption of electrification in the regions***.
>
> We are ***resetting execution and improving quality management processes to address previous operational issues triggered by past decisions***. ***Those are changes very needed, necessary that we are aggressively implementing***. Implementation is all in progress, and they are delivering to us initial signs of recovery already in H2 '25.

(Emphasis added).

62. Defendant Laranjo then took over the call to briefly discuss the €22 billion in charges disclosed alongside the business reset, providing, in pertinent part

> As part of our 2025 second half results, we are announcing ***EUR 22 billion worth of charges that are excluded from AOI***. We have broken this out for you into 3 categories: ***EUR 14.7 billion related to product plans***. It includes write-offs of canceled products of EUR 2.9 billion and also impairment of certain platforms of

31

EUR 6 billion. This is *primarily due to substantially reduced volume and profitability expectations for BEV products*.

It also includes approximately *EUR 5.8 billion in projected cash payments expected to be paid over the next 4 years. EUR 2.1 billion related to steps taken to resize the EV supply chain*. This includes a total of EUR 700 million in cash payments expected to be paid over the next 4 years. *EUR 5.4 billion relate to other items. This includes EUR 4.1 billion due to a change in estimate for contractual warranty provisions and EUR 1.3 billion of restructuring and other charges*. The vast majority of charges relate to necessary corrective actions have been taken in 2025.

(Emphasis added).

63.    He further detailed the preliminary second-half results and elaborated on the adjusted operating income shortfall even when not considering the €22 billion in charges, pertinently stating:

Now let me review the preliminary results for the second half. Revenues rose 10% year-over-year at the preliminary estimate midpoint on 11% higher consolidated shipments. *AOI was negative in the range of EUR 1.2 billion to EUR 1.5 billion.* Industrial free cash flow was negative in the range of EUR 1.4 billion to EUR 1.6 billion. This represents approximately half of the negative EUR 3 billion in the first half of 2025.

Now let's dive deeper on the AOI topic. *We finished below our AOI expectation for the second half of 2025 due to a combination of specific items, which more than offset improvements in other areas*.

First, let's go through the items impacting industrial costs. *Warranty expense for second half was EUR 700 million higher year-over-year. EUR 500 million of this was triggered by the change in estimate related specifically to vehicles shipped in the first half of 2025. Another EUR 200 million of warranty expense related to the recall of certain now discontinued PHEV models*. The company also booked EUR 500 million in compliance fine provisions related to European LCV volumes. This represented the entire 2025 full year accrual booked in the second half. And *moving forward, we project this should be about EUR 300 million lower in the first half of 2026.*

Lastly, *there were also EUR 500 million related to 2 items, a supplier bankruptcy and for costs incurred* due to disruption of the aluminum supply chain. Next, 2 items in the Financial Service business had a negative impact of EUR 400 million in the FX and other bucket. *The first was due to the residual value impact incurred*

32

> ***in the U.S. for the now discontinued PHEV models; and the second was a provision related to an industry-wide motor finance redress program in the U.K.***
>
> So in total, there was EUR 2.1 billion of negative impact from the specific items I mentioned. At the same time, core foundational business drivers like volumes, price, industrial efficiency and purchasing costs were all moving in the right direction.

(Emphasis added).

64.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the above-referenced press releases, earnings calls, and shareholder presentations. In those calls and releases, Defendants confidently touted claims that "[e]lectrification is growing" and that their ability "to be differentiated" in offerings aligned with "what our customers want," while repeatedly minimizing risks associated with the potential need for additional charges in the back half of 2025 related to restructuring efforts and the potential for tariff or other macroeconomic impacts to such efforts.

65.    Investors and analysts reacted immediately to Stellantis' revelation. The price of Stellantis' common stock declined dramatically. From a closing market price of $9.54 per share on February 5, 2026, Stellantis' stock price fell to $7.28 per share on February 6, 2026, a decline of about 23.69% in the span of just a single day.

66.    A number of well-known analysts who had been following Stellantis lowered their price targets in response to Stellantis' disclosures. For example, Deutsche Bank, "cut its numbers to reflect the updated communication, roll valuation to 2026 and set a new target price at EUR7." In pertinent part, the analyst justified Deutsche Bank's price target reduction on the surprising charges and earnings misses, as follows:

> In our view, the key negatives of the release are the size of the charges taken and the cash relevant portion of it which is ***far above market expectations***. Also the ***H2-25 earnings miss even when adjusting for one timers and the guided cash burn is below consensus expectations***.

33

(Emphasis added).

67.    Morningstar, while considerably reducing their price target by about 12.86%, similarly emphasized the sticker shock on the Defendants' charges, stating, in pertinent part:

> *Stellantis announced EUR 22.2 billion in charges related to a reset of its battery electric vehicle* strategy to align with *weaker-than-expected demand*, including EUR 6.5 billion in cash outflows over the next four years. The 2026 dividend will be suspended.

> **Why it matters:** Although we expected additional restructuring beyond the measures announced in the first half, the *magnitude of today's charges came as a surprise*, particularly the *EUR 6 billion platform impairments, given the supposed flexibility of Stellantis' multi-energy architecture to support different powertrains*

(Emphasis added).

68.    The fact that these analysts, and others, discussed Stellantis' shortfall and the significant, unexpected volume of the charges suggests the public placed significant weight on Stellantis' prior earnings estimates and statements regarding the progress of Stellantis' restructuring. The frequent, in-depth discussion of Stellantis' above-expectation charges confirms that Defendants' statements during the Class Period were material.

### *Additional Scienter Allegations*

69.    During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Stellantis were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the trendlines in electrification, earnings growth potential of Stellantis, the wants and desires of its customer base, and the potential need for sizeable restructuring charges to bring the Company in-line with such customer desires.

70.     Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that Stellantis was well positioned to implement and capitalize upon growth initiatives to reach its 2025 benchmark. Defendants further repeatedly claimed confidence in both the growth potential for electrification as a whole and in Stellantis' ability to capitalize upon it.

71.     Yet, Defendants made selective and misleading disclosures in repeated claims of confidence in Stellantis' ability to achieve earnings growth, despite the headwinds from tariffs and other geopolitical actions.

72.     Defendants' scienter was further evidenced by the Individual Defendants' claims that one of Stellantis' key strengths over its competitors stems from its ability "to be differentiated in terms of what our customers want" due to the Company's regional scale, despite ultimately admitting to investors the very basis for the charges announced on February 6, 2026, "largely reflect the cost of over-estimating the pace of the energy transition that distanced us from many car buyers' real-world needs, means, and desires."

73.     Indeed, the gap between what Stellantis was doing and what its customers wanted was apparently quite considerable. In what was a sudden move from an investor's perspective, Stellantis announced a "decisive reset" of its business, which included resetting the company's "organization . . . stakeholder relationship . . . product plan and our EV supply chain . . . execution and improving quality management processes," all in the name of pivoting the Company toward its clientele's desires and significantly reduced expectations for BEV products.

74.     Moreover, Defendant Filosa, shortly after taking over the role of CEO, announced Stellantis was "correcting some initial all-in BEV powertrain decisions into multi-energy offers . . . to be closer to the real customer demand." Yet, Defendants waited until February 2026 to inform its investors of €14.7 billion in product plan charges, including €2.9 billion in write offs and €6

35

billion in platform impairments, undertaken specifically due to reassessed "profitability expectations for BEV products."

75. Defendants were aware of the risks to their earnings growth potential and of the risks of how necessary and sizeable the February 6 charges would be, yet they continued to deliberately disregard or otherwise minimize such risks in their claims to investors. Branded Checkout growth, yet they continued to deliberately disregard or otherwise minimize them in their claims of confidence to investors.

76. Defendants initially announced €3.3 billion of net charges during their first-half earnings calls and specified €2 billion of such "represent[ed] some tough decisions and changes in strategy." Defendants here claimed, "we could see other strategic shifts that could lead to onetime charges in the second half." During the third quarter call, this changed to discussions of a review of the business that "will likely lead" to additional charges, and while they "could have a cash impact," it would be "limited." Defendants never suggested the potential for net charges in the second half to vastly eclipse that of the first half or that the cash impact would more than double the entirety of the first half charge.

77. Considering the charges, and the significant earnings shortfall, shocked both the market and analysts alike, Defendants' repeated minimizations as to the severity of the charges and headwinds to its earnings growth were, at best, deliberately reckless.

### *Loss Causation and Economic Loss*

78. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Stellantis' common stock and operated as a fraud 'or deceit on Class Period purchasers of Stellantis' common stock by materially misleading the investing public.

Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Stellantis' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Stellantis' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

79.    Stellantis' stock price fell in response to the corrective event on February 6, 2026, as alleged *supra*. On February 26, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Stellantis' forecasting processes, growth guidance, and potential restructuring charges.

80.    In particular, on February 6, 2026, Stellantis announced significantly below-market earnings results shy of Stellantis' own previous guidance for positive growth alongside the disclosure of €22.2 billion in restructuring charges, including €6.5 billion in cash payments.

### *Presumption of Reliance; Fraud-On-The-Market*

81.    At all relevant times, the market for Stellantis' common stock was an efficient market for the following reasons, among others:

(a)    Stellantis' common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Stellantis communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Stellantis was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Stellantis was reflected in and incorporated into the Company's stock price during the Class Period.

82.    As a result of the foregoing, the market for Stellantis' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Stellantis' stock price. Under these circumstances, all purchasers of Stellantis' common stock during the Class Period suffered similar injury through their purchase of Stellantis' common stock at artificially inflated prices, and a presumption of reliance applies.

83.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

84.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with earnings growth projections while at the same time failing to maintain adequate forecasting processes and further provided investors with suggestions of the possibility of charges while at the same time failing to adequately convey to investors the certainty of such charges and their respective magnitude. Defendants provided the public with forecasts that failed to account

for significant AOI headwinds and the volume of charges required and/or failed to adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

85.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

86.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Stellantis who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Stellantis common stock on the NYSE during the Class Period seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class"). Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

88.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Stellantis' common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Stellantis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 31, 2025, there were 2.897 billion shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

89.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

90.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

91.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Stellantis;

(c)     whether the Individual Defendants caused Stellantis to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Stellantis' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

92.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

95. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Stellantis common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Stellantis' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

96. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Stellantis' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

97. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

98.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Stellantis' internal affairs.

99.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Stellantis' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Stellantis' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Stellantis' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of

43

the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

100. During the Class Period, Stellantis' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Stellantis' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Stellantis' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Stellantis' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

101. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

103.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Stellantis' misstatements.

105.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Stellantis which had become materially false or misleading.

106.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Stellantis disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Stellantis to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Stellantis' common stock.

107.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same

to cause Stellantis to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

108.    By reason of the above conduct, the Individual Defendants and/or Stellantis are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

*[Signature block on following page]*

46

Dated: April 7, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

47