UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | X | |
| In re STELLANTIS N.V. SECURITIES LITIGATION | : | Civil Action No. 1:26-cv-02839-LAK |
| | : | |
| | X | CLASS ACTION |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

Page

I. SUMMARY OF ACTION ........ 1

II. JURISDICTION AND VENUE ........ 4

III. THE PARTIES ........ 5

IV. FACTUAL ALLEGATIONS ........ 7

A. Stellantis Digs a Financial Hole Immediately Preceding the Class Period ........ 7

B. Stellantis Makes Costly Pivots Away from EVs Without Disclosing the Impact of these Costs to Investors ........ 9

C. Stellantis Announces Some Adjustments and Reissues H2 2025 Guidance, and Defendants Continually Affirm this Guidance ........ 13

D. The Truth is Partially Revealed, But Stellantis Continues to Conceal the Magnitude of the Imminent and Expansive Additional Impairments ........ 16

E. The Truth is Finally Revealed ........ 18

V. DEFENDANTS VIOLATED IFRS ........ 18

A. IFRS PROVISIONS ........ 18

B. EVIDENCE OF IMPAIRED STELLANTIS ASSETS ........ 23

1. Impairment Indicator: Stellantis' Poor Financial Performance in North America and Europe in FY 2024 and H1 2025 ........ 24

2. Impairment Indicator: U.S. Government Shifts Policies Away From Electrification Growth ........ 26

3. Impairment Indicator: Management Decisions and Comments Demonstrate Their Knowledge the EV Market was Deteriorating ........ 27

4. Cash Payments of €5.8 billion due to Product Plan Realignments for BEVs ........ 29

5. EV Supply Chain Impairments ........ 31

6. The February 2026 Company and Management Statements Support Earlier Impairment ........ 33

**Page**

VI. DEFENDANTS' MATERIALLY MISLEADING STATEMENTS AND OMISSIONS ....35

A. February 26, 2025 Press Release and Earnings Call....35

B. April 30, 2025 Press Release and Conference Call ....40

C. May 29, 2025 Bernstein Strategic Decisions Conference ....41

D. July 21, 2025 Press Release and Conference Call....43

E. July 29, 2025 Semi-Annual Report, Press Release, and Conference Call....49

F. September 11, 2025 Kepler Cheuvreux Autumn Conference ....59

G. September 29, 2025 Press Release....61

H. October 10, 2025 Press Release and Conference Call....62

I. October 14, 2025 Press Release....64

VII. THE TRUTH BEGINS TO EMERGE WHILE DEFENDANTS CONTINUED TO MISLEAD INVESTORS ....66

A. October 30, 2025 Press Release and Conference Call....66

B. December 4, 2025 Goldman Sachs Industrials & Autos Week....77

C. February 6, 2026 Corrective Disclosure....81

VIII. POST CLASS PERIOD EVENTS ....84

IX. ADDITIONAL FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER ....87

A. The Individual Defendants' High-Level Positions and Experience ....87

1. Filosa....90

2. Elkann ....91

3. Ostermann....92

4. Laranjo ....92

**Page**


B. Analysts and Investors Frequently Asked Questions About, and Defendants Frequently Evinced Personal Knowledge by Commenting on, Stellantis' Strategic Review ....................92

C. The Alleged Fraud Concerns the Core Operation of Stellantis' Business ....................94

D. Stellantis Experienced Suspiciously High Executive Turnover at Suspicious Times During the Class Period ....................95

E. Stellantis' Impairment Was Material to Its Financial Condition ....................96

X. LOSS CAUSATION ....................97

A. October 30, 2025 ....................97

B. February 6, 2026 ....................98

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ....................100

XII. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE ....................101

XIII. CLASS ACTION ALLEGATIONS ....................102

COUNT I ....................104

COUNT II ....................106

PRAYER FOR RELIEF ....................107

JURY DEMAND ....................108

1. Lead Plaintiff David Yakim ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Amended Complaint for Violations of the Federal Securities Laws (the "Complaint")[1] the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Stellantis N.V. ("Stellantis" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Stellantis' public documents, conference calls, press releases, and stock charts; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

2. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## I. SUMMARY OF ACTION

3. This is a federal securities class action on behalf of all persons who purchased Stellantis common stock on the New York Stock Exchange ("NYSE") between February 26, 2025, and February 5, 2026, inclusive (the "Class Period"), seeking remedies pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against defendants Stellantis, John Jacob Philip Elkann ("Elkann"), the Company's Executive Chairman of the Board of Stellantis, Douglas R. Ostermann ("Ostermann"), the Company's Chief Financial Officer ("CFO") from October 10, 2024, until September 29, 2025, Antonio Filosa ("Filosa"), Chief Executive Officer ("CEO") from June 23, 2025 to the present, and Joao Laranjo ("Laranjo"), Stellantis' CFO following Ostermann starting on September 29, 2025 (collectively, "Defendants").

4. Stellantis is a global automobile designer, engineer, manufacturer, and distributor headquartered in the Netherlands. As described in more detail below (¶¶23-25), Stellantis was

---

[1] Emphasis is added throughout unless otherwise indicated.

formed via the merger of Fiat Chrysler Automobiles N.V. ("FCA") and Peugeot S.A. ("PSA") in January 2021. Stellantis' expansive brand lineup includes Alfa Romeo, Chrysler, Citroën, Dodge, Fiat, Jeep, Maserati, Opel, Peugeot, Ram, and others.

5. Following the merger in 2021, Stellantis embarked on an ambitious plan called "Dare Forward 2030," committing to investing over €50 billion to provide a sales mix of 100% passenger car battery electric vehicles ("BEVs") in Europe and 50% passenger car and light-duty truck BEVs in the U.S. by 2030. For a time, owing in large part to increased demand for electric vehicles ("EVs") beginning in approximately 2020, Stellantis generated record annual returns on its investment strategy. By early 2024, Stellantis could boast about a fiscal year ("FY") 2023 which resulted in a 6% year-over-year increase in net revenues, a 7% increase in shipment volumes, adjusted operating income ("AOI") of €24.3 billion, and industrial free cash flow of €12.9 billion.

6. However, by the end of 2024, the tide had turned due to weakening demand for EVs and costly mistakes by Stellantis' then-CEO Carlos Tavares ("Tavares"). Additionally, after the November 2024 U.S. Election of President Donald J. Trump, Stellantis became aware of a significant shift in the priorities of a U.S. government administration that would not be supporting an expanded electrification market. The U.S. government policy changes would instead make it significantly more difficult to attain the highly aggressive EV targets that the Company admitted were "challenging" even before the new U.S. government regulations were introduced.

7. Stellantis was ultimately forced to announce a massive reduction in guidance for FY 2024, and soon thereafter, Tavares abruptly "resigned" as CEO effective December 1, 2024. The Company's Chairman, Elkann, announced that the Company aimed to find a new CEO within the first half ("H1") of 2025, and that he would oversee the Company in the interim. In an attempt to shore up its financials, Stellantis quickly reversed course on committing to its "Dare Forward 2030" agenda and pivoted to hybrid vehicles, delayed the launch of its Ram EV pickup, and brought back internal combustion engine ("ICE") products like the HEMI V8 engine.

8. Fixing the Company's problems, however, would require more drastic measures, including accounting for excess capacity and taking significant one-off impairment charges, which

would be far more costly than Defendants let on during the Class Period. Indeed, beginning in January 2025, Stellantis' senior leadership team, including Ostermann and Filosa, and led by Elkann, began a strategic review to identify the difficult but necessary choices they would have to make to right the ship. But rather than provide a transparent outlook, by February 26, 2025, at the start of the Class Period, Elkann and Ostermann rebuffed investors' concerns over the need to make such adjustments. In response to a question about "the cost of reducing the excess capacity," Elkann assured investors it was not a concern, noting that Stellantis would simply "***start selling more cars***," and fix the capacity issue with increased volumes. Similarly, Ostermann told investors that Stellantis' 2024 "adjustments" were "***onetime unusual items***."

9. Stellantis continued to make similar false assurances to the market by downplaying the need for costly adjustments in H1 2025, while internally making the very changes and decisions that would ensure that the Company would have to take additional, costly adjustments. Stellantis' strategic review quickly revealed that drastic changes were necessary. For example, Stellantis executive Jean-Phillippe Imparato ("Imparato") testified before the French Senate on March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now."

10. Yet, Stellantis continued to downplay the need for imminent and costly changes to its business, including when the Company announced Filosa as its new CEO on May 28, 2025. For example, during the May 29, 2025 Bernstein Strategic Decisions Conference, Ostermann told investors that "***the adjustments that [Stellantis] made in the last six months with John Elkann's support***," were delivering early returns, but concealed from investors that the actions resulting from this review required the Company to take significant impairments by assuring them that Stellantis' "***multi-energy platforms***" were still "***an effective strategy***," and that "***EU [was] ramping up BEV pretty substantially***."

11. By the end of July 2025, Stellantis was forced to ultimately recognize charges in the amount of €3.3 billion. But, as described in §V, Stellantis understated this number by approximately €15 billion. And by re-issuing positive guidance for H2 2025, and through other positive statements

downplaying the impending need to address excess capacity and take additional adjustments, the Company continued to conceal further needed impairments of a much greater magnitude.

12. The truth about the extent of Stellantis' problems, and the charges the Company would be forced to take to fix them, began to be revealed to investors on October 30, 2025, when Stellantis finally admitted that such "***potential***" and "***possibl[e]***" additional adjustments were "***likely***," but failed to quantify the amount, and eased investors' concerns by continuing to confirm guidance for H2 2025 and otherwise paint a rosy picture of the Company's commercial recovery.

13. Based on Stellantis' public assurances, the market remained optimistic about the Company's outlook. Analysts following Stellantis took heart in the fact that, despite their comments about the possibility or potential for unquantified, additional charges, Ostermann, Filosa, and Laranjo nonetheless repeatedly reaffirmed guidance and touted progress in commercial recovery.

14. On February 6, 2026, Stellantis finally and belatedly disclosed to the market a massive €22.2 billion write-down, revealing that the Company's BEV investments had been much larger than previously disclosed, and that cancelling and limiting these investments had a drastic financial impact on Stellantis' operations.

15. These concealed facts decimated Stellantis' Class Period stock price. As the truth of the Company's financials was disclosed, Stellantis' stock price plummeted from a Class Period high of $13.29 to $7.28 per share at the end of the Class Period, a stunning drop of nearly 45%. As a result of Defendants' wrongful acts, and the resulting decline in the market value of Stellantis' stock, Plaintiff and other Class members have suffered significant damages.

## II. JURISDICTION AND VENUE

16. Plaintiff brings this action, on behalf of himself and all other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

17. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

19. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Stellantis' business, actions, and the subsequent damages to Plaintiff and the Class (defined below), took place within this District.

20. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III. THE PARTIES

21. Plaintiff purchased Stellantis common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff, as set forth in his previously filed certification (ECF 23-2), purchased or acquired Stellantis common stock during the Class Period and was damaged by Defendants' conduct as alleged herein.

22. Stellantis is a Netherlands corporation with its principal executive offices located at Taurusavenue 1, 2132 LS Hoofddorp, The Netherlands. During the Class Period, the Company's common stock traded on the NSYE under the symbol "STLA."

23. Stellantis was originally incorporated under the laws of the Netherlands in April 2014 under the name Fiat Chrysler Automobiles N.V. The current iteration of Stellantis was formed when PSA merged into and with FCA on January 16, 2021. The combined company was renamed Stellantis N.V. on January 17, 2021.

24. FCA's history traces to when Fiat S.p.A was founded in July 1899 as Fabbrica Italiana Automobili Torino. Over the decades, Fiat grew and acquired brands and manufacturers including Lancia, Alfa Romeo, Maserati, and Ferrari. In 2009, FCA US LLC (then-known as Chrysler Group LLC) acquired the principal operating assets of the former Chrysler LLC as part of a U.S. government-sponsored restructuring of the North American automotive industry. In October 2014, after Fiat S.p.A. obtained 100% interest of FCA US LLC, it completed a corporate

reorganization establishing FCA. After the completion of Ferrari N.V.'s initial public offering in October 2015, FCA's remaining interest in Ferrari was spun off to investors in January 2016.

25. PSA was a French multinational automotive company that began manufacturing and selling vehicles to consumers in 1896 and, like FCA, expanded and grew throughout the decades.

26. Stellantis also provides contracting, financing, leasing services, and rental services, and engages in after-market parts businesses.

27. Stellantis operates under various notable brands both inside and outside the US, including Abarth, Alfa Romeo, Chrysler, Citroën, DS Automobiles, Dodge, Fiat, Jeep, Maserati, Ram Trucks, Opel, Lancia, Vauxhall, Peugeot, Free2move, Share Now, Leasys, and Comau.

28. Elkann was, at all relevant times, the Executive Chairman of the Board of Stellantis. From December 2024 – following the departure of Tavares from Stellantis – until the appointment of Filosa as CEO in June 2025, Elkann also had approval over and was a signatory to Stellantis' SEC reporting, submitted a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's conference calls and other market-related events.

29. Ostermann was the CFO of Stellantis from October 10, 2024, until he departed the Company on September 29, 2025. During his time as CFO, Ostermann signed Stellantis' SEC reporting, submitted a SOX certification affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's conference calls and other market-related events.

30. Filosa was, at all relevant times, the Chief Operating Officer ("COO") of North American Brands of Stellantis. Filosa also served as the Company's Chief Quality Officer ("CQO") until his appointment to the roles of CEO and Executive Director of Stellantis on June 23, 2025, roles he maintained at all relevant times through the remainder of the Class Period. As CEO, Filosa communicated directly with shareholders and market analysts through the Company's conference calls and other market-related events.

31. Laranjo was, at all relevant times following his appointment on September 29, 2025, CFO of Stellantis, following Ostermann's departure from the Company. As CFO, Laranjo communicated directly with shareholders and market analysts through the Company's conference calls and other market-related events.

32. Elkann, Ostermann, Filosa, and Laranjo are sometimes referred to herein as the "Individual Defendants."

33. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Stellantis' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

34. Stellantis is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

35. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Stellantis under *respondeat superior* and agency principles.

## IV. FACTUAL ALLEGATIONS

### A. Stellantis Digs a Financial Hole Immediately Preceding the Class Period

36. Stellantis' stock price plummeted in the year leading up to the Class Period due to crucial mistakes under the watch of former CEO Tavares. At its peak in March 2024, Stellantis could boast a $93 billion market cap, with a peak stock price of over $29 per share. By the start of

the Class Period, however, Stellantis' market cap had plummeted to approximately $41 billion, with its stock trading at less than half of its March 2024 peak.

37. Tavares served as Stellantis' CEO beginning in January 2021, when Stellantis was formed from the merger of PSA with FCA described above. On March 1, 2022, Tavares introduced its "Dare Forward 2030" strategic plan, setting lofty goals of 100% EV sales mix in Europe and 50% in the U.S. by 2030, and carbon neutrality by 2038. Stellantis announced it would invest €50 billion to achieve these goals.

38. Despite early success, Stellantis soon began to struggle to meet the lofty goals set forth in the Dare Forward 2030 plan. The Company lost market share throughout 2024, as Tavares' practices of cost cutting (including by replacing metal parts with plastic) while raising prices resulted in strained relationships with dealerships and bloated inventories. By June 13, 2024, Tavares admitted to investors during a conference call that Stellantis had been "arrogant" in its approach to dealing with plant issues in later 2023, which contributed to higher inventories at the beginning of 2024, and acknowledged that the Company would have "to expand the time window during which you will have this transition" to EVs as promised under Dare Forward 2030.

39. On September 30, 2024, Stellantis shocked investors when it issued a press release announcing a revision in guidance, revising AOI for FY 2024 downward from double-digit to between 5.5% and 7%, and revising free cash flow from positive to between negative €5 billion to negative €10 billion. The Company cited remediation efforts in North America amid global industry dynamics as reasons for these revisions. Shortly thereafter, on October 10, 2024, Stellantis announced that: (a) Filosa would be appointed North America COO and Jeep brand CEO; (b) Ostermann would succeed Natalie Knight as CFO; and (c) Tavares planned to retire at the end of his term in early 2026.

40. On December 1, 2024, Stellantis shocked investors again by informing them that Elkann and the rest of the Board had accepted Tavares' resignation, which Stellantis' senior independent director attributed to "different views hav[ing] emerged which have resulted in the Board and the CEO." The Company's press release announcing this change stated that Stellantis

would seek to appoint a new CEO "within the first half of 2025," and that in the meantime, "a new Interim Executive Committee, chaired by John Elkann, [would] be established." As discussed in more depth at ¶¶42, 52,125, 144, 147, 169, 250, 254-256, 261, in this role, Elkann spoke to investors during analyst calls and was responsible for issuing Stellantis' filings with the SEC until Filosa was appointed in June 2025.

### B. Stellantis Makes Costly Pivots Away from EVs Without Disclosing the Impact of these Costs to Investors

41. After a devastating 2024, Defendants repeatedly assured investors during the Class Period that they were making the hard decisions necessary to turn the Company around, including by pivoting away from an all-electric future and refocusing on hybrids and staples like the gas-powered HEMI V8 and Jeep Wrangler. Defendants simultaneously brushed off concerns over the need to restructure excess capacity, ensuring investors that the Company would launch more products and sell more cars rather than having to restructure. In doing so, they ignored obvious indicators demonstrating the need to take billions of Euros in impairment charges, and instead improperly delayed these adjustments until February 2026.

42. For example, during Stellantis' February 26, 2025 earnings call for its FY 2024 results, Ostermann assured investors that one-time charges from H2 2024 were "***unusual***," and that they should not expect additional headcount reductions. Likewise, Elkann assured investors that Stellantis could simply "***sell[] more cars***" instead of needing to restructure or even think about shifting capacity.

43. These statements blunted any impact of the damning disclosure made in the Company's 2024 Form 20-F which acknowledged the deteriorating BEV market by stating its Dare Forward 2030 electrification targets had become "***increasingly challenging***" because of changes in market demand, regulation, policy and infrastructure.[2]

---

[2] The Company's 2024 Form 20-F was also accompanied by SOX certifications from Elkann and Ostermann.

44. Ultimately, at year-end 2024, the Company recorded a little over a billion euros' worth of platform impairments and product-plan cancellation charges, but this was in stark contrast to the €14.7 billion in impairments and related charges that Stellantis recorded for year-end 2025 for BEV platforms, even though Stellantis had taken the actions leading to these impairments long before the end of the Class Period in February 2026.

45. The departure and return of long-time Dodge executive Tim Kuniskis was emblematic of how Stellantis was rolling back its EV investments long before it disclosed any adjustments for the same. On May 17, 2024, Stellantis announced that Kuniskis was retiring after having worked for Dodge for 32 years. This announcement came only a few months after Kuniskis had exhibited a new electric Dodge Charger at a March 2024 Detroit Auto Show.

46. Kuniskis' retirement was short-lived, however, as he returned a week after Tavares' departure, on December 9, 2024. Soon after Kuniskis rejoined Stellantis, on December 18, 2024, the Company announced that it would delay its all-electric Ram pickup from 2025 until 2026. A January 16, 2025 interview with Kuniskis by *Newsweek* noted that "[h]is first public order of business was to flip flop the release dates of the electric and hybrid full-size Ram pickups."[3] In the interview, Kuniskis acknowledged that Stellantis was behind the competition in launching an EV truck, stating "we were going to be the third player in a game that's not living up to the expectations that everybody thought it was."[4]

47. *Bloomberg* also reported on March 31, 2025, in an article titled "Stellantis Shift to Hybrids Causes Production Delays in Europe," that Imparato, Stellantis' COO for Enlarged Europe, testified during a French senate hearing on government aid for businesses that "EVs didn't work, so we pushed full speed on hybrids."[5] The *Bloomberg* article also reported that Imparato stated that Stellantis risked EU penalties of about €1.7 billion a year because low demand for EVs was likely to

---

[3] *See* Ex. A at 2.

[4] *Id*. at 3.

[5] *See* Ex. B at 2.

cause the Company to miss emission targets and "[t]wo years of this would kill the company."[6] Also, according to the *Bloomberg* article, Imparato stated, "[t]here is no market for EVs right now."[7]

48. On April 15, 2025, Stellantis hosted its Annual Shareholders Meeting. During his opening remarks, Ostermann quashed any hopes of share buybacks in the near future, but declined to state whether the Company would maintain its dividend, stating:

> Given the early stage of our commercial recovery, we clearly don't expect to be doing any stock buybacks in the first half of 2025 and only will evaluate returning to buybacks as income and cash flow improve.

49. By early May 2025, interest was growing around Stellantis' search for a new CEO. For example, *Bloomberg* published an article on May 9, 2025 titled "Stellantis Nears CEO Decision With US Boss a Top Contender" reporting that Filosa was a top candidate and that he "ha[d] been part of Stellantis' senior executive team since the company formed in 2021.[8] He took over as COO for North American operations in October as part of a broader shake-up in the waning days of Tavares' tenure."[9]

50. On May 28, 2025, Stellantis issued a press release formally announcing Filosa's promotion from his role of COO for the Americas and CQO "to assume CEO powers on June 23."

51. According to the release, Stellantis' "Board selected Antonio Filosa to be CEO based on his proven track record of hands-on success during his more than 25 years in the automotive industry, the depth and span of his experience around the world, his unrivalled knowledge of the Company and his recognized leadership qualities."

52. Elkann was quoted in the release as touting Filosa's deep knowledge of Stellantis' business:

---

6 *Id.*

7 *Id.*

8 *See* Ex. C at 2

9 *Id.*

> Antonio's deep understanding of our Company, including its people who he views as our core strength, and of our industry equip him perfectly for the role of Chief Executive Officer in this next and crucial phase of Stellantis' development . . . I have worked closely with Antonio over the past six months during which time his responsibilities have increased, and his strong and effective leadership spanning both North and South America at a moment of unprecedented challenge have confirmed the excellent qualities he brings to the role. Together with the entire Board, I look forward to working with him.

53. A May 27, 2025 *Bloomberg* article titled "Stellantis Names Americas Boss Filosa CEO to Lead Turnaround" also noted that "Stellantis is also contending with excess capacity in Europe," and that Elkann, "who ha[d] been running Stellantis since Tavares' departure in December, has tried to patch relations with dealers and reassure governments on sustaining local production."[10] The article noted that this dynamic "risk[ed] making Filosa's job even harder as demand for new cars in Europe remains muted."[11] *Bloomberg* also reported that Filosa had "recently started visiting dealers and factories in the US to improve relations there."[12]

54. On May 29, 2025 Ostermann attended and spoke at the Bernstein Strategic Decisions Conference, and likewise praised Filosa as "being very hands on" and having a "very ground level understanding of manufacturing in the business":

> **Daniel Roeska Bernstein Research – Analyst**:
>
> And maybe I'll start with a piece of news that's especially exciting for you guys because you just announced your new CEO. What should investors know about Antonio?
>
> **Ostermann**:
>
> One is that Antonio has this proven track record of improving things and building things and getting at issues and being very hands on, and that has been really important in his whole career. I think from the time that he worked in Europe, starting in one of the paint shops in one of our plants, right, very ground level understanding of manufacturing in the business. His time running Latin America, where he built one of the most successful parts of our entire organization.

---

[10] *See* Ex. D at 2.

[11] *Id.*

[12] *Id.* at 3.

55. After Filosa took over as CEO in June 2025, Stellantis continued to conceal the massive costs of pivoting away from many of its BEV investments, and doubled down on incentives and discounts on other vehicles in order to pump up sales volumes. Filosa made it clear that the Company's focus would be moving away from BEVs, but failed to provide the market with the consequences of these actions.

56. For example, on June 5, 2025, Stellantis issued a press release announcing the return of the "HEMI" V-8 engine for the Ram 1500. Kuniskis was quoted in the release as stating "[e]veryone makes mistakes, but how you handle them defines you. Ram screwed up when we dropped the HEMI — we own it and we fixed it."

57. On or about July 2, 2025, Stellantis announced that Kuniskis was promoted from CEO of Ram to head of American brands and North America marketing and retail strategy, while retaining his position as CEO of Ram. As part of this release, Stellantis also announced the return of its performance division Street and Racing Technology ("SRT") under Kuniskis' leadership.

### C. Stellantis Announces Some Adjustments and Reissues H2 2025 Guidance, and Defendants Continually Affirm this Guidance

58. On July 16, 2025, Stellantis issued a press release announcing its decision to discontinue its hydrogen fuel cell technology development program. The Company stated that "[d]ue to limited availability of hydrogen refueling infrastructure, high capital requirements, and the need for stronger consumer purchasing incentives, the Company does not anticipate the adoption of hydrogen-powered light commercial vehicles before the end of the decade." As a result, Stellantis cancelled the launch of its new range of hydrogen-powered Pro One vehicles for 2025.

59. On July 21, 2025, Stellantis issued a press release "Publish[ing] Preliminary and Unaudited Key Figures for First Half 2025" and hosted a conference call that day to discuss the same. The release cited certain "factors [which] had a significant impact on results in the first half of 2025," including "[t]he early stage of actions being taken to improve performance and profitability, with new products expected to deliver larger benefits in the Second Half of 2025," and "[a]pproximately €3.3 billion of pre-tax net charges" excluded from AOI. The release specified that

the €3.3 billion charges were "primarily related to program cancellation costs and platform impairments, net impact of the recent legislation eliminating the CAFE penalty rate, and restructuring."

60. As discussed in more detail in ¶163, Ostermann told investors during the accompanying conference call that the charge was the result of "management taking some decisive and tough decisions on product programs." He failed to mention any other imminent charges, however, and assured investors about the Company's positioning in Europe, noting that Stellantis had "increased [its] BEV penetration in Europe in the first half to 13% and [its] BEVs [had] been very well received."

61. Ostermann also demonstrated how quickly Stellantis was able to incorporate its decisions into recording adjustments. Specifically, he told investors that "management [was] taking some decisive and tough decisions on product programs where we really couldn't see sufficient returns," "includ[ing] our hydrogen fuel cell EV efforts, as we announced to the market last week."

62. On July 29, 2025, Stellantis published a press release more fully reporting H1 2025 results and held a conference call that day regarding the same. In the release and accompanying conference call, Filosa continued to assure investors that he and Stellantis management would continue making the "tough decisions" and "decisive actions" necessary for Stellantis' turnaround. Ostermann seconded Filosa's statements, and the Company returned to issuing guidance for H2 2025.

63. During the July 29, 2025 conference call, Filosa and Ostermann assured investors that the €3.3 billion in adjustments was a sign that the Company was making the right decisions, but again failed to warn investors that more significant charges were on their way. Instead, Filosa vaguely referred to such tough "***decisions . . . continu[ing] in the second half of this year***." Filosa also answered an analyst question about taking down capacity by repeating Elkann's refrain from February 2025 that Stellantis' "new products" and higher "volume" would solve the problem. And when pressed for more information on potential additional charges, Ostermann told investors that

"***we could see other strategic shifts that could lead to onetime charges in the second half***," but omitted that billions in additional BEV-related assets were already impaired.

64. Soon thereafter, Stellantis announced additional indicators of impending impairments, belying Filosa's and Ostermann's statements during the July 29, 2025 conference call that additional adjustments were purely hypothetical. First, on August 26, 2025, *Reuters* reported in an article titled "Stellantis shelves Level 3 driver-assistance program as it downscales software ambitions, sources say" that, according to "three people familiar with the matter," Stellantis had "shelved its first Level 3 advanced driver-assistance program because of high costs, technological challenges and concerns about consumer appetite."[13] When *Reuters* asked "how much time and money was lost on the initiative, Stellantis declined to say, responding that the work done on AutoDrive will help support its future versions."[14] *Reuters* noted that "[t]he pressure to cut costs [was] pronounced at Stellantis as it emerge[d] from a turbulent year of dropping sales."[15]

65. Then, on September 8, 2025, Imparato announced during a roundtable at the Munich car show that Stellantis was no longer pursuing its Dare Forward 2030 targets for Europe. And on September 12, 2025, Stellantis announced that it was no longer pursuing its Ram 1500 electric pickup.

66. Around this same time, on September 11, 2025, Filosa appeared with Ostermann at the Kepler Cheuvreux Autumn Conference and implicitly affirmed Stellantis' guidance issued on July 29, 2025. As described in more detail below at ¶187, analysts interpreted Filosa's statements as confirming its H2 2025 guidance issued at the end of July 2025, sending Stellantis' stock price up approximately 9%.

---

13 *See* Ex. E at 1.

14 *Id.*

15 *Id.* at 2.

67. On September 29, 2025, Stellantis explicitly affirmed H2 2025 guidance in a press release. The same press release announced that Ostermann was stepping down as CFO, to be immediately replaced by Laranjo.

68. In early October 2025, Stellantis continued to provide positive information to the market while concealing the need for additional charges of its already impaired BEV-related assets.

69. For example, on October 10, 2025, Stellantis issued a press release reporting its Q3 2025 estimated consolidated shipments, which noted a 13% increase year-over-year in shipments, including a 35% increase year-over-year in North America. The release attributed the North American increase in part to "initial deliveries of HEMI® V8-powered Ram 1500." That same day, Stellantis' head of investor relations, Ed Ditmire, hosted a conference call with analysts, during which he reiterated Stellantis' message that they were continuing to "***review[] a number of key programs, product plans, etc.,***" and alluded to a "***a broader review of the strategic plan in the second half***," but failed to warn investors that additional charges were upcoming.

70. On October 14, 2025, Stellantis continued to conceal impending additional charges when it issued a press release announcing that the Company was committing to invest over $13 billion into the United States to grow its market share there. Notably, no upcoming BEV product launches were specifically highlighted by Stellantis in the release, demonstrating the Company's continuing shift away from the BEV market.

### D. The Truth is Partially Revealed, But Stellantis Continues to Conceal the Magnitude of the Imminent and Expansive Additional Impairments

71. On October 30, 2025, Stellantis published more fulsome results for its Q3 2025 shipments and net revenue and held a conference call that day discussing the same. Filosa and Laranjo strongly confirmed Stellantis' H2 2025 guidance, but Laranjo told investors that Stellantis' strategic review would "***likely lead to further charges in the second half***." As discussed in more detail at ¶¶205, 206, 210, 277, 278, Stellantis' stock price fell approximately 10% as a result of this partial disclosure, but Stellantis continued to conceal the full truth from investors by continuing to suggest that these might only be "potential" or "possibl[e]" additional charges, and by refusing to

quantify them. These false and misleading statements continued to assuage investors' concerns about any impending additional impairments.

72. On December 4, 2025, Filosa spoke at the Goldman Sachs Industrials & Autos Week on behalf of Stellantis, where he told investors that "***Through the end of November***," Stellantis was "***on track on our guidance***." Filosa also admitted that some of Stellantis' "assumption of the past strategy" regarding BEVs "resulted to be wrong," but again continued to conceal the magnitude of the impending charges.

73. A December 11, 2025 *Reuters* article titled "Inside Stellantis CEO's 'emergency room' rush to recapture market share" provided hindsight reporting of Filosa's failed approach. Citing "four sources familiar with the matter," *Reuters* reported that "Filosa [was] prioritising vehicle sales growth over profits including resorting to lower-margin fleet sales and investing in affordable models to recapture market share in North America and Europe."[16] The article also reported that Filosa had launched an "'emergency room' operation" to fix Tavares's mistakes with the goal to "deliver sales and revenues this year above low analyst expectations."[17]

74. According to an "industry source" cited by *Reuters*, "Filosa's tactics include[d] resorting to U.S. fleet sales - lower-margin sales to rental companies, corporations and government agencies that automakers have historically used to offload inventory and pad sales figures."[18] *Reuters* also reported that according to "three of the sources," "Filosa [was] ready to sacrifice short-term margins while investing in better products to prove Stellantis can still build popular cars."[19]

75. The *Reuters* article also noted that a "company spokesman" said that under Filosa, "'Stellantis is accelerating actions . . . to correct past strategic and operational decisions.'"[20]

---

[16] *See* Ex. F at 1.

[17] *Id.*

[18] *Id.* at 2.

[19] *Id.* at 3.

[20] *Id.* at 2.

### E. The Truth is Finally Revealed

76. The truth of Defendants' fraud was fully revealed on February 6, 2026. On that day, Stellantis announced €22.2 billion in charges alongside a "reset" of the Company's business and a shortfall, aside from the charges, against Stellantis' previously guided AOI benchmarks. Stellantis stated that the charges and reset were due in significant part to the need to shift organizational priorities, stakeholder relationships, supply chains, execution, and quality control due to "an initial overestimation of pace of adoption of electrification in the regions." Stellantis further pointed specifically to "substantially reduced volume and profitability expectations for BEV products."

77. The Company's February 6, 2026 press release and related conference call included statements that demonstrated that the billions of euros of impairment charges and write-downs announced should have occurred significantly earlier and no later than June 30, 2025. *See* §V.B.6. For example, the Company press release admitted the billions of Euros of charges taken reflected changes and decisions Stellantis "began implementing in 2025" and were part of a decisive process "we started in 2025."

78. Investors and analysts reacted immediately to Stellantis' revelation. The price of Stellantis' common stock declined dramatically. From a closing market price of $9.54 per share on February 5, 2026, Stellantis' stock price fell to $7.28 per share on February 6, 2026, a decline of about 23.69% in the span of just a single day.

## V. DEFENDANTS VIOLATED IFRS

### A. IFRS PROVISIONS

79. During the Class Period, Stellantis prepared, reported, and certified its consolidated financial statements under International Financial Reporting Standards ("IFRS"). Promulgated by the International Accounting Standards Board ("IASB"), IFRS is the accounting profession's principles, conventions, rules, and procedures that define accepted international accounting practices. Pronouncements issued by IASB's predecessor are designated "International Accounting Standards" ("IAS"), which were adopted by IASB and remain part of IFRS.

80. IAS 1, *Presentation of Financial Statements*, sets the "overall requirements for the presentation of financial statements, guidelines for their structure and minimum requirements for their content," (*see* IAS 1.1), and applies to all "general purpose financial statements" that are prepared and presented "in accordance with International Financial Reporting Standards (IFRSs)." IAS 1.2. "General purpose financial statements (referred to as 'financial statements') are those intended to meet the needs of users who are not in a position to require an entity to prepare reports tailored to their particular information needs." IAS 1.7. "The objective of financial statements is to provide information about the financial position, financial performance and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS 1.9.

81. A company's "[f]inancial statements shall present fairly the financial position, financial performance and cash flows of an entity. Fair presentation requires the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Conceptual Framework for Financial Reporting". IAS 1.15. "An entity whose financial statements comply with IFRSs shall make an explicit and unreserved statement of such compliance in the notes. An entity shall not describe financial statements as complying with IFRSs unless they comply with all the requirements of IFRSs." IAS 1.16.

82. As part of its business, Stellantis recorded as assets on its balance sheet billions of euros of intangible assets and property, plant, and equipment ("PP&E"). For example, as of June 30, 2025 Stellantis recorded at a consolidated level €20.5 billion of other intangible assets and €44.9 billion of PP&E. More specifically, Stellantis recorded on its balance sheet PP&E that for BEV-related vehicle platforms would have included tooling, plant machinery and equipment, and manufacturing facilities. The Company also recorded on its balance sheet intangible assets that would have included certain development expenditures for vehicle production and related

components, engines and production systems.[21] At December 31, 2024, "capitalized development expenditures" were €19.7 billion of the total €22.4 billion of other intangible assets.

83. During the Class Period, the Company's accounting treatment, evaluation and recoverability of its intangible assets and PP&E was governed by IAS 36, *Impairment of Assets*. IAS 36.1 states that "[t]he objective of this Standard is to prescribe the procedures that an entity applies to ensure that its assets are carried at no more than their recoverable amount. An asset is carried at more than its recoverable amount if its carrying amount ['book value'] exceeds the amount to be recovered through use or sale of the asset ['fair value']. If this is the case, the asset is described as impaired and the Standard requires the entity to recognize an impairment loss."

84. IAS 36.8 states that "[a]n asset is impaired when its carrying amount exceeds its recoverable amount." IAS 36.9 states that "[a]n entity shall assess at the end of each reporting period whether there is any indication that an asset may be impaired." IAS 36.12 to 36.14 "describe some indications that an impairment loss may have occurred. If any of those indications is present, an entity is required to make a formal estimate of recoverable amount."

85. In relevant part, IAS 36.12 states that "[i]n assessing whether there is any indication that an asset may be impaired, an entity shall consider, as a minimum, the following indications:

**External sources of information**

(a) there are observable indications that the asset's value has declined during the period significantly more than would be expected as a result of the passage of time or normal use.

(b) significant changes with an adverse effect on the entity have taken place during the period, or will take place in the near future, in the technological, market, economic or legal environment in which the entity operates or in the market to which an asset is dedicated.

---

[21] The Company's 2024 Form 20-F disclosed that these development expenditures were recognized as intangible assets if all of the following conditions within IAS 38 – *Intangible assets* were met: (a) development expenditures can be measured reliably; (b) technical feasibility of the product, projected volumes and pricing support the view that the development expenditure will generate future economic benefits; and (c) the intention to complete the intangible asset as well as the availability of adequate technical, financial and other resources for this purpose.

* * *

**Internal sources of information**

(e) evidence is available of obsolescence or physical damage of an asset.

(f) significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used. These changes include the asset becoming idle, plans to discontinue or restructure the operation to which an asset belongs, plans to dispose of an asset before the previously expected date, and reassessing the useful life of an asset as finite rather than indefinite.

(g) evidence is available from internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected."

86. IAS 36.13 further states that "[t]he list in paragraph 12 is not exhaustive," noting that "[a]n entity may identify other indications that an asset may be impaired and these would also require the entity to determine the asset's recoverable amount."

87. Expanding on the "internal" indicators above, IAS 36.14 states that "[e]vidence from internal reporting that indicates that an asset may be impaired includes the existence of:

> (a) cash flows for acquiring the asset, or subsequent cash needs for operating or maintaining it, that are significantly higher than those originally budgeted;
>
> (b) actual net cash flows or operating profit or loss flowing from the asset that are significantly worse than those budgeted;
>
> (c) a significant decline in budgeted net cash flows or operating profit, or a significant increase in budgeted loss, flowing from the asset; or
>
> (d) operating losses or net cash outflows for the asset, when current period amounts are aggregated with budgeted amounts for the future."

88. Under IAS 36, if ***any*** impairment indicator is present, then an entity is ***required*** to test for impairment by determining an asset's or cash generating unit's ("CGU") recoverable amount. IAS 36 defines recoverable amount as the higher of an asset's or CGU's "fair value" less costs of

disposal (the fair value method) and its "value in use" (the cash flow method). Based on Stellantis' disclosures made during the Class Period, the Company primarily determined recoverable amount through value in use or "a discounted cash flow methodology based on estimated pre-tax future cash flows attributable to the CGUs and a pre-tax discount rate."[22]

89. IAS 36.22 states that if it is not possible to estimate the recoverable amount of an individual asset, the entity should determine the recoverable amount "for the cash-generating unit [CGU] to which the asset belongs." IAS 36.6 defines a CGU as "the smallest identifiable group of assets that generates cash inflows that are largely independent of the cash inflows from other assets or groups of assets." According to the Company, the lowest level of asset groups that generate largely independent cash flows is the vehicle platform level, which is considered the CGU for impairment testing. Therefore, different vehicle platform levels would have been the CGUs for the purposes of evaluating indicators of impairment and impairment testing.[23]

90. In addition, Stellantis was required to comply with IAS 37 during the Class Period, which establishes guidance on when a provision (*e.g.*, a charge or liability for a current or expected future expense) is required to be recorded on a company's income statement. When the Company announced at the end of the Class Period its €22.2 billion of impairments and charges it included €5.8 billion in charges for projected cash payments over the next four years (*i.e.*, provisions) due to cancelled products as well as other ongoing BEV products whose volumes are now expected to be considerably below prior projections.

91. IAS 37.14 establishes that a "provision shall be recognized when:

---

[22] Stellantis' 2025 Form 20-F disclosed "For the years ended December 31, 2025, 2024 and 2023, the impairment tests performed compared the carrying amount of the assets included in the respective CGUs to their value-in-use. The value-in-use of the CGUs is determined using a discounted cash flow methodology based on estimated pre-tax future cash flows attributable to the CGUs and a pre-tax discount rate, which ranges from 9.5 percent to 19.0 percent, reflecting a current market assessment of the time value of money and the risks specific to the CGUs."

[23] The 2024 Form 20-F disclosed that STLA Large, STLA Frame, STLA Small, and STLA Medium were the four platforms comprising Stellantis' BEV-centric platform strategy.

(a) an entity has a present obligation (legal or constructive) as a result of a past event;

(b) it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation; and

(c) a reliable estimate can be made of the amount of the obligation."

92. Further, IAS 37.66-69 addresses how provisions must be established for onerous contracts. IAS 37 defines an onerous contract as "a contract in which the unavoidable costs of meeting the obligations under the contract exceed the economic benefits expected to be received under it."[24] For example, due to reduced expected BEV volumes and cancelled products, Stellantis had unavoidable obligations, including unavoidable payments to suppliers and termination liabilities that exceeded any economic benefits expected to be received from the contracts.

93. Importantly, IAS 37.69 states "***[b]efore a separate provision for an onerous contract is established, an entity recognizes any impairment loss*** that has occurred on assets used in fulfilling the contract (*see* IAS 36)."

**B. EVIDENCE OF IMPAIRED STELLANTIS ASSETS**

94. Due to the deteriorating BEV overall market, U.S. government regulations shifting away from electrification, the Company's plans to move more towards ICE and hybrid vehicle production, and Stellantis' own poor financial performance, Stellantis, Elkann, Filosa, and Ostermann had the information available that required recording in its June 30, 2025 financial statements at least €15 billion of impairments and related charges for its impaired vehicle platforms, product-plan cancellations and related supplier claims and EV-related supply chain charges.[25] As

---

[24] IAS 37.68 states "[t]he unavoidable costs under a contract reflect the least net cost of exiting from the contract, which is the lower of the cost of fulfilling it and any compensation or penalties arising from failure to fulfil it."

[25] The approximate €15 billion overstatement of assets and earnings consists of the €14.7 billion of BEV vehicle platform impairments and related charges and a €500 million write-off of the Company's battery joint venture investment with Automotive Cells Company SE ("ACC") that were

discussed herein, Stellantis ultimately announced €22.2 billion of impairments and related charges as part of the Company's business reset announcement made on February 6, 2026 and recorded the charges in the Company's December 31, 2025 financial results.

95. Despite Stellantis' attempt to assure investors the impairments and charges were recent developments related to "resetting" expectations, "overestimation" of the pace of BEV adoption, and "shifting regulations," these excuses ignored what Defendants already were seeing in 2024 and H1 2025 with significant deterioration in the Company's North America and European financial performance, a declining BEV market that included shifting customer demand away from BEVs, and a U.S. administration that was hostile to electrification.

### 1. Impairment Indicator: Stellantis' Poor Financial Performance in North America and Europe in FY 2024 and H1 2025

96. Stellantis was already seeing a substantial deterioration in North America performance in H1 2024 with double-digit declines in shipments (-18%), revenue (-16.5%) and AOI (-45.6%). Then, on September 30, 2024, the Company issued a major profit warning for North America and stated it was "significantly enlarge[ing] remediation actions on North American performance issues." The Company also accelerated its U.S. inventory reduction and expected more than 200,000 fewer North American shipments in the second half ("H2") of 2024 versus the prior year.

97. By the end of 2024, Stellantis' North America performance had continued to deteriorate. For example, North America AOI dropped ***80%*** at year-end 2024 compared to the prior year, and AOI margins had dropped from 15.4% in FY 2023 to 4.2%, in FY 2024, a stark 11.2% drop. And, the Company's 2024 Form 20-F disclosed that its U.S. Low Emissions Vehicle production mix target of 21% was significantly missed at only 8.7%, demonstrating disappointing North American EV production.

---

both announced at the end of the Class Period, but for all the reasons stated herein should have been recorded no later than June 30, 2025.

98. In Europe, the Company was also seeing declining performance as its Europe BEV market share (EU29) fell to 12.1% at year-end 2024 from 14.7% at February 2024, a 260 basis point decrease or 18% decline. Notably, the Company disclosed in January 2025 that the European BEV market was experiencing a "***sharp slowdown in demand for electric vehicles***."

99. Further, the Company's 2024 Form 20-F disclosed that the EU BEV market share was 12.0% at the end of 2024 versus a 14.2% minimum performance threshold target for market share. In addition, total 2024 BEV sales and LEV sales were down 10% and 20% respectively from 2023.

100. Additionally, Stellantis made a damning disclosure in its 2024 Form 20-F that acknowledged the deteriorating BEV market, stating that its Dare Forward 2030 electrification targets had become "***increasingly challenging***" due to changes in market demand, regulation, policy, and infrastructure. The Company's disclosure of a deteriorating and challenging electrification market was made ***a year earlier*** than when Defendants ultimately announced €22.2 billion in impairments and related charges due substantially to the same "significantly reduced volume and profitability expectations" for BEV products that were present at the end of 2024.

101. Ultimately, at year-end 2024, the Company recorded a little over a billion euros' worth of platform impairments, yet ***almost none*** of the platform impairments disclosed were related to North America, and ***less than 20%*** of the total impairments related to Enlarged Europe. In contrast, of the €14.7 billion in platform impairments and related charges announced at the end of the Class Period for BEV vehicle platforms, ***over 98%*** were recorded in the North America and Enlarged Europe segments.

102. Stellantis continued to see negative growth in its largest markets of North America and Enlarged Europe in H1 2025. For example, the Company's AOI of only €540 million for H1 2025 decreased an incredible ***94%*** or ***almost €8 billion*** as compared to H1 2024 AOI of €8.5 billion. Of this almost ***€8 billion*** AOI decrease, ***€5.3 billion*** (***67%***) pertained to North America and ***€2.1 billion*** (***26%***) pertained to Enlarged Europe.

103. In addition, North America performance was particularly troubling as the region went from €4.4 billion of AOI in H1 2024 to a ***€951 million loss*** in H1 2025. In addition, the North America AOI margin dropped from 11.4% in H1 2024 to ***-3.4%*** in H1 2025.

104. Despite these disastrous results in North America AOI performance, Stellantis recorded ***zero*** BEV platform impairments in North America in H1 2025, but instead improperly waited to record a massive €6 billion BEV platform impairment charge at the end of 2025, of which ***95%*** or ***€5.7 billion*** was related to North America.

105. Notably, an internal impairment indicator referenced in IAS 36.12 is evidence that "is available from internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected."

106. Ironically, North America's performance actually improved in H2 2025 as its shipments increased over 27% and its net revenues increased over 16% compared to H1 2025. Further, the February 6, 2026 reset announcement highlighted that Stellantis' U.S. market share was 7.9% for H2 2025, which was 60 basis over H1 2025. Consequently, Stellantis, Elkann, Filosa, and Ostermann had sufficient evidence that demonstrated Stellantis' North America platform assets were impaired by billions of euros as of June 30, 2025, but chose to ignore or conceal the impairment indicators and improperly delay the impairment until the end of the Class Period.

**2. Impairment Indicator: U.S. Government Shifts Policies Away From Electrification Growth**

107. In H1 2025, Stellantis was aware of a significant shift in the priorities of a U.S. government administration that would not be supporting an expanded electrification market.

108. First, Stellantis knew on the Inauguration Day for President Trump (January 20, 2025), that the U.S. government rescinded its 2030 EV adoption targets and announced its intent to significantly reduce support for electrification by directly stating that U.S. policy would be "to eliminate the 'electric vehicle mandate.'" Similarly, in March 2025, the U.S. Environmental Protection Agency ("EPA") formally announced it would reconsider multiple rules and regulations that had previously encouraged increasing electrification.

109. Then, just four days after the end of Stellantis' Q2 2025 and weeks prior to the Company's announcement of H1 2025 earnings, the One Big Beautiful Bill Act ("OBBBA") was signed into law. Importantly, the OBBBA reduced the Corporate Average Fuel Economy ("CAFE") civil penalty rate to $0 beginning with model year 2022. This change was a slap in the face by the U.S. government to the BEV market because it reduced all economic consequences of not selling enough fuel-efficient vehicles by eliminating all financial penalties if an automaker failed any CAFE requirements. In addition, the OBBBA also accelerated termination of three important clean-vehicle credits[26] as vehicles acquired after September 30, 2025 became ineligible.

110. As a result, Stellantis was aware that the U.S. government would not be supporting an increasing electrification push, making it significantly more difficult to attain the highly aggressive BEV penetration targets that the Company admitted were "challenging" even before significant new U.S. government regulations were passed in 2025. Notably, one of the impairment indicators disclosed in IAS 36.12 is "***significant changes with an adverse effect on the entity have taken place*** during the period, or will take place in the near future, in the ***technological, market, economic or legal environment in which the entity operates*** or in the market to which an asset is dedicated."

### 3. Impairment Indicator: Management Decisions and Comments Demonstrate Their Knowledge the EV Market was Deteriorating

111. Importantly, the Company made certain management decisions and comments towards the end of 2024 and first half of 2025 that indicated it recognized customer demand for EVs was shrinking and its aggressive targets and projections for BEV sales and market share were in serious jeopardy.

112. For example, in December 2024 Stellantis delayed the Ram 1500 BEV, the Company's first pure BEV pickup truck, to 2026 and moved the range-extended Ramcharger ahead of it. The Company had originally planned to launch the RAM 1500 BEV in H1 2025, but moved

---

[26] The three clean-vehicle credits eliminated were the following: §30D New Clean Vehicle Credit; §25E Previously-Owned Clean Vehicle Credit; and §45W Qualified Commercial Clean Vehicle Credit.

production back due to "overwhelming consumer interest" in the Ramcharger and "***slowing industry demand for half-ton BEV pickups***." Ultimately, the Company discontinued development of the RAM 1500 BEV and completely scrapped the BEV pickup truck in September 2025.

113. Further, by March 2025 Maserati had officially cancelled the planned all-electric MC20 Folgore, with external commentary that buyers were "very keen on driving powerful ICE engines" and "not ready to switch to BEVs for the foreseeable future."

114. Similarly, *Bloomberg* reported on March 31, 2025, that Imparato, Stellantis' COO for Enlarged Europe, testified before a French senate hearing on government aid for businesses that "***EVs didn't work, so we pushed full speed on hybrids***." The *Bloomberg* article also reported that Imparato stated Stellantis risked EU penalties of about €1.7 billion a year because low demand for EVs was likely to cause it to miss emission targets and "[t]wo years of this would kill the company." Also, according to the *Bloomberg* article, Imparato stated, "***[t]here is no market for EVs right now***."[27]

115. Moreover, in June 2025, in response to ***customer feedback***, Stellantis announced the return of the 5.7-liter HEMI V-8 to the RAM 1500, with trucks arriving in H2 2025. As noted in ¶¶65 and 112 above, it would only be a few months later that the Company would announce the formal cancellation of the previously planned RAM 1500 BEV pickup truck.

116. Finally, on the H1 2025 conference call, Filosa explicitly diagnosed the North American deterioration as partly resulting from poor prior product and powertrain decisions. More specifically, he identified discontinued successful ICE nameplates and the removal of the HEMI V8 as decisions that cost Stellantis both volume and margin.

117. All of these management decisions and related comments signaled the Company's awareness of a shifting change in customer preferences and the need to move away from their prior all-in BEV thesis, a thesis upon which the Company had recorded billions of euros of BEV assets that were in fact impaired due to all the indicators present in H1 2025.

---

[27] *See* Ex. B.

118. Management even doubled down on the already known deteriorating overall BEV market by announcing in October 2025 a record $13 billion U.S. investment that emphasized ICE and other powertrains outside of the BEV platforms. Included in the $13 billion investment were a new midsize truck, ICE large SUV, a next-generation Dodge Durango, and a new four-cylinder ICE engine. Notably absent from the $13 billion investment announcement was any significant new investments in anticipated BEV product launches.

119. Critically, an internal impairment indicator identified under IAS 36.12 is "***significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used***." The changes referenced in IAS 36.12 include "the asset becoming idle," "plans to discontinue or restructure the operation to which an asset belongs," and "plans to dispose of an asset before the previously expected date." All of these changes were present based on management shifting away from their original all-in BEV thesis, yet Stellantis would wait until the end of the Class Period before recording €22.2 billion in impairments and related charges.

**4. Cash Payments of €5.8 billion due to Product Plan Realignments for BEVs**

120. As part of the €22.2 billion in charges disclosed at the end of the Class Period, Stellantis included €5.8 billion in charges for projected cash payments over the next four years, primarily related to contractual obligations to suppliers due to its product plan realignments for BEVs. As discussed above, IAS 37 required Stellantis to record provisions for these charges to its suppliers at the time when its contracts were impaired or deemed "onerous."[28] *See* ¶¶90-93 .

121. Based on all the evidence discussed above that Stellantis was aware of during 2024 and H1 2025 that evidenced significant indicators of impairment requiring material write-downs of

---

[28] A provision which results in a corresponding charge (or expense) to the income statement when recorded are recognized as liabilities because they are present obligations and it is probable that an outflow of resources embodying economic benefits (*e.g.* cash payment) will be required to settle the obligations. IAS 37.13(a).

their overstated BEV-related vehicle platforms, Stellantis needed to record the €5.8 billion provision of expected cash payments for supplier claims by no later than June 30, 2025.

122. For example, when Stellantis disclosed the €5.8 billion provision for projected cash payments to suppliers, they claimed that a major reason for the charge was due to "ongoing BEV products whose volumes are ***now*** expected to be considerably below prior projections."

123. However, Stellantis, Elkann, Filosa, and Ostermann had knowledge during 2024 and the first half of 2025 that BEV volumes were already materially down, including a 260 basis point drop (or 18%) by year-end 2024 in Stellantis' Europe BEV market share (EU29). In addition, worldwide 2024 BEV sales and LEV sales were down 10% and 20% respectively from 2023. The poor performance in H1 2025 continued with North America AOI dropping 122% from €4.4 billion profit in H1 2024 to a ***€951 million loss*** in H1 2025.

124. Further, as discussed above in ¶¶107-110, Stellantis knew future BEV volumes would be severely impacted by new U.S. government regulations, including the OBBBA pronouncements that would significantly disincentive future North American BEV sales.

125. Ostermann and Elkann were also aware that BEV volumes were significantly below original projections because they admitted in the 2024 Form 20-F that its Dare Forward 2030 targets of 50% BEV sales mix for U.S. and 100% for Enlarged Europe by 2030 were "challenging," and Ostermann disclosed in May 2025 that BEV sales mix in the U.S. was only 7% to 8% of the market. In addition, Filosa publically acknowledged in December 2025 that BEV assumptions underlying Stellantis' prior strategy had proved wrong, highlighting only 6% U.S. BEV sales mix at the time.

126. As a result of all the adverse indicators Stellantis had knowledge of, the Company was keenly aware by H1 2025 that expected BEV volumes would have been "considerably below [their] prior projections." As a result, the Company was required under IFRS standards to assess all their contracts with suppliers and if the contract was onerous (*e.g.*, impaired) because the unavoidable costs under the contract exceeded the economic benefits, a provision was required. IAS 37.68.

127. As an example, assume Stellantis had committed to a supplier to produce 500,000 units of a BEV product originally, but due to the downturn in the BEV market which Stellantis, Elkann, Filosa, and Ostermann had knowledge of during 2024 and H1 2025, the new expected production was reduced to 150,000 units. In this scenario, the Company would need to record a provision for the unavoidable costs due to the supplier under the contract that exceeded the economic benefits based on the lower volume production. Importantly, Stellantis admitted when recording the €5.8 billion provision for projected cash payments that it was due to BEV volumes being ***considerably below prior projections***.

128. Yet, Stellantis improperly waited until the end of 2025 to record billions of euros in provisions when Stellantis, Elkann, Filosa, and Ostermann had sufficient information no later than June 30, 2025 to know BEV-related supplier contracts were onerous and impaired, requiring the €5.8 billion of provisions to be recorded under IFRS standards.

**5. EV Supply Chain Impairments**

129. At the end of 2025, Stellantis also recorded a charge of approximately €2.1 billion related to actions taken to rationalize its EV battery manufacturing capacity. Included in the €2.1 billion charge was a €500 million loss related to a full impairment of its ACC battery joint venture investment. For reasons discussed below, Stellantis, Elkann, Filosa, and Ostermann were already aware of impairment indicators identified in IAS 28 (*see* ¶133) that required an impairment test and related write-down of its ACC investment by no later than June 30, 2025.

130. First, Stellantis was aware of many negative developments involving ACC in 2024 and the first half of 2025 that were major warning signs of impairment. In June 2024, ACC paused construction plans for its Kaiserslautern, Germany and Termoli, Italy battery gigafactories.[29] Notably, at the time then-CEO Tavares said Stellantis would adapt EV investment plans to the pace of EV sales growth.

[29] *See* Ex. G.

131. Then, the Company's 2024 Form 20-F disclosed that Stellantis' share of equity-method investee results deteriorated substantially in 2024 to a €33 million loss compared to a €491 million profit in 2023 (107% decrease), ***largely because of losses incurred by ACC***.[30] Despite this disclosure of losses in the ACC investment, ***zero*** impairment was taken until a full write-down occurred a year later at the end of 2025.

132. Further, in February 2025, Stellantis announced that it would install production of dual-clutch transmissions for hybrid vehicles at Termoli, the same Stellantis site that had originally planned for an ACC battery gigafactory. Then, on July 17, 2025 members of European parliament questioned the European Commission about the continuing suspension of the Termoli gigafactory, noting that ACC had halted the project because of slowing EV demand. Despite all these indicators that a full impairment of the ACC investment was necessary, Stellantis waited another six months before recording the full impairment in violation of IFRS standards.

133. In violation of IFRS standards, Stellantis, Elkann, Filosa, and Ostermann ignored all the negative developments with the ACC investment that demonstrated a full write-off was required no later than June 30, 2025. Critically, IAS 28.41C states that objective evidence of impairment includes "information about ***significant changes with an adverse effect that have taken place in the technological, market, economic or legal environment***" in which the joint venture operates. In addition, another impairment indicator under IAS 28 is "***significant financial difficulty of the associate or joint venture***". IAS 28.41A(a). Stellantis' 2024 Form 20-F disclosed that the Company's share of equity method investee results deteriorated substantially, ***largely because of losses incurred by ACC***. Despite, this direct evidence of impairment, Stellantis, Elkann, Filosa, and Ostermann ignored IFRS requirements and improperly waited until the end of the Class Period before writing down their ACC investment.

---

[30] *See* 2024 Form 20-F, pg. 48: "The decrease in the Share of the profit/(loss) of equity method investees in 2024 compared to 2023 is ***largely due to losses incurred by our joint venture Automotive Cell Company SE ('ACC')*** and lower profit from Tofas and joint ventures with SCF."

134. Notably, when the €500 million full impairment of the ACC investment was taken at the end of 2025, the Company explained it was due to the revised view of the pace of the energy transition in Enlarged Europe.[31] However, as noted above, Stellantis, Elkann, Filosa, and Ostermann were aware of the revised view of the overall energy transition and specifically that ACC had halted all construction on two of its largest gigafactories in 2024, its equity investment with ACC was generating significant losses by year-end 2024 and the Termoli gigafactory had pivoted to hybrid-transmission production by February 2025.

### 6. The February 2026 Company and Management Statements Support Earlier Impairment

135. When Stellantis announced the massive impairments and related charges on February 6, 2026, the Company's press release and related conference call included statements which demonstrated that the billions of euros in impairments and write-downs announced should have occurred significantly earlier and by no later than June 30, 2025. For example, the Company press release and conference call admitted the billions of euros of charges taken reflected changes and decisions Stellantis "***began implementing in 2025***" and were part of a decisive process "***we started in 2025***," including strategic actions taken in ***"January 2025"*** to correct prior management decisions.

136. As discussed above, by June 30, 2025, Stellantis' management had already made multiple decisions that moved the Company away from prior management's all-in EV thesis and more toward multi-energy platforms, which included moving the Ramcharger ahead of the Ram 1500 BEV and pushing ahead "full speed on hybrids" in Europe.

137. In addition, the Company press release blamed the charges on "***over-estimating the pace of the energy transition***." However, as discussed herein, Stellantis, Elkann, Filosa, and Ostermann were aware of significant red flags by the end of 2024 and H1 2025 including that Stellantis' Dare Forward 2030 targets were "challenging," that new U.S. government laws and

---

[31] The Company's 2025 Form 20-F disclosed, "The full impairment of ACC is due to the revised view of the pace of energy transition in Enlarged Europe."

regulations were adversely impacting the BEV market, that Stellantis' North America and Enlarged Europe financial performance and market share was down significantly, and that its ACC battery joint venture investment had postponed construction on two gigafactories completely.

138. Further, Filosa, on the February 6, 2026 conference call, blamed the charges on "past decisions" and "previous operational issues" made by prior management. However, well before these comments, on the H1 2025 conference call, Filosa had already criticized prior management for discontinuing certain powertrains that were ICE vehicles and reinstated the 5.7-liter HEMI V-8 to the RAM 1500. On the same conference call, Filosa stated the Company was "correcting some initial, all in the [BEV] powertrain division into multi energy offers . . . to be closer to the real customer demand." Finally, on the October 30, 2025 conference call, Filosa stated that Stellantis started taking actions "***in January*** to correct past strategic and operational decisions" of prior management.

139. As a result, the pivot away from the BEV market due to changing customer demands was already well in existence at the time Filosa became CEO in June 2025, necessitating a need to test all the BEV-related vehicle platforms and programs for impairment and record €15 billion of impairments and related charges no later than June 30, 2025.

140. In addition, Stellantis, in discussing €14.7 billion of impairments and product plan cancellations in the February 6, 2026 press release and related conference call, connected the charges to "substantially reduced volume and profitability expectations for BEV products" and BEV volumes that were expected to be "considerably below prior projections."

141. However, as discussed herein, Stellantis' North America and Enlarged Europe BEV volumes were already in a downslide as early as 2024 and continued to see poor financial results in H1 2025. *See* ¶¶96-106.

142. Importantly, since management was aware of their decreasing market share, adverse U.S. government regulations on EVs and a lack of future demand for EVs, these factors that would be key considerations in forecasting future cash flows in an impairment test, had to be contemplated in any impairment tests Stellantis conducted prior to the massive charges recorded at year-end 2025.

In fact, Stellantis highlighted at year-end 2025 that H2 2025 shipments and revenues were actually improving, demonstrating the impairment charges recorded were strictly due to management changing assumptions downward for future BEV volumes and profitability, which they already knew were significantly declining in 2024 and H1 2025.

## VI. DEFENDANTS' MATERIALLY MISLEADING STATEMENTS AND OMISSIONS[32]

143. Throughout the Class Period, Defendants assured investors they were making the hard decisions necessary to turn the Company around after a disastrous FY 2024. But despite the many changes that Defendants made, including slowing and canceling investments in BEVs, Defendants delayed recognizing significant impending charges when appropriate. All the while, Defendants assured investors that they could fix their problems by selling more cars, that they would not need to restructure for excess capacity, and touted their pivot to hybrid and ICE vehicles rather than addressing the immediate consequences of walking back their BEV investments.

### A. February 26, 2025 Press Release and Earnings Call

144. The Class Period begins on February 26, 2025. On that date, Stellantis filed with the SEC a Form 6-K covering the Company's full year results for FY 2024. The Company also filed on the same day its 2024 Form 20-F, which was accompanied by SOX certifications from Elkann and Ostermann.

145. In the accompanying press release, Stellantis provided its Fiscal 2025 guidance, including "Net Revenue Growth: Positive . . . Adjusted operating income margin: Mid-Single Digits . . . Industrial free cash flows: Positive."

146. The release also quoted Elkann as assuring investors that despite "results falling short of our potential" in 2024, "we achieved important strategic milestones. Notably, we began the

---

[32] Plaintiff asserts that the statements set forth below in this section in ***bold italics*** were materially false and/or misleading for the reasons set forth therein. Non-bolded statements are included for context. Additionally, for the Court's convenience, attached hereto is Appendix A, a summary chart of Defendants' misleading statements.

rollout of new multi-energy platforms and products, which continues in 2025, started production of EV batteries through our JVs, and launched the Leapmotor International partnership."

147. During the question-and-answer portion of the conference call the same day, Elkann dodged an analyst's question about what Stellantis would do with its excess capacity, assuring investors that Stellantis could solve this issue by "***selling more cars***":

> **Philippe Houchois (Jefferies – Analyst)**:
>
> And I'm trying to think as you rebuild share to what extent – how do you balance the cost of rebuilding share, which I appreciate this product, but is also positioning and therefore, pricing? And how much do you take in account the cost of reducing the excess capacity that was inherited in some extent in Europe and created in the US because of the loss of market share because there's to be a cost, if it's not immediately two or three years down the road to resize the capacity.
>
> **Elkann**:
>
> Philippe, that's a really pertinent question. And what we really want to address in '25 is our ability of really gaining market share, which is a function of products. We have between '24 and '25, 30 new products that we're launching, and it's a function of being more focused on that part, which is why we're being more we're empowering more the regions. We're being closer to the customers, and we are investing more in marketing. That's really today the focus.
>
> As we sell more, we use more of our plants. And so the way you should think about this is really not that selling more is going to cost us more in terms of pricing because, as Doug mentioned, we have aligned ourselves in terms of pricing. It's not really going to cost us more because we have invested in the products so it's really a question of making sure that our great products are going to reach the customers. And that's what we're focused on.
>
> **Philippe Houchois (Jefferies – Analyst)**:
>
> But at some point, you will have to address the capacity? Or do you think you can roll back into using that capacity on your own or maybe through using working for Leapmotor or try to think for how do we resolve that issue of that excess capacity?
>
> **Elkann**:
>
> ***Well, we start selling more cars. That's a good starting point***.

148. The statements in ¶147 above were materially false and/or misleading when made because Elkann assured investors that Stellantis' could simply "***sell[] more cars***" to address market

share and excess capacity, rather than needing to restructure in the U.S. and Europe, while omitting that:

(a) Stellantis' executive management had begun a rigorous strategic review since the departure of Tavares in late 2024 to early 2025, and by the time of this statement, had made decisions and were aware of information that was likely to lead to the need to restructure to account for excess capacity. Specifically,

(i) Stellantis' performance in North America was marred by an 80% drop in AOI at year-end 2024 compared to the prior year, and that its U.S. Low Emissions Vehicle production mix target of 21% was significantly missed at only 8.7%;

(ii) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(iii) the Trump administration's January 20, 2025 "Unleashing American Energy" Executive Order undid support for electric vehicle manufacturing jobs and other investments in clean car and truck technologies; and

(iv) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market.

149. Ostermann also assured investors that Stellantis did not anticipate further restructuring or one-time charges when asked by an analyst about adjustments Stellantis had taken in H2 2024, labelling these adjustments as "***unusual***," and noting that workforce reductions were "***not something [he] would expect to recur going forward***":

**Tim Rokossa (Deutsche Bank – Analyst)**:

> Yeah, thank you very much, Tim from Deutsche Bank. I have two questions, please, as well. The first one, Doug, probably to you on adjustments. It's a pretty big number again that we've seen in H2. Can we get some details on the specifically EUR1.2 billion impairment that you had Maserati and then also when we think about this, obviously, adjustments purpose to the capital market that is to give us a better feeling for the underlying profitability.
>
> But if those adjustments continue to be as big as they were now for a while, for a very long time, it kind of gets a bit absorbed because the underlying



4939-1041-9403.v1

profitability and the actual profitability and the cash and the earnings to be distributed. How should we think about that number going forward?

* * *

**Ostermann**:

Okay. Maybe I can start out. So you'd asked about the unusuals and you're certainly right, Tim. I mean this year, ***we had a fairly high level of onetime unusual items***. And maybe I can just walk through those and give you some color.

One, we had EUR1.6 billion of restructuring charges related to workforce reductions, primarily in Europe and North America. A lot of those decisions, frankly, were made last year and are playing out from a cash perspective as we move forward. Much of the cash related to that, we had a fairly large cash outflow related to that restructuring in the second half of 2024, ***but I don't see these large workforce reductions continuing going forward***.

We will, of course, continue to be frugal and efficient, but ***I think the size of the reductions will come down***. When we look at the second large adjustment there, we had EUR800 million related to the expansion of the Takata airbag recall campaign. I believe this is the last piece of that, and so that EUR800 million should finish off.

So again, ***not something I would expect to recur going forward***.

150. The statements in ¶149 above were materially false and/or misleading when made because when Ostermann assured investors that the 2024 adjustments were "***unusual***," and that "***large workforce reductions***" would not "***continu[e] going forward***," he omitted or failed to disclose that:

(a) Stellantis' executive management had begun a rigorous strategic review since the departure of Tavares in late 2024 to early 2025, and by the time of this statement, had made decisions and were aware of information that was likely to lead to the need to make additional workforce reductions. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;



4939-1041-9403.v1

(ii) the Trump administration's January 20, 2025 "Unleashing American Energy" Executive Order undid support for electric vehicle manufacturing jobs and other investments in clean car and truck technologies;

(iii) Stellantis' U.S. Low Emissions Vehicle production mix target of 21% was significantly missed at only 8.7%; and

(iv) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market, all of which indicated Stellantis' pivot away from its BEV investments and corresponding workforce need.

151. Financial analysts following Stellantis remained cautious about Stellantis' turnaround, but Elkann's and Ostermann's assurances gave them reason to be optimistic. For example, a BNP Paribas report issued on February 26, 2025, noted that "[a]rguably FY24 was always going to be 'a bad news day,'" and stated that "[m]anagement appear confident that signs of improvement are emerging however, and interestingly believe that [free cash flow] will be positive in 2025." Likewise, Evercore ISI noted in a report published on February 26, 2026 that "this is 'early stage' of commercial recovery and that company 'will evaluate share buybacks in H2 '25' based on this recovery."

152. Over the next few days, Stellantis executives continued to meet with analysts to assure them that the Company was moving in the right direction. For example, on February 28, 2025, UBS published a report titled "Feedback from CFO roadshow post results" citing a meeting with Ostermann and stating "[t]he CFO gave more colour on the impact from the new generation of products, which will likely result in a strong base effect y/y in H2/25" and that as a result, "[w]e nonetheless are confident about a H2/25 AOI margin run-rate well above 5%, which should also provide the basis for a better 2026." Similarly, RBC published a report on March 6, 2025 titled "Takeaways from Management and Investor Meetings," citing meetings with Edward Ditmire ("Ditmire"), Stellantis' then-head of investor relations. They noted that "[t]akeaways include[d] . . . 2025 to benefit from launch efforts . . . [i]n 2024, Europe suffered from launch delays which should

see some relief in H1/25 . . . [a]s such, while there should be an improvement in H1/25 vs H2/24 in the US, the real benefit should come in H2/25."

**B. April 30, 2025 Press Release and Conference Call**

153. On April 30, 2025, Stellantis issued a press release reporting its Q1 2025 Net Revenues and Shipments, noting in pertinent part: (a) net revenues of €35.8 billion, down 14% compared to Q1 2024 primarily due to lower shipment volumes, as well as unfavorable mix and pricing; (b) consolidated shipments down 9%, reflecting lower North American production, a consequence of extended holiday downtime in January, product transition impacts and lower industry LCV volumes in Enlarged Europe; (c) commercial recovery actions that included the launch of 3 all-new products and several updated nameplates in Q1 2025, contributing to increased EU30 market share compared to Q4 2024, and improvement in U.S. retail order volumes; and (d) that Stellantis was "suspending its 2025 financial guidance due to tariff-related uncertainties."

154. Ostermann was quoted in the release, highlighting that despite "Q1 2025 top-line results [being] below prior year levels" the Company's "other KPIs reflect early, initial progress on our commercial recovery." Continuing, Ostermann clarified "[n]orth America is at a very early stage, with improvement in retail order intake, while we are seeing sequential improvement in EU30 market share."

155. The release further informed investors that Stellantis was temporarily suspending its full-year guidance in light of "evolving tariff policies, as well as the difficulty predicting possible impacts on market volumes and the competitive landscape."

156. Analysts reacted to Stellantis' suspension of guidance as reasonable given tariff uncertainties, and took comfort in the Company's messaging for new product launches. For example, Deutsche Bank noted in a report published on April 30, 2025 titled "In-line start, but guidance removed on persisting uncertainties" that Stellantis removing guidance was not a "significant surprise" because "GM removed its outlook yesterday for the same reasons." RBC also noted in an April 30, 2025 report titled "Challenging Times" that "[t]his creates a tough y/y comp for H1/25, but H2/25 should see easy y/y pricing comps, especially with the new nameplates."

### C. May 29, 2025 Bernstein Strategic Decisions Conference

157. On May 29, 2025, the day after Stellantis announced that Filosa would take over as CEO, Ostermann attended the Bernstein Strategic Decisions Conference, where he told investors that the Company's "multi-energy platforms" were "***an effective strategy***," for producing ICE, BEVs, and hybrids, and that "***EU [was] ramping up BEV pretty substantially***" while referring to "***the adjustments that we've made in the last six months with John Elkann's support***":

**Daniel Roeska (Bernstein Research – Analyst)**:

> If we take a step back and think about a little bit more the next couple of years, there was a big strategic reset over the past couple of years when Carlos came in. There was record profitability also due to several market factors, but there was also the creation of Stellantis. We forget that sometimes. It seems not that long ago actually, if you look at it. What of the initial premise of that marriage between PSA and FCA is still valid going forward?

**Ostermann**:

> Well, I think a lot of it is valid, and you're right, it's not that long ago. I remember Carlos used to say, we're still a baby, we're 4 years old. We're still a baby, there's still lots to do, right? And I think there's some really great things that Carlos developed within the culture in terms of like cost focus, right. And that cost culture is still very much a part of the organization. I think this movement to try and focus the product plan around these four multi-energy platforms is still, in hindsight, a very good move that we didn't try to move to these kind of BEV dedicated platforms.
>
> But ***we have the flexibility of the multi-energy platforms to offer very competitive BEVs but also ICE, mild hybrid, hybrid, PHEV, right***. And ***that has been an effective strategy for us***. So I think there are some really very positive things that have been a fundamental part of the core of the strategy. ***They're still very valid and relevant today***.
>
> Now there are some things that are shifting, right? So when we look at the importance of regional management and the way that regions are fracturing and moving away from each other and moving in different directions, ***with BEV penetration in the United States only at kind of 7% to 8% of the market, EU ramping up BEV pretty substantially***, I think the importance of local regional management and the empowerment of that regional management to jump on those issues, be close to those issues, be the core decision makers in those issues, and the movement that – ***and some of the adjustments that we've made in the last six months with John Elkann's support, I think, have been very important***. And I think as always, you need to adjust to the environment, right.

158. Ostermann also downplayed the extent of any changes to Stellantis' BEV business by stating that BEVs were profitable for Stellantis in Europe, and highlighted that Stellantis "need[ed] to stay on the forefront of BEV technology":

> **Daniel Roeska Bernstein Research – Analyst**:
>
> You already touched a little bit on the EV share and compared that in Europe and the US. Give us a little bit more sense how you're specifically tailoring your approach to those two markets because it's the same platform. It's basically Stellantis Medium, Large frame. How does that work across the brands and the regions?
>
> **Ostermann**:
>
> Yeah, I mean, the fact that they're multi-energy, right, if you look at the powertrain offering on those platforms in Europe, you see that we offer ICE, we offer mild hybrid, we offer P-HEV, and we offer BEV. And right now, the BEVs have been very well received on the new B&C segment vehicles. ***And we make money on BEVs in Europe, so it's good to see***.
>
> * * *
>
> But yeah, we'll produce globally over 500,000 BEVs this year, most of it in Europe. ***And so we need to stay on the forefront of BEV technology, and we will, right***? But in the United States, a lot of the push will be more focused on hybrids, the HEV like I mentioned, bringing that out to a wider range of vehicles.

159. The statements in ¶¶157 and 158 above were materially false and/or misleading when made because when Ostermann assured investors that the Company's "multi-energy platforms" were "***an effective strategy***," for producing ICE, BEVs, and hybrids, that "***EU [was] ramping up BEV pretty substantially***" while touting "***the adjustments that we've made in the last six months with John Elkann's support***," that Stellantis "***ma[d]e money on BEVs in Europe***," and that the Company "***need[ed] to stay on the forefront of BEV technology***," he omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions that showed they were pivoting away from BEVs and had indicators of impairment which would require the Company to take additional charges. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) the Trump administration's January 20, 2025 "Unleashing American Energy" Executive Order undid support for electric vehicle manufacturing jobs and other investments in clean car and truck technologies;

(iii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market; and

(iv) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now."

160. Analysts continued to be encouraged by Ostermann's comments, projecting a turnaround under the new leadership. For example, Kepler Cheuvreux published a report on June 17, 2025 titled "Twelve gauge" that "turnaround stories often capture investors' interest – particularly when driven by new leadership," and noting that "we believe the turnaround angle warrants a closer look and we encourage investors to revisit the case." The report stated that Filosa's "management style is widely regarded as approachable, collaborative, and execution focused," and that "Filosa's leadership is visible and hands-on, continuing habits from his North America Jeep role, where he regularly visited plants and met with line workers." Similarly, Jefferies published a report on June 25, 2025 titled "Jump-starting Stellantis - Upgrade to Buy," noting that "[a] new internal CEO can move fast on overdue decisions," and that "H1 looks a low point in earnings and FCF . . . . with restructuring charges likely."

**D. July 21, 2025 Press Release and Conference Call**

161. On July 21, 2025, Stellantis issued a press release "Publish[ing] Preliminary and Unaudited Key Figures for First Half 2025" and hosted a conference call that day to discuss the same. The press release included preliminary financial information for the first half 2025, which included a ***net loss of (€2.3) billion***. The release also cited certain "factors [which] had a significant impact on results in the first half of 2025," including "[t]he early stage of actions being taken to

improve performance and profitability, with new products expected to deliver larger benefits in the Second Half of 2025," and "***[a]pproximately €3.3 billion of pre-tax net charges***" excluded from AOI. The release specified that the €3.3 billion charges were "primarily related to program cancellation costs and platform impairments, net impact of the recent legislation eliminating the CAFE penalty rate, and restructuring."

162. The statements in ¶161 above were materially false and/or misleading when made because when Stellantis reported a "***net loss of (€2.3) billion***," and ***"€3.3 billion of . . . charges***," it omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) the Trump administration's January 20, 2025 "Unleashing American Energy" Executive Order undid support for electric vehicle manufacturing jobs and other investments in clean car and truck technologies;

(iii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iv) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(v) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(vi) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

163. Ostermann also discussed the €3.3 billion restructuring charge during the conference call that same day, assuring investors that Stellantis management was "***taking some decisive and tough decisions***" to set the Company back on track:

> Next, let's move to the net total of ***approximately EUR 3.3 billion of adjustments to AOI***, and I'll provide you some detail on that figure. First, approximately EUR 2 billion is related to ***management taking some decisive and tough decisions on product programs where we really couldn't see sufficient returns***.
>
> This included our hydrogen fuel cell EV efforts, as we announced to the market last week, which resulted in approximately EUR 700 million charge of that EUR 2 billion I mentioned, certain product cancellations and related supplier payments as well as restructuring charges mostly related to the European headcount reductions.
>
> Second, about EUR 700 million across 2 noncash items. The majority of this was related to impairments of certain Maserati vehicle platforms that really reflects the reality of the current sales pace that we see on those vehicles.
>
> Third, there was a net expense of roughly EUR 300 million associated with several items related to the change in U.S. CAFE penalty rates going to zero with the passage of major U.S. congressional legislation, the one big beautiful bill, including a write-down of the CAFE credits and a provision for purchase commitments netted against the release of the majority of our CAFE compliance cost provision.
>
> Last, approximately EUR 300 million relates to about two-thirds of an expansion of the Takata airbag recall campaign in Europe with the rest split between miscellaneous items. In total, about half of the approximately EUR 3.3 billion of net charges relates to future period expected cash flows and the other half are all noncash in nature.

164. The statements in ¶163 above were materially false and/or misleading when made because when Stellantis disclosed these €3.3 billion in charges, which Ostermann attributed to

"***decisive and tough decisions***" made by Stellantis management, they omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) the Trump administration's January 20, 2025 "Unleashing American Energy" Executive Order undid support for electric vehicle manufacturing jobs and other investments in clean car and truck technologies;

(iii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iv) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(v) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(vi) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT; and

(b) as detailed in §V, Stellantis, Elkann, Filosa, and Ostermann ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

165. During the question-and-answer portion of the call, Ostermann assured investors about the Company's BEV prospects in Europe, noting that their BEVs had "***been very well received***," and that there should be no "***panic at the end of the year***:"

> **Horst Schneider (BofA Securities – Research Analyst)**:
>
> . . . [W]e just had last week kind of warning from Renault, which was saying basically that there's increased competitive pressure in Europe. That just happened in June. So maybe you can comment on that specifically in Europe, if you see something like that, too? And if you can share any further detail on that.
>
> **Ostermann**:
>
> Yes. I mean Europe is a very competitive environment. I won't disagree with our counterparts at Renault. I think we're very fortunate in that we have some fantastic new products, right, that are coming out. But for us, there's a number of headwinds that we are combating in Europe.
>
> I talked a little bit about the sluggish LCV market. Of course, ***the race to be compliant on the CO2 side with increased BEV penetration, we increased our BEV penetration in Europe in the first half to 13% and our BEVs have been very well received***. Our new B segment BEVs are based on very affordable LP technology. They have really nice ranges. I think the pricing is very attractive, and we make money on them.
>
> But it is a profitability headwind, of course, because we don't make as much money on a BEV in most cases as we do on the ICE counterparts. But it's a tough market as everybody tries to get up that scale to the levels that are going to be required for compliance.
>
> Now luckily, because of the change in regulations, we all have three years to be compliant, right? ***So there shouldn't be a panic at the end of the year, which we had all kind of feared***. But yes, Europe is a tough environment.
>
> I give our credit – our team and the new products a lot of credit for being able to increase our market share sequentially second half '24 to '25 by 130 basis points despite a 13% decline in the area where we have basically one of our strongest market shares at 30% in LCV.
>
> So I think it's – given the environment, as you said, which is pretty tough, I think it's quite a good accomplishment for the team. And certainly not where we want to be. We want to continue to strive for more. But yes, there are a lot of headwinds in Europe. You are correct on that.

166. The statements in ¶165 above were materially false and/or misleading when made because when Ostermann stated that Stellantis "***increased our BEV penetration in Europe in the first half to 13% and our BEVs have been very well received***," and that there should be no "***panic at the end of the year***," he omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) the Trump administration's January 20, 2025 "Unleashing American Energy" Executive Order undid support for electric vehicle manufacturing jobs and other investments in clean car and truck technologies;

(iii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iv) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(v) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(vi) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

167. Analysts reacted by acknowledging the earnings miss, but were assured by Ostermann's statements about the H2 2025 turnaround. For example, on July 21, 2025, Deutsche Bank published a report titled "H1-25 misses; focus shifts to FY25 guide next week," which noted that "both Europe and North America seem to have been disappointing in H1," but "[p]ost the Renault warning on Europe, part of this was likely already expected by the market." The report also noted that "there should be positive drivers like product launches/availability to support volumes and earnings across Europe and North America in H2," and even held out hope that "the dividend should also be up for debate."

168. Similarly, Jefferies published a report on July 21, 2025 titled "Relief, and some Confusion," which noted that "[s]hares enjoyed some modest relief today following a limited data pre-release . . . and helpful call with CFO Doug Ostermann," and that as a result, "[w]e continue to think STLA is reaching a turning point while we expect an internally appointed CEO to make overdue strategic decisions rapidly."

### E. July 29, 2025 Semi-Annual Report, Press Release, and Conference Call

169. On July 29, 2025 the Company filed with the SEC on Form 6-K its semi-annual report,[33] which reported on the Company's financial results for the six months ended June 30, 2025, and which was certified by the board of directors, including Elkann and Filosa, pursuant to Section 5:25d, paragraph 2 of the Dutch Financial Supervision Act. In the report, the Company included an ***operating loss of (€2.7) billion***, a ***net loss of (€2.3) billion*** and ***diluted loss per share of (€0.78)*** on its income statement. The report also included ***€20.5 billion of other intangible assets*** and ***€44.9 billion of PP&E*** on its balance sheet. Notably, the report falsely disclosed to investors that "***[t]he***

---

[33] Ostermann, as CFO of the Company, signed the Form 6-K, which included the semi-annual report as Exhibit 99.1.

***Semi-Annual Condensed Consolidated Financial Statements include all adjustments considered necessary by management to fairly state the Company's results of operations, financial position and cash flows***."

170. On the same day, Stellantis filed a press release which finalized and expanded on the preliminary H1 2025 financial results previously announced on July 21, 2025. Filosa was quoted in the release as assuring investors that Stellantis was committed to making the necessary hard decisions:

> My first weeks as CEO have reconfirmed my strong conviction that ***we will fix what's wrong in Stellantis by capitalizing on everything that's right in Stellantis*** – starting from the strength, energy and ideas of our people, combined with the great new products we are now bringing to market.
>
> 2025 is turning out to be a tough year, but also one of gradual improvement. ***Signs of progress are evident when comparing H1 2025 to H2 2024, in the form of improved volumes, Net revenues, and AOI, despite intensifying external headwinds. Our new leadership team***, while realistic about the challenges, will ***continue making the tough decisions*** needed to re-establish profitable growth and significantly improved results.

171. Stellantis further returned to issuing guidance for H2 2025, announcing that it "expect[ed] to see increased Net revenues, low-single digit AOI profitability, and improved Industrial FCF results in H2 2025."

172. Stellantis hosted a conference call following the release of the final H1 2025 results, during which Filosa acknowledged the difficulties thus far, but assured investors that leadership was "committed to taking decisive actions" necessary for Stellantis' turnaround:

> 2025 has been and will be a tough year, and these H1 results make that very clear. At the same time, we are making progress on our product wave and beginning to see early but encouraging improvement. Our new leadership team is in place and is ***committed to taking decisive actions***.

173. Ostermann also presented on the conference call, during which he seconded Filosa's statements that Stellantis was "***making the tough decisions and executing on fundamental issues***" to reach Stellantis' reestablished guidance for the second half of the year:

**Ostermann**:

> As Antonio mentioned in his opening remarks, we are reestablishing financial guidance. With H1 in the books, we want to provide a clear view of how we see the rest of the year developing. And our second half 2025 guidance tells a story of continued improvement.
>
> Net revenues are expected to increase half-over-half and AOI margin is expected to be in the low single digits. Lastly, we expect improvements in industrial free cash flow as compared to the first half of 2025. We're not, of course, anywhere near or close to the full potential of this company. But ***we're making the tough decisions and executing on fundamental issues to build on our first half progress in the second half and beyond***.

174. The statements in ¶¶169, 170, 172, and 173 above were materially false and/or misleading when made because when: (i) Stellantis, Filosa, and Elkann claimed that their consolidated financial statements "***include[d] all adjustments considered necessary by management to fairly state the Company's results of operations, financial position and cash flows***;" (ii) Filosa stated that Stellantis would continue to "***fix what's wrong***" by "***continu[ing] [to] mak[e] the tough decisions***," that Stellantis was "***committed to taking decisive actions***;" and (iii) Ostermann stated that Stellantis was "***making the tough decisions and executing on fundamental issues***," they omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

175. Filosa similarly assured investors during his opening remarks that Stellantis' management was successfully making the necessary "tough decisions" to right the ship:

> As a team, we will also take together the tough decision to accelerate the business. Let me go through some of the actions we have taken already in H1 in detail to give a clear picture of how we are operating moving forward. We made the decision to end our fuel cell initiatives in Europe. Why? Because it was clear that in the absence of any reasonable prospect to develop a market for these products, there is no path to profitability.
>
> ***We have also stopped product initiatives that we understood were poorly suited to customer needs***. At the same time, we are already taking actions to develop and launch products that we know represent a clear opportunity for us. A small but a good example of this is the RAM 1500 express stream level, very affordable and very appealing to the customer. It will substitute the RAM DS Classic that we have discontinued the last year. It will help for sure regaining share in the entry-level light-duty truck segment.
>
> * * *
>
> Now let's move to enlarge Europe. The other key region for our commercial recovery. Here, we are beginning to benefit in terms of market share from a wave of recently launched products. H1 '25 market share at 17% is up 1.3-percentage-points from H2 2024. ***And I am also very pleased with our progress ramping BEVs and hybrid vehicle sales***.
>
> * * *
>
> ***And then exactly in North America, we need to increase profitability. So let's talk about profitability***. Here, you may appreciate six sections, among many others that we have taken or are taking and I would like to highlight maybe a few of

> them. ***We recently announced the return of the SRT division for the North American brands***. To create the most distinctive high-performance products, our fans are most passion about.
>
> * * *
>
> First, H1 was incredibly tough and nowhere near where we want and we need to be. But the sequential improvement on H2 2024 is indeed encouraging. ***It includes the impact of tough decisions, decisions that will continue in the second half of this year***. Second, we are maintaining the discipline on inventories. We have healthier order books and the product launch cadence is in progress.

176. The statements in ¶175 above were materially false and/or misleading when made because when Filosa stated that Stellantis had "***stopped product initiatives that we understood were poorly suited to customer needs***" as examples of "***tough decisions . . . that will continue in the second half of this year***," and touted "***ramping BEVs***" in Europe, and the "***return of the SRT division***" as a way to "***increase profitability***" in North America, he omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several additional decisions which would require the Company to take additional charges by the time of this statement, which Stellantis had not done. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT; and

(b) as detailed in §V, Filosa ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

177. During the question-and-answer portion of the call, Filosa responded to a question about potentially taking down capacity or restructuring by parroting Elkann's February 2025 statement that Stellantis would simply launch new products and sell more "***volumes that are much closer to the end customer demand***."

**Jose Asumendi (JPMorgan Chase & Co – Analyst)**:

> Thank you very much, Jose Asumendi from JPMorgan. Thank you, Antonio, for the comments and Doug as well. Just one question, please. I would like to focus a bit more on the US market. And I think you've provided, I think, compelling arguments with regards to how to get the company back to growth in the second half of the year. Can you talk a little bit more about the delivers to improve the profitability excluding growth levers, what are the actions you plan to take when it comes to maybe taking down capacity, any restructuring elements, actions you may take also in the US? Any actions excluding growth?

**Filosa**:

> Very well, and thank you for your question, Jose. So you said, priority number one for Stellantis growth of business will be grow in North America, which is a key market for us. And what are the key actions? ***Number one, obviously, it's volumes as well, but we are launching new products that will be all accredited in AOI margins***. For instance, the V8 engine on versions such as the RAM 1500 TRX, will deliver to us additional volumes, as you said, but on crudes, but also accretive margin per unit.
>
> Second, the recently signed by President Trump, big beautiful bill of July 4 give us more flexibility in choosing better margin optimized mix in between ICE version and electrified version of the models that we sell. ***And this will mean to us a lot of additional profit and also volumes that are much closer to the end customer demand***. Third, we are launching now in US model year 26 products, and we are starting from a much healthier inventory situation. That means that we might – we will enjoy net price opportunities by doing that.

178. When asked how investors should "think about cash returns . . . in light of the . . . stretched balance sheet situation," Filosa again assured investors that Stellantis would right the ship with "***new products that are much closer to customer demands and that also healthier in terms of margin per unit***."

> **Patrick Hummel (UBS AG – Analyst)**:
>
> How should we think about cash returns to shareholders short term and medium term in light of the, well, let's say, somewhat somewhat [sic] stretched balance sheet situation.
>
> **Filosa**:
>
> Thank you very much. And I will take the first part of the answer, and then I will leave to Doug the rest. So as we said, ***the first business priority is to grow that means volume through the expansion of our lineup with the addition of new products that are much closer to customer demands and that also healthier in terms of margin per unit. By growing volumes – by growing profit, we will automatically grow the top line of cash generation, which is [AOI]***.

179. The statements in ¶¶177 and 178 above were materially false and/or misleading when made because when Filosa stated that Stellantis would simply increase volume rather than fix capacity or a strained balance sheet, he omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"



4939-1041-9403.v1

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

180. Filosa and Ostermann also responded to analyst questions regarding the €3.3 billion restructuring charge, and the potential for additional charges in H2 2025. Filosa and Ostermann acknowledged the potential, but assured investors by referring to any other charges as purely hypothetical:

> **Stuart Patrick Pearson (BNP Paribas Exane – Chief Financial Analyst & Head of Thematic Research)**:
>
> So I guess for Antonio, to start with, I mean, Stellantis has obviously gone from being the benchmark for profitability in both Europe and North America, not so long ago, it's now pretty much loss-making in both, and peers are earning reasonable returns.
>
> So I mean, you've had a front row seat on all of this. I mean what's your diagnosis of what's gone wrong? And what kind of response do we expect from you? I know we've got to wait for the CMD, but I mean, when we look at what you're saying today, it looks like more of the same that might be unfair, but more incremental actions.
>
> But I wonder, are you considering anything more radical that you think might be required to get the company back to benchmark levels[?] And maybe just linked to that possibly for Doug, just on the restructuring charges and exceptional items, we had EUR 3 billion on average now over the last five years, another EUR 3 billion in H1 this year. I mean, what can you say about H2 as things stand today?
>
> Do we expect anything more there? And then when will those continued charges perhaps finally moderate[?] And then maybe to finish the question, Doug, perhaps now that financial services is becoming such a bigger part of the business,

we could get some separate disclosure between industrial and the Finco. And I'm sure there'll be lots to look at and analyze there.

**Filosa:**

Well, thank you for your question. I will take the first part, and then I will hand to Doug for the second part. So the first part, the diagnosis, both in Europe and North America. Well, diagnosis itself is large and complex -- but for sure, one important root cause of our market share deterioration, both in North America, especially, but also in Europe, is the fact that in the past, we decided to phase out many important, relevant and successful nameplates. For instance, in North America, U.S. specifically, we phased out seven successful nameplates: Jeep Cherokee, Jeep Renegade, Chrysler 300, Ram DS Classic, Ram ProMaster CD, Dodge Charger, the muscle car of the past, Dodge Challenger, same family.

Those seven nameplates were granting to us 300,000 units per year sold and several billions of gross commercial result per year. So now we are restoring that lineup. Jeep Cherokee is coming much improved than the previous one with two years of absent, but coming strong. The powertrain that we have discontinued in the past, they are coming back, starting with the legendary Hemi V8 engine has been shared before.

This means volumes and this means margin per unit. ***And also in Europe, we are correcting some initial all-in BEV powertrain decisions into multi-energy offers to our customers because we believe that both in North America and Europe, to be multi-energy means to be closer to the real customer demand***. Then on the rest of the question, I will leave Doug answering.

**Ostermann:**

Thanks, Antonio. ***So just to address the other pieces of the question, when you talked about onetime charges, when we look at the EUR 3.3 billion of onetime charges that we saw in the first half, as I've mentioned in my comments on the 21st, roughly EUR 2 billion of that, I think, represents some tough decisions and changes in strategy that have been made by this new management team***.

Antonio certainly mentioned one significant one, which was our decision to stop our investment – continued investment in fuel cell programs in Europe. But there are other shifts in strategy that are all a part of that number, including some restructuring, as you mentioned in your question itself.

In terms of – now there are other factors built in there, changes in our environment. For instance, there's some recognition of the changes of the One Big Beautiful Bill passed in the United States that impacted CAFE fines and the like. So there's some – certainly, ***I think the majority of it represents us getting after those tough decisions and changes in strategy, but there are also some pieces related to***

> ***changes in our environment***. In terms of – ***we don't typically forecast kind of onetime items for the future***.
>
> But looking forward, given that I think the new management team still has a fair amount of work to do in looking at our strategies and preparing for all the announcements that will come forward on the Capital Markets Day, ***we could see other strategic shifts that could lead to onetime charges in the second half***.

181. The statements in ¶180 above were materially false and/or misleading when made because when Filosa assured investors that Stellantis was "***correcting some initial all-in BEV powertrain decisions***" and Ostermann assured investors that "***onetime charges . . . represent[ed] some tough decisions and changes in strategy that have been made by this new management team***," and indicated that investors "***could see other strategic shifts that could lead to onetime charges in the second half***," he omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges in H2 2025. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

182. Analysts were assured by Filosa and Ostermann's statements about Stellantis' turnaround. For example, BofA Securities published a report on July 30, 2025 titled "Weak H1 in the rear mirror, revving up for a better H2," noting "H1 results weak but no surprise anymore," and "New H2 25 guidance promises significant NA recovery." The report also stated: "The good news and encouraging sign is that Stellantis share price is no longer reacting to negative newsflow or even increases on the back of that. The weak H1 means though that the H2 upturn is a bullish view."

183. But analysts also questioned whether Stellantis would need to take more restructuring charges. For example, J.P. Morgan published a report on July 29, 2025, titled "H1 post conference call wrap," noting the "deep restructuring plan to bring the business back to single-digit industrial margins and positive free cash generation" but also questioning "does the firm need to take deeper restructuring charges in order to realign output with capacity allowing the firm to return to free cash generation in a global car market with limited volume growth?"

184. Analysts such as Bernstein (in an August 7, 2025 report titled "Stellantis: New strategy emerging, but volumes continue to lag expectations - Maintain Market-Perform, TP €8") also questioned Filosa's refrain about "[v]olumes, volumes, volumes," as risking "falling back into bad volume chasing habits that Carlos Tavares had promised to eliminate but ultimately amplified."

**F. September 11, 2025 Kepler Cheuvreux Autumn Conference**

185. Filosa assuaged investors' concerns from the H1 2025 results during his appearance – accompanied by Ostermann – at the Kepler Cheuvreux Autumn Conference on September 11, 2025. There, he touted the leanness of Stellantis' new leadership team, and largely reiterated the guidance from the H1 2025 call:

> ***As myself and Doug, who is in this room, my CFO, told the analyst in the first earning call, we have three priorities in the next years. Number one is business growth. The second is flawless industrial execution. The third is increased profits. The result that we want to achieve by doing that is improve our business indicators,***

> ***all of them, in a gradual and progressive but visible way, quarter by quarter***. This is where we want to land.

186. The statements in ¶185 above were materially false and/or misleading when made because when Filosa implicitly affirmed Stellantis' guidance, he omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI";

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

187. Filosa's statements strongly assured analysts who understood his statements to mean that Stellantis was turning the corner. The stock closed as high as 9% higher after his call (Stellantis' stock price closed at $8.75 per share on September 10, 2025, and closed at $9.57 per share on September 11, 2025). Analysts following Stellantis took note and attributed the stock price jump to Filosa's statements. For example, Barclays published a report titled "Quick Look at +9.2% move yesterday upon CEO fireside chat" on September 12, 205, noting that he "repeated his priorities from the H1 call" and "confirmed that FCF is the primary objective and that STLA 'wants to turn the corner very soon.'" Banca Akros similarly published a report titled "Market share recovery in NA should start soon" on September 12, 2025, which cited Filosa as "express[ing] high conviction about the potential for market share recovery in NA, as soon as 4Q."

**G. September 29, 2025 Press Release**

188. On September 29, 2025, Stellantis continued to assure investors that it was on the right track when it filed with the SEC a press release announcing that Laranjo would be succeeding Ostermann as CFO. The release quoted Filosa, who described "[h]aving worked closely with Joao for 15 years."

189. The release also explicitly confirmed Stellantis' H2 2025 guidance, stating: "***Stellantis confirms that its 2025 financial guidance, as communicated during the H1 Earnings Call on July 29, 2025, remains unchanged in all respects***."

190. The statement in ¶189 above was materially misleading when made because when Stellantis again affirmed its H2 2025 guidance, it omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030;

(vii) on September 12, 2025, Stellantis announced it was abandoning the Ram 1500 electric pickup; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

**H. October 10, 2025 Press Release and Conference Call**

191. On October 10, 2025, Stellantis filed with the SEC a press release reporting its Q3 2025 shipments. That same day, Ditmire hosted a conference call with analysts.

192. During Ditmire's prepared remarks, he reiterated that "management was reviewing a number of key programs" and that "tough but necessary decisions had begun to be made in the first half," while only alluding to "a broader review of the strategic plan in the second half":

> In our H1 results call in late July, our CEO, Antonio Filosa discussed how the ***management was reviewing a number of key programs, product plans, etc., and***

> ***how tough but necessary decisions had begun to be made in the first half, and that a broader review of the strategic plan in the second half*** would enable not only the types of adjustments and corrections that position the company best for the evolving landscape we are operating in, but also a comprehensive Capital Markets Day in early 2026.

193. The statements in ¶192 above were materially false and/or misleading when made because when Ditmire, on behalf of Stellantis, vaguely referred to "***a broader review of the strategic plan in the second half***," he omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030;

(vii) on September 12, 2025, Stellantis announced it was abandoning the Ram 1500 electric pickup; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

194. Analysts reacted positively to this release and Ditmire's statements. For example, TD Cowen published a report titled "Takeaways from Q3 Shipments & Pre-Close Call" on October 10, 2025, noting that the "Q3 shipment results" "reflect[ed] early turnaround progress consistent with our recent views on the NT stock setup." The report also noted that "guidance was recently confirmed on Sept 29th." Likewise, HSBC published a report the same day titled "Hold: Better Q3 revenues, but profit uncertain," noting that while there was "[n]o discussion on profitability," Stellantis "pointed out the FY25 guidance was reconfirmed on 29 Sept."

**I. October 14, 2025 Press Release**

195. On October 14, 2025, Stellantis published a press release announcing that it planned to invest $13 billion "to [g]row in the United States." Filosa was quoted in the release as saying: "'***As we begin our next 100 years, we are putting the customer at the center of our strategy, expanding our vehicle offerings and giving them the freedom to choose the products they want and love***.'"

196. The statements in ¶195 above were materially false and/or misleading when made because when Stellantis announced this investment, it omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030;

(vii) on September 12, 2025, Stellantis announced it was abandoning the Ram 1500 electric pickup; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

197. This press release assured analysts that Stellantis had gained clarity on tariff impacts. For example, TD Cowen published a report titled "Initial Thoughts on Newly Announced US Investments" on October 14, 2025, noting that "the timing of this announcement possibly signals greater tariff comfort/clarity on the part of Stellantis management." Santander likewise noted in an October 15, 2025 report titled "US$13bn Investment in the US to Boost Local Production Footprint" that this "could reduce the impact on margins of the import tariffs by c1.0pp, and we believe it is a clear step in the right direction," and that they "expect[ed] further strategic decisions before the year-end."

## VII. THE TRUTH BEGINS TO EMERGE WHILE DEFENDANTS CONTINUED TO MISLEAD INVESTORS

### A. October 30, 2025 Press Release and Conference Call

198. On October 30, 2025, Stellantis published more fulsome results for its Q3 2025 shipments and net revenue, reporting a 13% year-over-year increase, confirmed its H2 2025 guidance, but also vaguely referred to the potential for additional charges in H2, which spooked investors.

199. Stellantis hosted a conference call with analysts that same day. During Filosa's opening remarks, he touted Stellantis' progress to date, the Company's $13 billion U.S. investment, and strongly confirmed Stellantis' H2 2025 guidance:

> First, ***let's look at the performance, which improved as we progressed our commercial trends***. Consolidated shipments and net revenue both increased 13% compared to prior year, and we delivered a global sales performance that was 4% higher year-over-year. Net sales performance included a sequential increase in market share in North America and even stronger trends in the United States. At the same time, we also saw some share contraction in Europe for reasons I will explain shortly.
>
> Second, we announced our $13 billion U.S. investment program, which directs significant capital into our U.S. products, plants and production. For customers, this means we are re-entering segments where we have been missing for too long and extending powertrain choices in ways we know our customers love. ***Lastly, we are confirming our second half 2025 financial guidance which implies continued sequential improvement and at the same time, we'll continue what we started in the first half to structure our business for profitable growth***.
>
> * * *
>
> ***Last quarter highlighted six near-term opportunities we had to improve profitability***, spending new products, changes for the new model year vehicles and improved manufacturing and operational efficiencies. ***And I'm happy to report we are making good progress***.
>
> The return of the HEMI V-8 to the RAM 1500 light-duty trucks in the third quarter has delighted many of our customers.
>
> * * *
>
> Since I took the CEO role, I made clear inside and outside the company that the U.S. is a key priority for our success. Because when we are strong in the U.S., we are

> stronger and better as a company everywhere. ***The $13 billion we will invest in U.S. in the next 4 years is an investment in growth. This is the largest single investment in our history and a proud commitment to our U.S. people, plants, products and communities***.

200. The statements in ¶199 above were materially false and/or misleading when made because when Filosa confirmed guidance while also stating that Stellantis would "***continue what we started in the first half to structure our business for profitable growth***," he minimized the severity of the impending charges, and omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030;

(vii) on September 12, 2025, Stellantis announced it was abandoning the Ram 1500 electric pickup; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

201. During Laranjo's opening remarks, he admitted that Stellantis' strategic review would "***likely lead to further charges in the second half***" but assured investors that "***a large portion . . . will be excluded from AOI***," and that changes to how they estimated warranty costs would not "***materially impact future period profitability***":

> We expect the second half 2025 to continue the third quarter's return to year-over-year growth and to be above first half 2025 levels, ***stronger volumes and their contribution to improved industrial efficiency will put us in position to deliver low single-digit adjusted operating income margin in the second half*** and we are working to deliver sequentially improved industrial free cash flow.
>
> Please note also, we have refined our projection for net tariff expenses for 2025, now approximately EUR 1 billion compared to the prior EUR 1.5 billion. There are a few other things I'd like to touch on which, ***while they are currently expect to have limited impact on the aforementioned second half guidance metrics will likely affect other aspects of our second half financial results***.
>
> First, as we indicated in July, ***we are engaged in the ongoing process of reviewing all aspects of the business as part of updating our strategic plan. This will likely lead to further charges in the second half. We expect that a large portion of the charges will be excluded from AOI to the extent that they are not indicative of our ongoing operations***.
>
> Second, we are in the process of updating how we estimate warranty costs. Our historical model was in line with industry practice and worked well. However, in recent periods, we've experienced cost inflation. While this change in estimate does not change the actual cash cost or their time, it is likely to result in a onetime charge, which would increase the level of balance sheet reserves. ***It is not expected to materially impact future period profitability compared to the 2025 run rate***.

202. The statements in ¶201 above were materially false and/or misleading when made because when Laranjo announced that the Company's review would "***likely lead to further charges in the second half***," but assured investors that the charges would largely be excluded from AOI, and

that any changes in warranty cost estimations would not have a material impact on future period profitability, he omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had already made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030;

(vii) on September 12, 2025, Stellantis announced it was abandoning the Ram 1500 electric pickup; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

203. But to assuage any concerns investors had over the potential additional charges, Filosa pointed to the Q3 2025 numbers as "***an early signal that our actions are beginning to have a positive impact***," and tied these decisions to "***actions we started in January to correct past strategic and operational decisions***." Filosa also assured investors that in the context of these decisions, "***confirming our second half guidance signals our belief in further steady sequential progress quarter-by-quarter***."

> Thank you, Joao. Before opening to your questions, let me recap the key points from today's presentation. ***The third quarter revenue and shipment performances give an early signal that our actions are beginning to have a positive impact***. You can see that in quarter three, we continued the accelerated the actions we started in January to ***correct past strategic and operational decisions***. We quickly changed our organizational structure to restore proximity to our customers, dealers and suppliers.
>
> We reconnected with our governments and regulators, and ***we took important decisions such as the product actions and major investments we discussed today that have restored the freedom to choose to the very heart of our strategy***. And lastly, ***confirming our second half guidance signals our belief in further steady sequential progress quarter-by-quarter***. That concludes our opening remarks. And so I would like to ask our operator to open the line for your questions. Thank you.

204. The statements in ¶203 above were materially false and/or misleading when made because when Filosa stated that the Company's "***actions [were] beginning to have a positive impact***," and that "***confirming our second half guidance signals our belief in further steady sequential progress quarter-by-quarter***," he and omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had already made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030;

(vii) on September 12, 2025, Stellantis announced it was abandoning the Ram 1500 electric pickup; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

205. During the question-and-answer portion of the call, Laranjo continued to conceal the full imminent impact of Stellantis' charges by referring to the change in methodology for warranty costs as "***potential adjustments***":

> **Thomas Besson (Kepler Cheuvreux – Head of Automobile Sector)**:
>
> On warranty cost and provision, you talked about a change in methodology that will drive some one-off charges. Can you remind us broadly the recall costs for '25 you expect versus '24 and '23 and confirm that setting up this provision for using this new way of assessing future recall costs has no cash impact on H2? And can you eventually make as well some comments by region, whether you're using different methodologies or whether costs vary a lot between North America and Europe in particular?
>
> **Laranjo:**

> Okay. So – on the warranty, the first thing is that the methodology that we are reviewing would primarily impact U.S. and Europe. And ***the potential adjustments*** would be a noncash provision in 2025. The warranty cost, the total warranty cost for the group in 2023 was EUR 8.9 billion.
>
> In 2024, sorry – corrections here. It was actually mentioned the balance sheet for warranty in 2024 was EUR 9.3 billion. And then on the details specifically to the recalls, we can follow up on off-line if it's okay, Thomas, because I don't have the numbers on hand here.

206. Similarly, Laranjo responded to an analyst question about whether these potential changes would have any cash impact by stating the changes "***would lead possibly to project cancellations***." And Filosa responded to the same analyst's question about adapting to US regulations by assuring investors Stellantis was still actively investing in BEVs.

> **Emmanuel Rosner (Wolfe Research, LLC – Managing Director of Research & Senior Research Analyst)**:
>
> The first one is just a point of clarification. These charges that you're taking in the second half, both for, I guess, turnaround actions but also for warranty. Can you just confirm again if there's any sort of cash impact that you should be thinking about associated with it and whether that would be included in the free cash flow reiterated guidance?
>
> And then just maybe a little bit longer term, with these changes in U.S. regulations and in particular, a significant easing in the emissions regulations, what kind of opportunity does that provide for you? What kind of upside does that unlock one of your – the three competitors on the record saying that this is a multibillion-dollar opportunity. How would you plan to take advantage of it?
>
> * * *
>
> **Filosa**:
>
> So in our product offer that we are implementing since January, freedom of choice is the mantra of our strategy. ***We are still a lot developing beautiful BEV vehicles for the customer that will prefer a BEV***. That's why we are launching the Jeep Recon very soon in half one, 2026. But also, we are enlarging our lineup with ICE introduction, hybrids introduction. This is the portion of the industry that is growing fast.
>
> * * *
>
> **Laranjo:**

> Thank you, Antonio, and hi Emmanuel. So the reviews – the ***strategic review and the product plan reviews that we are undertaking would lead possibly to project cancellations as we have already communicated the light-duty BEV here in the U.S.*** And the type of adjustments that we should expect on the project cancellations would be a write-off of CapEx and R&D capitalized spend and also other program cancellations costs. And ***those other program cancellation costs, they could have a cash impact, which we would expect to have limited cash impact in '25 and more into the future***.

207. The statements in ¶¶205 and 206 above were materially false and/or misleading when made because when Laranjo referred to "***potential adjustments***" and "***would lead possibly to project cancellations***," and when Filosa assured investors that Stellantis was still investing in BEVs, they omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had already made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030;

(vii) on September 12, 2025, Stellantis announced it was abandoning the Ram 1500 electric pickup; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

208. On the same call, Laranjo continued to vaguely refer to the "***adjustments that we are working on our strategic plan***," and declined to offer any kind of quantification, noting "***we are still going through them and assessing the amount***:"

> **Patrick Hummel (UBS Investment Bank – Executive Director & Head of European Autos Research):**
>
> Also two questions from my end. The first one, Joao, your predecessor said that the second half AOI in North America should be positive. Now this is nowhere in the deck, you had a good volume balance over the first half in North America. So I was just wondering if that statement is still valid that we should expect a positive AOI for North America in the second half? And my second question relates to free cash generation of the business.
>
> I appreciate today is not guidance day. But if we qualitatively think about the puts and takes for the cash flow as we're heading into next year, is it fair to say they are going to be higher investments year-over-year because you've got that $13 billion plan for the U.S., I guess some of that CapEx is going to be incremental and I'm still wondering if there is a little trailing effect on free cash flow of any bigger further one-off announcements you might have in the second half of this year. So would you say with confidence that next year's free cash flow should be in positive free territory? Or is that too early to say?
>
> **Laranjo:**
>
> Yes. No, thank you for the question, Pat. So first on North America, we are not providing guidance by region. But ***we are very focused on sequentially improving quarter-by-quarter***, as Antonio mentioned. And then on free cash flow, despite the investments that we have announced in the U.S., we continue to focus on monthly investments around 8% of our revenue going forward.

> And the – ***in relation to the adjustments that we are working on our strategic plan, we are still going through them and assessing the amount***. Sorry, I don't have right now final figures to understand the impacts for next year. And we'll provide an update, obviously, on that when we have the financials for the full year financials.

209. The statements in ¶208 above were materially false and/or misleading when made because when Laranjo stated that Stellantis was "***deploying already since January, a strategy of growth that will deliver to the company, a steady sequential improvement in all business KPIs quarter-by-quarter,***" and that management was "***still going through [adjustments to Stellantis' strategic plan] and assessing the amount***," he omitted or failed to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had already made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030;

(vii) on September 12, 2025, Stellantis announced it was abandoning the Ram 1500 electric pickup; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

210. As a direct result of this partial corrective disclosure, Stellantis' stock dropped 10.03%, from a closing price of $11.21 per share on October 29, 2024 to a closing price of $10.14 per share on October 30, 2025.

211. Analyst reactions to Stellantis' Q3 2025 shipments demonstrated that while the market reacted negatively to potential additional charges, Filosa and Laranjo – and thus, Stellantis – continued to mislead investors about the scope of the changes the Company would have to make, and the resulting cost. First, analysts latched onto Laranjo's characterization of future "***potential***" charges. For example, Deutsche Bank noted in an October 30, 2025 report titled "The write-down risk ahead" that Stellantis "point[ed] to risk of ***potential charges*** related to the strategic review and warranty estimation processes" and that "***potential charges*** taken in H2-25 could relate to, among others, project cancellations and associated costs." Likewise, HSBC noted that the "***prospect*** of further one-offs came as a little surprise to us" in a November 3, 2025 note titled "Hold: A forward step into an uncertain future."

212. Some analysts characterized the risk of additional one-off charges as more certain, but Filosa's and Laranjo's statements during the October 30, 2025 call convinced them that the amount was not a cause for concern. For example, Jefferies noted in an October 30, 2025 note titled "Q3 – Revenue Beat, Communication Miss" that "[i]mpairments were expected already, as a result of adjustments to product plans and emissions compliance, with similar adjustments by peers taken



4939-1041-9403.v1

positively by investors," and took comfort in the "indicat[ion] [that] the revaluation of warranty provisions would not impact future provisions and cash outflows."

213. Analysts also took comfort in Filosa's affirming H2 2025 guidance despite the risk of one-off charges. For example, J.P. Morgan published an October 30, 2025 report titled "Model Update Post Earnings Call," stating that "[l]ooking ahead, we expect Stellantis to deliver steady operational improvement, supported by a robust product pipeline, disciplined regional execution, and prudent financial management" because "[t]he company has reaffirmed its 2025 guidance, projecting continued yoy growth in the second half."

214. Still, some analysts had doubts following the October 30, 2025 conference call. For example, BNP Paribas noted in an October 31, 2025 report titled "Cashflow continues to overhang" that "Stellantis delivered Q3 revenues 0.5% ahead of consensus led by the US (+3%), albeit this appears to have been volume driven, with ASPs below cons," and that "[d]espite guidance being reiterated, this was not enough to support the shares, with increasing investor concern (per our conversations) surrounding H2 profitability and the timeline for a return to positive FCF generation." J.P. Morgan likewise published a 23-page report on November 18, 2025 titled "Restructuring in Motion: Evaluating STLA's Progress to Date." They stated that Stellantis had "in our view delayed the restructuring plans of the firm," and noted that "[e]xcess capacity needs to be taken down in Europe and North America." Even still, Filosa's and Laranjo's statements minimizing the impact of any potential restructuring led J.P. Morgan to "estimate about Eur 1.3bn average annual restructuring cash outflows per year on a group level over the next ~4 years."

### B. December 4, 2025 Goldman Sachs Industrials & Autos Week

215. Soon thereafter, Filosa made further false and/or misleading statements to assure investors that Stellantis' turnaround was on the right track.

216. On December 4, 2025, Filosa presented on behalf of Stellantis at Goldman Sachs Industrials & Autos Week. During the exchange, Filosa again assured investors that "we are on track on our guidance":

**Christian Frenes (Goldman Sachs Group Inc. – Analyst)**:



4939-1041-9403.v1

So it sounds like a tremendous amount of momentum in North America in the second half. Volumes makes price. Can you comment a little bit on the profitability expectations for the second half?

**Filosa**:

Well, I will not comment because we will have to close the year and we will have those information properly shared by the end of the year when we close the year. We already said something in Q3, right? ***Through the end of November, we are on track on our guidance***. But obviously, I'm cautious by nature, also as an engineer. So the job is done when it's done, right? So let's wait the end of the year.

217. Filosa also admitted that some of Stellantis' "assumption of the past strategy" regarding BEVs "***resulted to be wrong***," but concealed the magnitude of Stellantis' upcoming charges, even though he admitted it was "***[n]ot because I don't have the information***":

**Christian Frenes (Goldman Sachs Group, Inc. – Vice President)**:

Stellantis is taking corrective actions. What kind of business decisions and strategic shifts are driving these actions, sort of product planning?

**Filosa:**

Yes. I believe that many, right? Because we realize that we have obviously many opportunities and we need to be fast and rigorous the way we explore them. But we can talk a lot about product, if you want, and product planning and what we have learned, right? ***So what we have learned is that some assumption of the past strategy resulted to be wrong, right?***

***So we were thinking of a battery electric vehicle penetration in U.S. up to 50% by 2030. Last month was less than 6%. It will say 6% or 7% a few years, right? We are planning to have a BEV penetration in Europe at 100% by 2030. It will be, for sure, higher than U.S., but not at the level we believe***. So we understood that was needed to change strategy around those assumptions, number one.

The other thing that we learned was on ourselves, right? By listening more to our customer, we discover what they really wanted from us, right? For instance, the return of the HEMI V-8 engine is exactly the results of listening to them and understanding that they badly wanted that engine back in our cars, right?

***And this is what we are doing. So by mixing what we keep discovering about ourselves and our customer base and the change of strategy that we are implementing, I believe that we have a good recipe to do what you said, which is incremental improvement quarter by quarter on all KPIs, including profitability***.

**Christian Frenes (Goldman Sachs Group, Inc. – Vice President)**:

And the execution also seems to have improved, and that's an addition.

**Filosa:**

Yes, ***execution is improving***. You see that the product launches now are much more on time, right? So we promised by the end of the year Jeep Cherokee is coming in this month. We promised in quarter three the V-8. It came in record time. We promised by quarter four the new Dodge Charger with ICE engine. We presented it and we launched it in production last week. So ***we are getting sharper and more rigorous in execution on product launches. We have a lot to improve, and we will do that heads down, working rigorously day by day***. But I believe that we ***have a clear part on how to move forward***.

* * *

**Jolyon Wellington (Centiva Capital LP – Analyst):**

It's Jolyon Wellington from Centiva. Question, as you execute on your turnaround strategy, you are still in the process of consuming cash. I'm just wondering if you can give any comments around how you see the balance sheet[?] And then as a follow-up to that, your earnings will be negative this year because of the restructuring charges and your low margins. Would you rule out shareholder returns as per your dividend policy at this point?

**Filosa:**

***There are parts of this question that I cannot answer right now. Not because I don't have the information, but because we will answer by when we close the year***. But obviously, ***we need to get back to cash generation for sure***. What we will do is ***we will improve all business KPI quarter by quarter, gradually but progressively, so you will see that***. And for the dividends, well, we will have a Board of Director to be scheduled on that where every year, we will decide what to do.

218. The statements in ¶¶216 and 217 above were materially false and/or misleading when made because when Filosa continued to confirm guidance, but declined to give any indication on the amount of imminent adjustments, he assuaged investors' concerns about the impact of the charges while omitting or failing to disclose that:

(a) As a part of Stellantis' rigorous strategic review since the departure of Tavares in late 2024 to early 2025, the Company had already made several decisions which would require the Company to take additional charges by the time of this statement. Specifically,

(i) by December 18, 2024, Stellantis had already delayed its all-electric pickup RAM from 2025 until 2026;

(ii) Stellantis had already acknowledged in January 2025 that there was "a sharp slowdown in demand for electric vehicles" in the European BEV market;

(iii) Imparato had testified before the French Senate by March 31, 2025 that "EVs didn't work, so we pushed full speed on hybrids," that "[t]wo [more] years of this would kill the [C]ompany," and that "[t]here is no market for EVs right now;"

(iv) on June 5, 2025, Stellantis announced the return of the "HEMI" V-8 engine for the Ram 1500, accompanied by a statement from Kuniskis that "Ram screwed up when we dropped the HEMI;"

(v) on July 2, 2025, Stellantis promoted Kuniskis to head of American brands and North America marketing and retail strategy and announced the return of SRT;

(vi) on September 8, 2025, Imparato announced that Stellantis was no longer pursuing a 100% EV target in Europe by 2030;

(vii) on September 12, 2025, Stellantis announced it was abandoning the Ram 1500 electric pickup; and

(b) as detailed in §V, Stellantis ignored or concealed impairment indicators and failed to timely record €15 billion in impairments and related charges to Stellantis' BEV-related assets and programs in violation of IFRS.

219. Filosa's statements affirming guidance misled analysts. For example, Intesa Sanpaolo published a report on December 4, 2025 titled "A Turnaround Worth Playing," suggesting that the bad news might be over because "[w]e believe investors are already aware of further ***potential*** negative FY25 earnings surprises ahead of additional restructurings and products cancellations." Banca Akros published a similar report on December 5, 2025 titled "North America

turnaround: the best is yet to come," noting that Filosa "indicated that NA business should continue the positive momentum seen in the last 3 months" and that "Europe should follow the US also benefiting from new models (A/B segments) plus potential new EU rules."

**C. February 6, 2026 Corrective Disclosure**

220. On February 6, 2026, Stellantis issued a press release announcing a "Reset[ of] its Business to Meet Customer Preferences and to Support Profitable Growth." The release further disclosed that the "reset of Stellantis' business resulted in charges of approximately €22.2 billion . . . including cash payments of approximately €6.5 billion, which are expected to be paid over the next four years."

221. Notably, the release contended that "[t]hese actions continue the decisive changes Stellantis began implementing in 2025," suggesting such charges were planned or at least previously contemplated by management.

222. Filosa was further quoted in the release, reiterating that this was part of an existing process, but disclosing that the charges further reflect execution missteps by previous management:

> The reset we have announced today is part of the decisive process we started in 2025, to once again make our customers and their preferences our guiding star. The charges announced today largely reflect the cost of over-estimating the pace of the energy transition that distanced us from many car buyers' real-world needs, means and desires. They also reflect the impact of previous poor operational execution, the effects of which are being progressively addressed by our new team.

223. Regarding the charges themselves, the release detailed their breakdown across various operations, pertinently providing the following details:

(a) €14.7 billion related to re-aligning product plans with customer preferences and new emission regulations in the U.S., largely reflecting significantly reduced expectations for BEV products:

(i) includes write-offs related to cancelled products of €2.9 billion and impairment of platforms of €6.0 billion, primarily due to significantly reduced volume and profitability expectations; and

(ii) includes approximately €5.8 billion in projected cash payments over the next four years, relating to both cancelled products as well as other ongoing BEV products whose volumes are now expected to be considerably below prior projections.

(b) €2.1 billion related to the resizing of the EV supply chain:

(i) €2.1 billion of charges, including a total of approximately €0.7 billion in cash payments expected to be paid over the next four years, related to steps of rationalizing battery manufacturing capacity.

(c) €5.4 billion related to other changes in the Company's operations:

(i) €4.1 billion due to a change in estimate for contractual warranty provision, resulting from the reassessment of the estimation process, taking into account recent increases in cost inflation and a deterioration in quality, as a result of operational choices, which did not deliver the expected quality performance, now being reversed by the new management team; and

(ii) €1.3 billion of other charges, including restructuring primarily related to already communicated workforce reductions in Enlarged Europe.

224. As a result of this business reset, Stellantis updated its second half 2025 guidance, notably announcing adjusted operating income margins would be "finishing below the guided low-single digit range."

225. Stellantis additionally announced it would "not pay a dividend in 2026" and that "the Board authorized the issuance of up to €5 billion non-convertible subordinated perpetual hybrid bonds."

226. Stellantis conducted a corresponding shareholder call to discuss the business reset and the second-half guidance revisions. In pertinent part, Filosa opened his remarks by providing the following details regarding the reset:

> What we are presenting today is a ***decisive reset*** for our future profitable growth. We are today ***resetting our organization*** by empowering our regional teams so that they can accelerate decision-making process and maximize rigor of execution.
>
> We are ***dramatically resetting our stakeholder relationships***, improving all of them, including relationships with our employees, with our partners, the dealers, the

> suppliers, the governments and the unions. ***We are resetting our product plan in our EV supply chain*** to reflect much more real customer demand, a shift in regulation, following an ***initial overestimation of pace of adoption of electrification in the regions***.
>
> We are ***resetting execution and improving quality management processes to address previous operational issues triggered by past decisions. Those are changes very needed, necessary that we are aggressively implementing***. Implementation is all in progress, and they are delivering to us initial signs of recovery already in H2 2025.

227. Laranjo then took over the call to briefly discuss the €22.2 billion in charges disclosed alongside the business reset, providing, in pertinent part:

> As part of our 2025 second half results, we are announcing ***€22 billion worth of charges that are excluded from AOI***. We have broken this out for you into three categories. ***€14.7 billion related to product plans***. It includes write-offs of canceled products of €2.9 billion. And also impairment of certain platforms of €6 billion. This is ***primarily due to substantially reduced volume and profitability expectations for BEV products***.
>
> It also includes approximately ***€5.8 billion in projected cash payments, expected to be paid over the next four years. €2.1 billion related to steps taken to resize the EV supply chain***. This includes a total of €700 million in cash payments expected to be paid over the next four years.
>
> €5.4 billion relate to other items. This includes €4.1 billion due to a change in estimate for contractual warranty provisions and €EUR 1.3 billion of restructuring and other charges. ***The vast majority*** of charges relate to necessary corrective actions have been taken in 2025.

228. He further detailed the preliminary second-half results and elaborated on the adjusted operating income shortfall even when not considering the €22.2 billion in charges, pertinently stating:

> Now let me review the preliminary results for the second half. Revenues rose 10% year over year at a preliminary estimate midpoint on 11% higher consolidated shipments. ***AOI was negative, in the range of €1.2 billion to €1.5 billion***. Industrial free cash flow was negative in the range of €1.4 billion to €1.6 billion. This represents approximately half of the -€3 billion in the first half of 2025.
>
> Now let's dive deeper on the AOI topic. ***We finished below our AOI expectation for the second half of 2025 due to a combination of specific items, which more than offset improvements in other areas***.

> First, let's go through the items impacting industrial costs. ***Warranty expense for second half was €700 million higher year over year. €500 million of this was triggered by the change in estimate related specifically to vehicles shipped in the first half of 2025. Another €200 million of warranty expense related to the recall of certain now discontinued PHEV models***. The company also booked €500 million in compliance fine provisions related to European LCV volumes. This represented the entire 2025 full year accrual booked in the second half, and ***moving forward, we project this should be about €300 million lower in the first half of 2026***.
>
> Lastly, ***there were also €500 million related to two items, a supplier bankruptcy, and for costs incurred*** due to disruption of the aluminum supply chain. Next, two items in the financial services business had a negative impact of €400 million in the FX & other bucket. ***The first was due to the residual value impact incurred in the U.S. for the now discontinued PHEV models, and the second was a provision related to an industry wide motor finance redress program in the U.K..***
>
> So in total, there was €2.1 billion of negative impact from the specific items I mentioned. At the same time, core foundational business drivers like volumes, price, industrial efficiency and purchasing costs were all moving in the right direction.

229. Investors and analysts reacted immediately to Stellantis' revelation. The price of Stellantis' common stock declined dramatically. From a closing market price of $9.54 per share on February 5, 2026, Stellantis' stock price fell to $7.28 per share on February 6, 2026, a decline of about 23.69% in the span of just a single day. A number of well-known analysts who had been following Stellantis also lowered their price targets in response to Stellantis' disclosures.

## VIII. POST CLASS PERIOD EVENTS

230. After Stellantis' February 6, 2026 press release and conference call, several events continued to confirm the extent of Stellantis' problems, and that fixing them would require even more costly restructuring.

231. Moody's and S&P Global downgraded Stellantis to "Baa3" and "BBB-," respectively one rating above junk.

232. Then, on February 26, 2026, Stellantis released its full H2 2025 guidance and held a conference call the same day. During the conference call, analysts continued to question whether further restructuring was necessary for Stellantis to right the ship. For example, Jose Asumendi of JP Morgan asked: "When it comes to Europe, it looks like you may need to take larger restructuring

measures to turn the business profitable . . . . So can you talk a bit about Europe and whether we need larger restructuring measures to turn the business into profit making . . . ?" Filosa dodged the question. But when another analyst asked a similar question, asking "in terms of one-off adjustment for 2026, . . . could you confirm that we should assume a much lower figure than that at this point?" Laranjo reiterated his statement from February 6, 2026, that "[w]e have taken the vast majority of the charge in H2 2025," but acknowledged the possibility of additional charges in 2026.

233. *Reuters* confirmed that Stellantis needed to address excess capacity in Europe in April 2026. On April 16, 2026, *Reuters* published an article titled "Stellantis to halt car assembly at France's Poissy plant by 2029."[34] *Reuters* noted that Stellantis was "facing chronic overcapacity in the region."[35] One week later, on April 23, 2026, *Reuters* reported via *Bloomberg* that according to "people familiar with the situation," Stellantis "ha[d] identified four factories in Europe it may sell or share as it tackles surplus manufacturing capacity."[36]

234. On April 30, 2026, Stellantis confirmed that its strategy to "sell[] more" by providing financial incentives and promotions, thus sacrificing margins, could not hide the Company's underlying problems. That day, after Stellantis had been riding high on a positive mid-April report about a positive direction in sales, analysts critiqued the Company for sacrificing margins to do so. *Bloomberg* reported on April 30, 2026, that "Stellantis NV shares fell as investors questioned the sustainability of an apparent turnaround in the key North American market, where ***its performance was bolstered by price cuts and one-time financial gains***."[37] The article also noted the €22.2 billion in charges, stating that the response was "based in part on reassurance . . . Filosa had offered only

[34] *See* Ex. H.

[35] *Id.* at 1.

[36] *See* Ex. I at 1.

[37] *See* Ex. J at 2.

two months earlier. While the company has improved car sales recently, investors aren't yet confident that its turnaround efforts are making a lasting impact."[38]

235. Stellantis further conceded in mid-2026 that, despite Defendants' statements during the Class Period, the Company needed to take drastic actions to resolve excess capacity, particularly in Europe. For example, at Stellantis' May 21, 2026 Capital Markets Day ("CMD"), Stellantis announced that it would be allowing Leapmotor to use some of Stellantis' European plants to manufacture cars. Analysts following Stellantis recognized these were half measures that did not resolve the underlying issues. For example, J.P. Morgan published a report on July 9, 2026, titled "Downgrade to Neutral," stating "in the absence of labor reductions or drastic capacity cuts across Europe and NA, we see limited chances for STLA to make a rapid return across both regions. In Europe, we believe STLA is effectively running the business cash neutral, avoiding large restructuring cash outflows as the firm leverages its capacity across Chinese partners such as Leapmotor and DongFeng." J.P. Morgan also noted that while Volkswagen and BMW were committed to the hard work of restructuring in Europe, they were disappointed in Stellantis' lack of conviction to do the same. "Post CMD we were hoping to see more evidence of capacity cuts across the US and Europe. The firm is opting to leverage on Chinese OEMs partners to utilize part of the European plants, limiting to an extent the large restructuring, but some restructuring will be unavoidable in our view." Likewise, *Bloomberg* published an article on July 13, 2026 titled "Stellantis CEO Struggles to Win Over Investors for Turnaround Plan," quoting an interview with Jefferies analyst Philippe Houchois as stating: "'More drastic actions on capacity or brands are delayed or avoided.'"[39]

---

[38] *Id.*

[39] *See* Ex. K at 4.

## IX. ADDITIONAL FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

### A. The Individual Defendants' High-Level Positions and Experience

236. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Stellantis, their control over, and/or receipt and/or modification of Stellantis' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Stellantis, were active and culpable participants in the fraudulent statements alleged herein.

237. Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent statements described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

238. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and final condition, as alleged herein.

239. The Individual Defendants, because of their positions with Stellantis, controlled the content of the Company's public statements during the Class Period. The Individual Defendants were provided with or had access to copies of the documents alleged herein to be false and/or

misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and assurances that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Stellantis' corporate statements and is therefore responsible and liable for the misrepresentations contained therein. At the very least, when making their public statements, the Individual Defendants were required to have a legitimate and valid basis for their representations. To the extent they were lacking such a basis, they are likewise responsible and liable for the misrepresentations contained therein.

240. Specifically, Defendants had actual knowledge of, or access to, non-public information concerning the Company's strategic review beginning in at least January 2025 and the need for sizeable charges as a direct result of the self-proclaimed tough decisions that Defendants made as a part of this strategic review.

241. Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that Stellantis was executing a turnaround from an all-out commitment to EVs, but when pressed about the cost of such a pivot, repeatedly assured investors that such costs could either be solved by "selling more," or minimized their importance by treating them as "potential" or "possibl[e]" and refusing to quantify the expected, inevitable massive charges.

242. Yet, Defendants made selective and misleading disclosures in repeated claims of confidence in Stellantis' ability to achieve earnings growth, despite the necessity to commit to costly, dramatic changes to its business.

243. Defendants' scienter was further evidenced by the Individual Defendants' claims that one of Stellantis' key strengths over its competitors stems from its ability "to be differentiated in terms of what our customers want" due to the Company's regional scale, despite ultimately admitting to investors the very basis for the charges announced on February 6, 2026, "largely reflect

the cost of over-estimating the pace of the energy transition that distanced us from many car buyers' real-world needs, means and desires."

244. Indeed, the gap between what Stellantis was doing and what its customers wanted was apparently quite considerable. In what was deemed a sudden move from an investor's perspective, Stellantis announced a "decisive reset" of its business, which included resetting the company's "organization . . . stakeholder relationship . . . product plan and our EV supply chain . . . execution and improving quality management processes," all in the name of pivoting the Company toward its clientele's desires and significantly reduced expectations for BEV products.

245. Stellantis was aware that it was pivoting away from EVs because of their low profitability in early 2025, as evidenced by the Company's 2024 Form 20-F, Imparato's March 2025 statements, the rehiring of Kuniskis, delaying and eventually cancelling the Ramcharger, and many other decisions made by Company executives. Yet, Stellantis waited until February 2026 to inform its investors of €14.7 billion in product plan charges, including €2.9 billion in write offs and €6 billion in platform impairments, undertaken specifically due to reassessed "profitability expectations for BEV products."

246. Defendants were aware of the risks to their earnings growth potential and of the risks of how necessary and sizeable the February 6 charges would be, yet they continued to deliberately disregard or otherwise minimize such risks in their claims to investors. For example, the Company press release admitted the billions of euros of charges taken reflected changes and decisions Stellantis "began implementing in 2025" and were part of a decisive process "we started in 2025." As discussed at ¶¶138 and 203, Filosa confirmed during the Company's October 30, 2025 conference call that this process started by at least as early as January 2025.

247. Stellantis initially announced €3.3 billion of net charges during their H1 2025 analyst call and specified €2 billion of such "represent[ed] some tough decisions and changes in strategy." Ostermann here claimed, "we could see other strategic shifts that could lead to one-time charges in the second half." During the October 30, 2025 call, this changed to discussions of a review of the business that "will likely lead" to additional charges, and while they "could have a cash impact," it

would be "limited." Stellantis and the Individual Defendants never suggested the potential for net charges in the second half 2025 to vastly eclipse that of the first half or that the cash impact would double the entirety of the first half charge.

248. Additional facts supporting scienter for each Individual Defendant are included below:

**1. Filosa**

249. Although he became CEO in June 2025, Filosa had been part of Stellantis' senior executive team since the Company formed in 2021. He took over as COO for North American operations in October 2024 as part of a broader shake-up in the waning days of Tavares' tenure.

250. Company and management's statements about Filosa when he took over as CEO demonstrate his unique knowledge of Stellantis' business and his hands-on approach. For example, Elkann was quoted in a May 28, 2025 Company release touting Filosa's deep knowledge of Stellantis' business, crediting Filosa's "deep understanding of our Company," and noting that Elkann had "worked closely with Antonio over the past six months during which time his responsibilities have increased." The press release further stated that Stellantis' Board selected Filosa because of "his unrivalled knowledge of the Company." Likewise, Ostermann described Filosa during the May 29, 2025 Bernstein Strategic Decisions Conference as "being very hands on" and having a "very ground level understanding of manufacturing in the business."

251. A May 27, 2025 *Bloomberg* article also reported that Filosa had "recently started visiting dealers and factories in the US to improve relations there," demonstrating his hands-on approach to dealing with the Company's EV capacity crisis.[40]

252. Filosa's hands-on approach and ground-level knowledge of Stellantis' business was corroborated by analyst reports throughout the Class Period. For example, as discussed at ¶252, Kepler Cheuvreux's report published on June 17, 2025 titled "Twelve gauge" stated that Filosa's "management style [was] widely regarded as approachable, collaborative, and execution focused,"

---

[40] *See* Ex. D.

and that "Filosa's leadership [was] visible and hands-on, continuing habits from his North America Jeep role, where he regularly visited plants and met with line workers."

253. Filosa also touted the leanness of Stellantis' new leadership team at the Kepler Cheuvreux Autumn Conference on September 11, 2025, stating that his "new team" was "smaller than the previous one," shifting from "larger than 35" to "less than 15." The relative leanness of Filosa's new team during crucial stages of Stellantis' strategic review support the inference that he and other Stellantis executives knew that Stellantis would be taking massive charges due to the "tough" decisions made during the strategic review beginning at least as early as January 2025.

**2. Elkann**

254. Prior to Filosa's appointment as CEO, Elkann was responsible for speaking to investors during investor conference calls and for issuing Stellantis' filings with the SEC. As discussed at ¶169, Elkann certified Stellantis' July 29, 2025 semi-annual report pursuant to §5:25d, ¶2 of the Dutch Financial Supervision Act, which stated that "***[t]he Semi-Annual Condensed Consolidated Financial Statements include all adjustments considered necessary by management to fairly state the Company's results of operations, financial position and cash flows***."

255. Elkann was personally involved in the Company's strategic review that led to the decisions that necessitated Stellantis' €22.2 billion in charges in February 2026. As discussed above at ¶52, Elkann, in his own words, "worked closely with [Filosa]" during the first half of 2025 as Stellantis executives conducted their strategic review. Further, as discussed at ¶157, Ostermann credited the decisions that Stellantis had made during H1 2025 as "adjustments that we've made in the last six months with John Elkann's support."

256. As discussed at ¶53, Elkann's scienter is further demonstrated by *Bloomberg*'s reporting on May 27, 2025 that Elkann, "ha[d] been running Stellantis since Tavares' departure in

December [2024]," and "ha[d] tried to patch relations with dealers and reassure governments on sustaining local production."[41]

### 3. Ostermann

257. During his time as CFO, Ostermann was also responsible for issuing Stellantis' filings with the SEC and communicated directly with shareholders and market analysts through the Company's investor conference calls and other market-related events. As discussed at ¶169, Ostermann signed the Form 6-K filed with the SEC attaching the Company's July 29, 2025 semi-annual report, which stated that "***[t]he Semi-Annual Condensed Consolidated Financial Statements include all adjustments considered necessary by management to fairly state the Company's results of operations, financial position and cash flows***."

### 4. Laranjo

258. Laranjo was, at all relevant times following his appointment on September 29, 2025, CFO of Stellantis following Ostermann's departure from the Company and role. As CFO, Laranjo communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events, as discussed in more detail at ¶¶31, 71, 140, 201, 205-208, 227, and 232. Moreover, Laranjo served as CFO of North America at Stellantis between April 2017 and April 2024.

259. Further as discussed at ¶188, Stellantis' September 29, 2025 release announcing that Laranjo would be replacing Ostermann as CFO quoted Filosa stating that he "[h]a[d] worked closely with Joao for 15 years," supporting the inference that Laranjo would have had knowledge of the impending massive charges.

## B. Analysts and Investors Frequently Asked Questions About, and Defendants Frequently Evinced Personal Knowledge by Commenting on, Stellantis' Strategic Review

260. Throughout the Class Period, each of the Individual Defendants were asked specific, direct questions from analysts about whether Stellantis would need to address excess capacity and

[41] *See* Ex. D.

whether and to what extent it would take additional one-off charges, and they held themselves out as knowledgeable on the topics.

261. For example, as discussed at ¶147, during the Company's February 26, 2025 conference call, Jefferies Analyst Philippe Houchois asked "how much do you take in account the cost of reducing the excess capacity that was inherited in some extent in Europe and created in the US," to which Elkann responded that Stellantis would "start selling more cars." Similarly, during the same call, Deutsche Bank analyst Tim Rokossa asked Ostermann about "some details" on Stellantis FY 2024 "adjustments," Ostermann held himself out as knowledgeable about Stellantis' adjustments, calling them "unusual," that he did not see "these large workforce reductions continuing going forward," and that "the size of the reductions will come down."

262. Similarly, during the Company's July 29, 2025 conference call – Filosa's first as CEO – JPMorgan Chase & Co analyst Jose Asumendi asked "what are the actions you plan to take when it comes to maybe taking down capacity, any restructuring elements, actions you may take also in the US?" Filosa responded that the "key actions" to "grow[ing] in North America" would be "volumes" and "launching new products." During the same call, when BNP Paribas Exane analyst Stuart Patrick Pearson asked "on the restructuring charges and exceptional items, we had [EUR] 3 billion on average now over the last five years, another [EUR] 3 billion in H1 this year. I mean, what can you say about H2 as things stand today? Do we expect anything more there?" Ostermann responded to this portion of the question by stating that "roughly [EUR] 2 billion of that, I think, represents some tough decisions and changes in strategy that have been made by this new management team" and that "we could see other strategic shifts that could lead to onetime charges in the second half."

263. Later in the Class Period, during the Company's October 30, 2025 conference call – Laranjo's first as CFO – Laranjo also held himself out as knowledgeable about Stellantis' strategic review and the need for potential additional charges for H2 2025. For example, when Wolfe Research, LLC analyst Emmanuel Rosner asked: "These charges that you're taking in the second half, both for, I guess, turnaround actions but also for warranty. Can you just confirm again if there's any sort of cash impact that you should be thinking about associated with it and whether that would be included in the free cash flow reiterated guidance?" Laranjo answered this portion of the question by stating that:

> So the reviews – the strategic review and the product plan reviews that we are undertaking would lead possibly to project cancellations as we have already communicated the light-duty BEV here in the U.S. And the type of adjustments that we should expect on the project cancellations would be a write-off of CapEx and R&D capitalized spend and also other program cancellations costs. And those other program cancellation costs, they could have a cash impact, which we would expect to have limited cash impact in '25 and more into the future.

### C. The Alleged Fraud Concerns the Core Operation of Stellantis' Business

264. Additionally, the fraud alleged herein relates to the core business and operations of Stellantis, so knowledge of the fraud may be imputed to Defendants. Defendants failed to review or check information they had a duty to monitor or ignored obvious signs of fraud. Considering the magnitude of charges, and the significant earnings shortfall, shocked both the market and analysts alike, Defendants' repeated minimizations as to the severity of the charges and headwinds to its earnings growth were, at best, deliberately reckless.

265. The alleged fraud concerns two of the most critical regions of Stellantis' business (North America and Europe) and the volume and profitability expectations for BEV products were topics that the Individual Defendants claimed to know about during investor conference calls held throughout the Class Period. Given the fundamental importance of BEVs to Stellantis' existence as a business, the Company's sales and guidance related to these products, as well as the insight of

Stellantis' senior executives into AOI benchmarks concerning this business segment, was a subject of intense market scrutiny and concern, and a topic on which the Defendants made numerous public statements during the Class Period. The Individual Defendants, who were the Company's highest-ranking executives, made numerous statements about these subjects in response to analyst questions, and were aware that the market was relying on the veracity of those statements.

266. The Individual Defendants were intimately familiar with the true state of the Company's earnings growth potential (or were reckless in touting their oversight and commitment to achieving previously guided AOI benchmarks) and knew about the need to shift organizational priorities and make certain adjustments due to "an initial overestimation of pace of adoption of electrification in the regions" at the time they made their misstatements, which strongly supports an inference of scienter.

267. Furthermore, these facts were known by Stellantis employees in senior positions, including Imparato, among others, and their knowledge can be imputed to Stellantis itself.

### D. Stellantis Experienced Suspiciously High Executive Turnover at Suspicious Times During the Class Period

268. The high level of executive departures during the Class Period supports an inference that Stellantis and its executives were aware of the need to incur significant charges due to the pivot away from BEVs. Key examples of this revolving door of executive departures include:

(a) on September 29, 2025, Stellantis announced that Laranjo would succeed Ostermann, who had only been CFO for less than a year; and

(b) on October 8, 2025, Stellantis announced that Imparato would be replaced as head of Enlarged Europe and would only focus on Maserati.

269. These departures were suspicious in timing and magnitude. For example, Ostermann's departure and Imparato's demotion occurred approximately one month before Stellantis disclosed to investors on October 30, 2025 that potential additional charges were "likely," and just weeks after the Company's September 8, 2025 announcement that it would no longer be pursuing

100% EVs in Europe, and its September 12, 2025 announcement that it would no longer be pursuing the RAM 1500 electric pickup.

270. Analysts were surprised by these departures. For example, Oddo-BHF analyst Michael Foundoukidis stated that the change "add[ed] to the general management instability and may add to worries about the extent of the efforts required to turn around the company."[42] Likewise, Barclays issued a report on October 13, 2025 titled "Q3 First Look: Another nervous reaction - and again on limited new news," which noted that Stellantis' "CMD [was] likely delayed to Q2'26 in the context of STLA's leadership reshuffle."

**E. Stellantis' Impairment Was Material to Its Financial Condition**

271. As discussed at §V, Stellantis violated IFRS standards by failing to timely record impairments and related charges by no later than June 30, 2025. The €15 billion of overstated earnings and assets was substantial relative to numerous metrics of Stellantis' business and financial condition.

272. For example, the Company's €15 billion overstatement amounted to approximately: (a) 554% of its H1 2025 operating loss; (b) 665% of its H1 2025 net loss; (c) 20% of its H1 2025 revenues; (d) 73% of its other intangible assets reported as of June 30, 2025; and (e) 33% of its PP&E reported as of June 30, 2025.

273. Since the €15 billion overstatement was so large and material to Stellantis' financial condition, a reasonable investor would have wanted to know the full and true extent of the Company's impairments and related charges. In fact, when the Company belatedly reported the €22.2 billion total of impairments and related charges, analysts were shocked at the size of the charges as Defendants during the Class Period minimized drastically smaller charges as "onetime" and "unusual" and the possibility of additional charges were described as "limited." The magnitude of Stellantis' accounting violations contributes to the already strong inference of Defendants' scienter.

---

[42] *See* Ex. L at 2.

## X. LOSS CAUSATION

274. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a course of conduct that artificially inflated the price of Stellantis' common stock and operated as a fraud or deceit on Class Period purchasers of Stellantis' common stock by materially misleading the investing public. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Stellantis' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Stellantis' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

275. Defendants' false and misleading statements and omissions, which as alleged above were made with the intent to deceive, had the intended effect and caused Stellantis common stock to trade at artificially inflated levels throughout the Class Period.

### A. October 30, 2025

276. On October 30, 2025, Stellantis published more fulsome results for its Q3 2025 shipments and net revenue, reporting a 13% year-over-year increase, confirmed its H2 2025 guidance, but also vaguely referred to the potential for additional charges in H2, which spooked investors. Specifically, Laranjo told investors that Stellantis' strategic review would "***likely lead to further charges in the second half***."

277. Investors reacted immediately to Stellantis' revelation, as discussed at ¶¶71, 198, 210. The price of Stellantis' common stock declined dramatically. From a closing market price of $11.21 per share on October 29, 2025, Stellantis' stock price fell to $10.14 per share on October 30, 2025, a decline of approximately 10% in the span of just a single day.

278. But as discussed at ¶¶205, 206, Laranjo concealed the full truth from investors by continuing to suggest that these might only be "potential" or "possibl[e]" additional charges, and by refusing to quantify them. These false and misleading statements continued to assuage investors' and analysts' concerns about any impending additional impairments.

**B. February 6, 2026**

279. On February 6, 2026, Stellantis announced significantly below-market earnings results shy of Stellantis' own previous guidance for positive growth alongside the disclosure of €22.2 billion in impairments and restructuring charges, including €6.5 billion in cash payments. Stellantis disclosures were directly related to Defendants' prior misrepresentations and material omissions concerning Stellantis' forecasting processes, growth guidance, and potential restructuring charges.

280. Investors and analysts reacted immediately to Stellantis' revelation. The price of Stellantis' common stock declined dramatically. From a closing market price of $9.54 per share on February 5, 2026, Stellantis' stock price fell to $7.28 per share on February 6, 2026, a decline of about 23.69% in the span of just a single day.

281. A number of well-known analysts who had been following Stellantis lowered their price targets in response to Stellantis' disclosures. For example, Deutsche Bank "cut our numbers to reflect the updated communication, roll valuation to 2026 and set a new target price at EUR7." In pertinent part, the analyst justified Deutsche Bank's price target reduction on the surprising charges and earnings misses, as follows:

> In our view, the key negatives of the release are the size of the charges taken and the cash relevant portion of it which is ***far above market expectations. Also the H2-25 earnings miss even when adjusting for one timers and the guided cash burn is below consensus expectations***.

282. Morningstar, while considerably reducing their price target by about 12.86%, similarly emphasized the sticker shock on the Stellantis' charges, stating, in pertinent part:

> ***Stellantis announced EUR 22.2 billion in charges related to a reset of its battery electric vehicle*** strategy to align with ***weaker-than-expected demand***, including EUR 6.5 billion in cash outflows over the next four years. The 2026 dividend will be suspended. . . .
>
> ***Why it matters***: Although we expected additional restructuring beyond the measures announced in the first half, the ***magnitude of today's charges came as a surprise, particularly the EUR 6 billion platform impairments, given the supposed flexibility of Stellantis' multi-energy architecture to support different powertrains***.

283. HSBC also expressed criticism by rating the Company a "Hold: Brutal U-turn" and stated the following:

> On a per unit basis, the cash cost of Stellantis' US pivot away from EVs is broadly in line with GM and Ford at cUSD6.7k per unit on our numbers. The exit from the LG JV in Canada was a surprise and leaves us wondering what the future is for the Indiana JV with Samsung SDI. We'd like to think this a clearing event, but there remain many questions (weak operating leverage, slow product ramps), and ***the suggestion that these decisions represent the "Vast Majority", but not all of the corrective actions***. Our view remains that the road to recovery (earnings and cash wise) is slow.

284. Bernstein similarly stated that:

> The stock price has slumped by >20% reflecting a ***significant miss to guidance reiterated as recently as December 2025 as well as the charges***. The much more muted stock price reactions to the $19.5bn and $6bn write-downs that Ford and GM made on 15 December 2025 and 8 January 2026, respectively, which also reflected major product realignment decisions indicates ***the chasm that Stellantis management needs to bridge to re-establish trust in the equity story***, especially with new FY26 guidance remaining largely qualitative rather than quantitative.

285. Likewise, *Bloomberg* published an article on February 6, 2026, titled "Stellantis Rout Nears €70 Billion After Surprise Writedowns," which noted that in addition to the EV-related charges, "Stellantis also released far weaker earnings than analysts had anticipated – ***based in part on reassurance Filosa offered only two months ago***."[43] The article further noted that "[a] significant chunk of the charges Stellantis announced was unrelated to Filosa's moves to cancel EVs that are falling short on both sales and profitability."

286. The fact that these analysts, and others, discussed Stellantis' shortfall and the significant, unexpected volume of the charges suggests the public placed significant weight on Stellantis' prior earnings estimates and statements regarding the progress of Stellantis' strategic review and turnaround. The frequent, in-depth discussion of Stellantis' above-expectation charges confirms that Defendants' statements during the Class Period were material.

---

43 *See* Ex. M.

287. The declines in the price of Stellantis common stock after the disclosures came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market and a materialization of the undisclosed risks alleged herein. The timing and magnitude of the price declines in Stellantis common stock negates any inference that the loss suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' prior misrepresentations. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Stellantis common stock and the subsequent significant decline in the value of Stellantis common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

288. At all relevant times, the market for Stellantis' common stock was an efficient market for the following reasons, among others:

(a) Stellantis' common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b) Stellantis communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Stellantis was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) unexpected material news about Stellantis was reflected in and incorporated into the Company's stock price during the Class Period.

289. As a result of the foregoing, the market for Stellantis' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Stellantis' stock price. Under these circumstances, all purchasers of Stellantis' common stock during the Class Period suffered similar injury through their purchase of Stellantis' common stock at artificially inflated prices, and a presumption of reliance applies.

290. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## XII. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

291. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they assured investors that the Company was making the necessary tough decisions to turn the Company around, but described the inevitable charges resulting from these "tough" decisions as "potential" or "possibl[e]," and later in the Class Period, assured investors by declining to quantify the charges and affirming reissued guidance.

292. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

293. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was

authorized and/or approved by an executive officer of Stellantis who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XIII. CLASS ACTION ALLEGATIONS

294. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Stellantis common stock on the NYSE during the Class Period seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

295. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Stellantis' common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Stellantis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of June 30, 2026, there were approximately 2.898 billion shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

296. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

297. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

298. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Stellantis;

(c) whether the Individual Defendants caused Stellantis to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Stellantis' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

299. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against All Defendants for Violations of §10(b) and Rule 10b-5 Promulgated Thereunder

300. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

301. This Count is asserted against Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

302. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock. Such scheme was intended to, and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Stellantis common stock; and (c) cause Plaintiff and other members of the Class to purchase or otherwise acquire Stellantis' common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

303. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Stellantis' securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

304. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

305. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Stellantis' internal affairs.

306. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Stellantis' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Stellantis' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Stellantis' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

307. During the Class Period, Stellantis' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Stellantis' common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Stellantis' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Stellantis' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

308. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

309. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**Against the Individual Defendants for Violations of §20(a) of the Exchange Act**

310. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

311. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Stellantis' misstatements.

312. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Stellantis which had become materially false or misleading.

313. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Stellantis disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Stellantis to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of §20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Stellantis' common stock.

314. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Stellantis to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

315. By reason of the above conduct, the Individual Defendants and/or Stellantis are liable pursuant to §20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: August 31, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
ERIC I. NIEHAUS (admitted *pro hac vice*)
JOSEPH J. TULL (admitted *pro hac vice*)
RACHEL C. BRABY (admitted *pro hac vice*)

s/ ERIC I. NIEHAUS
ERIC I. NIEHAUS

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
ericn@rgrdlaw.com
jtull@rgrdlaw.com
rbraby@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
drosenfeld@rgrdlaw.com

Lead Counsel for Lead Plaintiff